David F. Knobel
Crowley Fleck PLLP
P.O. Box 2529
Billings, MT 59103-2529
Email: dknobel@crowleyfleck.com
Tel: 406-252-3441

Jeff Rowes*
Christen Hebert*
Institute for Justice
816 Congress Ave., Ste 970
Austin, TX 78701
*pro hac vice forthcoming

Attorneys for Plaintiff Flathead Warming Center

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD WARMING CENTER, | Case No. _____ |
| Plaintiff, | |
| vs. | VERIFIED COMPLAINT |
| CITY OF KALISPELL, | |
| Defendant. | |

## INTRODUCTION

1.    This civil-rights lawsuit seeks to vindicate the rights of Plaintiff Flathead Warming Center under the United States and

1

Montana Constitutions. The Warming Center is a 501(c)(3) nonprofit that provides seasonal emergency shelter to the homeless at its clean, well-organized building in Kalispell, Montana. On September 16, 2024, the Kalispell City Council revoked the Warming Center's conditional-use permit by a 6-3 legislative vote, thereby destroying the shelter's ability to carry out its important work. The City took this extreme action despite never issuing the Warming Center even one citation for violating its conditional-use permit or any Kalispell ordinance. Instead, the City extinguished the Warming Center's important property rights and liberty interests based on unsworn statements in City Council meetings about unidentified private citizens, over whom the Warming Center has no control, allegedly engaging in wrongdoing off Warming Center property. The City's elimination of the Warming Center's rights without anything resembling judicial process violates the Warming Center's federal and state rights to procedural due process, equal protection, substantive due process, and protection from bills of attainder. Alternatively, in the unlikely event that the City's actions were lawful, the revocation of the Warming Center's permit is a taking under the Fifth Amendment, and the Warming Center is entitled to just compensation.

## JURISDICTION AND VENUE

2.     Plaintiff Flathead Warming Center is suing under Article I, Section 10 of the United States Constitution and its Fourteenth Amendment; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. § 2201; Article II of the Montana Constitution; and the Montana Uniform Declaratory Judgments Act, Mont. Code Ann. § 27-8-202.

3.     This Court has federal-question jurisdiction, 28 U.S.C. § 1331, civil-rights jurisdiction, 28 U.S.C. § 1343, and supplemental jurisdiction over the state constitutional claims, 28 U.S.C. § 1367.

4.     Venue lies in this Court under 28 U.S.C. § 1391(c)(2) because the events giving rise to this action occurred in Kalispell, Montana.

## PARTIES

5.     Plaintiff Flathead Warming Center is a Montana Non-Profit Corporation and IRS-recognized 501(c)(3) organization. Ex. 1 (Horn Aff.) ¶ 5. It is in good standing. *Id.* Its principal address is 889 Meridian Road, Kalispell, Montana. *Id.*

6. Defendant City of Kalispell is a municipality in and organized under the laws of the State of Montana.

## FACTUAL ALLEGATIONS

**The Warming Center provides guests with emergency shelter during Montana's life-threatening winter nights.**

7. The Flathead Warming Center is an emergency shelter in Kalispell, Montana. *Id.* ¶¶ 12–13.

8. During the 2018 Christmas season, the Warming Center's co-founders Tonya Horn and Luke Heffernan recognized an unmet need in the Flathead valley community. Ex. 1 (Horn Aff.) ¶¶ 6–9; Ex. 2 (Heffernan Aff.) ¶¶ 1–2. During Montana's harsh winters, there were not enough emergency beds for the homeless. *Id.* Individuals facing homelessness spent winter nights in vehicles, under bridges, in parks, behind businesses, in make-shift shelters, or, if they were lucky, in the lobby of the police station—even though that created a lot of logistical problems for the police and their operations. Ex. 1 (Horn Aff.) ¶ 8; Ex. 2 (Heffernan Aff.) ¶ 2; Ex. 3 (Ball Aff.) ¶ 16. Tonya and Luke resolved to make a warming center a reality. Ex. 1 (Horn Aff.) ¶¶ 9–11; Ex. 2 (Heffernan Aff.) ¶ 3.

9.      Warming centers only provide shelter when the weather is dangerously cold. Ex. 1 (Horn Aff.) ¶ 10. A warming center's main purpose is to prevent injury, like hypothermia or frostbite, or death from exposure to the elements. *Id.*

10.      Average monthly low temperatures in Kalispell, Montana during the Warming Center's October–April sleeping season are below freezing:

     a.  October: 29 degrees.

     b.  November: 24 degrees.

     c.  December: 16 degrees.

     d.  January: 16 degrees.

     e.  February: 18 degrees.

     f.  March: 25 degrees.

     g.  April: 31 degrees.[1]

---

[1] *Climate Kalispell – Montana,* U.S. Climate Data, https://www.usclimatedata.com/climate/ kalispell/montana/united-states/usmt0188 (last visited Oct. 4, 2024).

11.    Temperatures can and do regularly plunge well below average. The coldest day of 2024 so far was minus 33 degrees; minus 14 in 2023; minus 34 degrees in 2022; and minus 14 in 2021.[2]

12.    Tonya and Luke were successful in starting an emergency shelter. On December 23, 2019, the Flathead Warming Center first offered shelter at Christ Church Episcopal with Tonya serving as the Center's Executive Director and Luke as Chair of the Board of Directors. Ex. 1 (Horn Aff.) ¶¶ 12–14; Ex. 2 (Heffernan Aff.) ¶ 4.

13.    The Warming Center is low barrier. Ex. 1 (Horn Aff.) ¶¶ 15–19. No identification is required. *Id.* Pets are welcome. *Id.* It doesn't conduct background checks or drug tests. *Id.* Sobriety is not a requirement. *Id.* The mission is to get people out of the cold, save lives, and restore dignity. Ex. 1 (Horn Aff.) ¶ 13; Ex. 2 (Heffernan Aff.) ¶ 5.

14.    The Warming Center refers to the people it shelters as "guests." Ex. 1 (Horn Aff.) ¶ 20. The word choice is deliberate. *Id.* The Warming Center sees itself as *inviting* community members to come into

---

[2] Daily Minimum Temperatures in Kalispell, MT, Nat'l Weather Serv., https://www.weather.gov/wrh/Climate?wfo=mso (select "Kalispell Glacier, MT"; then select "Calendar day summaries"; then select 2024-2024, "Min temp", and "Daily Minimum"; and then click "Go"). This can be repeated for 2023, 2022, and 2021.

the center from the cold. *Id.* And, as guests, the people spending the night are expected to behave in a respectful manner. *Id.*

15.   As it was getting started, the Warming Center's leadership searched for a permanent location, but they knew that search might take a while. And they wanted just the right property. Ex. 1 (Horn Aff.) ¶ 21; Ex. 2 (Heffernan Aff.) ¶ 6.

16.   When it opened in 2019, the Warming Center operated out of the basement of Christ Church Episcopal, offering only 20 beds and restroom facilities, but no showers or laundry. Ex. 1 (Horn Aff.) ¶ 14; Ex. 2 (Heffernan Aff.) ¶ 7.

17.   Almost nightly, the Warming Center had to turn people away because of its limited capacity, but the Warming Center knew it needed to act immediately to save lives even if that meant operating with less-than-ideal capacity and limited services. Ex. 1 (Horn Aff.) ¶ 22; Ex. 2 (Heffernan Aff.) ¶ 8.

18.   For almost two years, the Warming Center's leadership searched for the right property. Ex. 1 (Horn Aff.) ¶ 23; Ex. 2 (Heffernan Aff.) ¶ 9.

19.    In the summer of 2020, the Warming Center put in an offer for a property on Second Street, but that was rejected. Ex. 1 (Horn Aff.) ¶ 30; Ex. 2 (Heffernan Aff.) ¶ 10.

**Tonya relies on advice and direction from the City's Planning Department staff in navigating the City's zoning requirements.**

20.    As the Warming Center was exploring locations for its permanent home, Tonya worked with the City's Planning Department to learn what the Warming Center would need to do to obtain the necessary zoning approvals and right to operate. Ex. 1 (Horn Aff.) ¶ 24.

21.    Tonya has a background in social work and has twenty plus years of working with individuals who struggle with severe and disabling mental illness. *Id.* ¶ 2. Tonya previously worked for a warming center in Bozeman before moving back to Kalispell following a few years away. *Id.* ¶ 3.

22.    Although Tonya had experience working with the homeless, Tonya had no experience in navigating zoning ordinances or applying for permits. *Id.* ¶ 25. She relied on the guidance and direction of the City's Planning Department staff. *Id.*

23.    The City's Planning Department staff informed Tonya that, for several of the properties that the Warming Center was considering,

8

two things would be required. *Id.* ¶ 26. First, the City's zoning ordinance would need to be amended to include "homeless shelter" as a permitted use in the zoning district where the property is located. *Id.* Second, a conditional-use permit would be necessary for the specific property. *Id.*

24.    When Tonya asked Planning Department staff in writing if the Warming Center needed legal counsel to complete the materials to obtain zoning approvals, a Planning Department staff member responded in writing that "[y]ou do not need legal council [sic] to fill out the application, but it will need to be complete. We can help you out with that." Ex. 1 (Horn Aff.) ¶ 28; Ex. 4 (2020.08.07 Horn-Nygren Emails).

25.    Even though the Warming Center was still working on finding the right property, Tonya began working with the Planning Department to draft the documents needed to obtain a CUP. Ex. 1 (Horn Aff.) ¶ 29.

26.    While the offer on the Second Street property was pending, Tonya submitted a draft petition for a zoning ordinance amendment and a CUP application. *Id.* ¶ 30. When that Second Street offer was rejected, the Warming Center withdrew both the petition and the CUP application. *Id.*

27.     Tonya sought feedback from Planning Department staff on her zoning ordinance amendment petition and her CUP application, so she could improve the Warming Center's submission when it applied again. Ex. 1 (Horn Aff.) ¶ 32; Ex. 5 (2020.08.17 Horn-Sorensen Emails).

28.     In response, Planning Department staff advised Tonya that "something simple is the better option" for the petition for a zoning ordinance amendment. Ex. 1 (Horn Aff.) ¶ 33; Ex. 5 (2020.08.17 Horn-Sorensen Emails).

29.     For the CUP application, Planning Department staff advised Tonya to include "additional information" such as "[m]ore detail on day-to-day operations, rules, etc[.]" Ex. 1 (Horn Aff.) ¶ 34; Ex. 5 (2020.08.17 Horn-Sorensen Emails).

**The Warming Center agreed to buy a commercial property if it could secure the right to operate a shelter on that property.**

30.     In August 2020, the Warming Center's leadership finally found what they thought would be a good permanent home for the Center: 889 North Meridian Road, Kalispell MT 59901. Ex. 1 (Horn Aff.) ¶ 35; Ex. 2 (Heffernan Aff.) ¶ 11.

31.     The Warming Center's leadership believed that 889 North Meridian would be a good location for an emergency shelter for a host of reasons:

a. The property was composed of three different tracts that would provide enough parking and space to grow.

b. The property was on a well-established and large public street, allowing volunteers and guests to easily access the center.

c. The property's central location in Kalispell would make getting to the center accessible for both volunteers and guests.

d. The property was located in a business district rather than a residential district.

e. Non-residential properties surround the property on all sides.

f. The back of the property is bordered by a large grassy, undeveloped lot that Flathead County Fairgrounds uses as a parking lot.

g. The property is located within walking distances of numerous community service providers including a hospital, a foodbank, a grocery store, a post office, and an addiction recovery center.

Ex. 1 (Horn Aff.) ¶ 36; Ex. 2 (Heffernan Aff.) ¶ 12.

32.     At the time, 889 North Meridian was a vacant property that had previously been a car mechanic shop. Ex. 1 (Horn Aff.) ¶ 37; Ex. 2 (Heffernan Aff.) ¶ 13.

33.    On August 19, 2020, the Warming Center contracted to buy 889 North Meridian, but the sale was expressly contingent on the Warming Center securing a CUP granting the Warming Center the right to operate a homeless shelter at 889 North Meridian. Ex. 1 (Horn Aff.) ¶ 38; Ex. 2 (Heffernan Aff.) ¶ 14; Ex. 6 (2020.08.19 Buy-Sell Agreement).

34.    The Warming Center would not have bought 889 North Meridian if it had not obtained the CUP giving it the right to operate a shelter on the property. Ex. 1 (Horn Aff.) ¶ 39; Ex. 2 (Heffernan Aff.) ¶ 15.

### The Warming Center obtained the right to operate an emergency shelter on 889 North Meridian.

35.    Once the Warming Center had 889 North Meridian under contract, Tonya worked with the Planning Department staff to revise the zoning petition to ask for an amendment to the B-1 Neighborhood Business district to add "homeless shelter" as a use permitted with a CUP. Ex. 1 (Horn Aff.) ¶ 40.

36.    The B-1 zone is designated "Neighborhood Business," a district for certain commercial and professional services in areas adjacent to residential zones. Kalispell, Mont., Code § 27.12.010. Uses such as barber and beauty shops, churches, fairgrounds, laundromats, offices, police and fire stations, restaurants, retail, and safe houses are

authorized as of right. *Id.* § 27.12.020. Uses such as bars, taverns, clubs, wineries, community centers, and group homes require a CUP to commence. *Id.* § 27.12.030.

37.    Even before the Warming Center proposed an amendment, homeless shelters were permitted after obtaining a CUP in other types of zones: RA-1 (Residential Apartment), RA-2 (Residential Apartment/Office), H-1 (Health Care), B-2 (General Business), B-3 (Core Area-Business), B-4 (Central Business), and B-5 (Industrial Business). Kalispell, Mont., Code ch. 27.

38.    On September 4, 2020, Tonya submitted a 14-page CUP application for a homeless shelter at 889 North Meridian to the Planning Department. Ex. 1 (Horn Aff.) ¶ 41; Ex. 7 (CUP Application).

39.    The first two pages of the September 4, 2020 CUP application were a standard form the Planning Department uses. Ex. 7 (CUP Application) at 1–2.

40.    On that standard form was the following statement, under which Tonya signed her name as the applicant:

> I hereby certify under penalty of perjury and the laws of the State of Montana that the information submitted herein, on all other submitted forms, documents, plans or any other information submitted as a part of this application, to be true, complete, and

13

accurate to the best of my knowledge. Should any information or representation submitted in connection with this application be incorrect or untrue, I understand that any approval based thereon may be rescinded, and other appropriate action taken. The signing of this application signifies approval for the Kalispell Planning staff to be present on the property for routine monitoring and inspection during the approval and development process.

*Id.* at 2.

41.     The remaining 12 pages of the September 4, 2020 CUP application include an attachment where the Warming Center addressed the required topics for a CUP application; provided additional information about the Warming Center's operations as advised by Planning Department staff; and included a sketch of the proposed exterior, a property survey, the expected internal floor plan, and a Warming Center newsletter. *Id.* at 3–14.

42.     On October 7, 2020, the Planning Department issued Staff Report # KZTA-20-01 that "recommends that the Kalispell City Planning Board adopt the finding in staff report KZTA-20-01 and recommend to the Kalispell City Council that the proposed amendment be adopted[.]" Ex. 8 (Staff Report # KZTA-20-01) at 4. In that Staff Report # KZTA-20-01, planning staff:

- stated that "[h]omelessness in Kalispell, as throughout the county, is a significant issue";

14

- concluded that the proposed amendment was consistent with the City's growth policy and its goal to encourage "housing types that provide housing for all sectors and income levels within the community";

- concluded that allowing homeless shelters in more commercially zones areas would provide access to "streets and sidewalks as well as proximity to public transportation";

- asserted that "[h]omelessness is an issue that exists in the city with or without this text amendment" and that shelters "reduce the community cost of unsheltered homelessness."

*Id.* at 2–3.

43.   On October 7, 2020, the Kalispell Planning Department issued a second report, Staff Report # KCU-20-05, "recommend[ing] that the Kalispell Planning Board adopt staff report #KCU-20-05 as findings of fact and recommend to the Kalispell City Council that the conditional use permit be approved subject to" nine enumerated conditions. Ex. 9 (Staff Report # KCU-20-05) at 7.

44.   Planning Department staff examined each of six enumerated "review criteria" in Zoning Ordinance § 27.33.080(2) and found that each of the six criteria favored granting the CUP. *Id.* at 4–7.

45.   Planning Department staff did not identify a single review criterion—or any sub-criterion within each review criterion—that did not favor granting the CUP. *Id.*

15

46.     Planning Department staff concluded that all five sub-criteria of the "Neighborhood impacts" criterion of Zoning Ordinance § 27.33.080(2)(d) favored granting the Warming Center the CUP:

    a. "Traffic: There is minimal impact on traffic in connection with the proposed use. They expect a few vehicles from people seeking shelter. Eagle Transit and church vans will provide service as well, which would tend to minimize traffic impacts."

    b. "Noise and Vibration: The primary use will occur inside the building. Outdoor use is limited to monitored breaks in the courtyard. As a supervised facility, noise should be kept to a minimum."

    c. "Dust, Glare, and Heat: The use of the property would not generate any unreasonable dust, glare, and heat."

    d. "Smoke, Fumes, Gas, or Odors: The use of the property will create minimal additional smoke, fumes, gas and odors."

    e. "Hours of Operation: The Center intends to operate from 7:00 pm to 7:00 am during the coldest months of the year, generally from October through April."

*Id.* at 7.

47.     In evaluating the "effects on property values" criterion in Zoning Ordinance § 27.33.080(f), Planning Department staff found that "[n]o significant impacts on property values are anticipated as a result of the requested conditional use of the property." *Id.*

48.     On October 13, 2020, the Kalispell Planning Board and Zoning Board held a public meeting at which it considered both the

16

Warming Center's petition for a zoning amendment and the application for a CUP. It examined Staff Report # KCU-20-01 and Staff Report # KCU-20-05, heard public comments, discussed the requests, and asked Planning Department staff questions. The Board unanimously voted to (1) adopt both reports and (2) recommend adopting the zoning amendment and granting the CUP to the Kalispell City Council. Ex. 10 (2020.10.13 Planning Board Minutes) at 2–5.

49.     During the public comment portion of the Planning Board's consideration of the zoning amendment, ten people spoke, six in favor and four against. *Id.* at 2–3.

50.     During the public comment portion of the Planning Board's consideration of the CUP application, thirteen people spoke, twelve in favor and one against. *Id.* at 3–4.

51.     On November 2, 2020, Planning Department staff submitted a report to the City Manager recommending that the City Council approve the first reading of Ordinance 1851, an ordinance to amend the Zoning Ordinance to add homeless shelters as a use which may be permitted by conditional use permit (Ordinance 1851). Ex. 11 (2020.11.02 Planning Board Submission Zoning Amendment). That report included

all of the Planning Board's materials on the zoning amendment from the October 13th meeting. *Id.*

52.    The Kalispell City Council, at their meeting on November 2, 2020, approved the first reading of Ordinance 1851 unanimously. Ex. 12 (2020.11.02 City Council Minutes) at 6.

53.    At the November 2, 2020 City Council meeting, seven people spoke about the zoning amendment, six for and one against. Ex. 12 (2020.11.02 City Council Minutes) at 5.

54.    On November 2, 2020, Planning Department staff also submitted a report to the City Manager recommending that the City Council approve the Warming Center's request for a conditional use permit to use 889 North Meridian for a homeless shelter with nine conditions. Ex 13 (2020.11.02 Planning Board Submission CUP Application). That report included all of the Planning Board's materials on the Warming Center's CUP application from the October 13th meeting. *Id.*

55.    At the November 2, 2020 City Council meeting, nine people spoke about the CUP application, eight for and one expressing concerns. Ex. 12 (2020.11.02 City Council Minutes) at 6–8.

56.     The single public comment raising concerns with granting the Warming Center the CUP expressed "concerns with safety, sanitation and loitering issues" and "requested Council put in a condition to be able to revoke the conditional use permit if problems arise." Ex. 12 (2020.11.02 City Council Minutes) at 7.

57.     Following public comment, the City Council, at their meeting on November 2, 2020, unanimously voted to grant the Warming Center the conditional use permit. *Id.* at 9.

58.     On November 2, 2020, Kalispell Mayor Mark Johnson signed the Warming Center's CUP. Ex. 14 (Warming Center CUP).

59.     The CUP states that the "City Council of the City of Kalispell, pursuant to the Kalispell Zoning Ordinance, hereby adopts Kalispell Planning Department Conditional Use Report #KCU-20-05 as the Council's findings of fact." *Id.* at 1.

60.     The CUP has nine conditions, which were the same conditions recommended by the Planning Department Staff:

> 1.     That commencement of the approved activity must begin within 18 months from the date of authorization or that a continuous good faith effort is made to bring the project to completion.

2.    The conditional use permit is not valid until the B-1 zoning text amendment allowing homeless shelters as a conditionally permitted use becomes effective under statutory timelines 30 days from approval of the zoning amendment on second reading.

3.    That the development of the site shall be in substantial conformance with the submitted application and architectural/site plan drawings.

4.    Prior to occupancy, the applicant shall apply for a building permit through the City of Kalispell Building Department to review the proposed improvements and change of use.

5.    Architectural renderings are required to be submitted to the Kalispell Architectural Review Committee for review and approval prior to issuance of a building permit for any work which significantly changes the exterior appearance of the building.

6.    To ensure the traffic flow and access comply with Kalispell Design and Construction Standards, as well as compliance with other site development standards, the development shall receive Site Review Committee approval prior to issuance of the building permit.

7.    A minimum of one paved parking space per five occupants shall be provided. The specific design shall be submitted for review and approval in conjunction with building permit and site review prior to occupancy of the building.

8.    The existing sidewalk along North Meridian Road shall be extended to define the parking lot access and reduce the driveway to 24 feet, along with a five-foot landscape buffer adjacent to the sidewalk. The sidewalk should be continued through the approach in a manner designed to meet City of Kalispell Standards for Design and Construction.

9.    The number of occupants shall be limited to no more than 40 people. Increases to the occupancy may be applied for and would go through either the conditional use permit or administrative conditional use permit process. The review would be based on an analysis of the increased impacts.

*Id.* at 1–2.

61.    Although a member of the public asked the City Council to put a condition in the Warming Center's CUP about revoking the permit if problems arose, the City Council declined to do so. Ex. 12 (2020.11.02 City Council Minutes) at 8–9.

62.    During both the October 13, 2020 Kalispell Planning Board and Zoning Board meeting and the November 2, 2020 City Council meeting, public comments repeatedly confirmed that homeless individuals frequented the area surrounding the Warming Center's proposed location. Ex. 10 (2020.10.13 Planning Board Minutes); Ex. 12 (2020.11.02 City Council Minutes) at 5, 7.

63.    Several members of the public noted that the Flathead County Fairgrounds drew homeless individuals looking for a place to camp or a building to sleep in. Ex. 10 (2020.10.13 Planning Board Minutes); Ex. 16 (11.02.2020 Video) at 1:12:30.[3]

---

[3]  For the Court's convenience, the 11.02.2020 Video is available at https://tinyurl.com/54mrw8pd.

64.    Homeless individuals did indeed use the Flathead County Fairgrounds for shelter before the Warming Center considered the area. They continue to do so today. Ex. 1 (Horn Aff.) ¶ 117; Ex. 3 (Ball Aff.) ¶ 16.

65.    During the November 2, 2020 City Council meeting, two City Council members themselves remarked how the area around 889 North Meridian was already experiencing issues because of the presence of a significant homeless population, who often looked for a warm place to sleep at the neighboring fairgrounds. Ex. 16 (11.02.2020 Video at 53:17, 1:29:05).

66.    The City Council put the second reading of Ordinance 1851 on its consent agenda for the November 16, 2020 meeting. The consent agenda passed unanimously. Ex. 17 (2020.11.16 City Council Minutes) at 2.

67.    Thirty days later, on or about December 16, 2020, Ordinance 1851 took effect, and the Zoning Ordinance was amended to permit "homeless shelters" in the B-1 zone with a conditional use permit. Ex. 18 (Ordinance 1851).

**The Warming Center opened its doors at 889 North Meridian.**

68.   On December 17, 2020, the day after Ordinance 1851 took effect amending the zoning ordinance to allow homeless shelters in the B-1 district with a CUP, the Warming Center closed on its purchase of 889 North Meridian. Ex. 1 (Horn Aff.) ¶ 43; Ex. 19 (Realty Transfer Certificate).

69.   To cover the cost of purchasing and renovating 889 North Merdian, community members raised over $750,000 in donations. Ex. 1 (Horn Aff.) ¶ 44; Ex. 2 (Heffernan Aff.) ¶ 19.

70.   After closing, there was still a considerable amount of work for the Warming Center to do to transform 889 North Meridian into an emergency shelter, but both Warming Center leadership and City officials recognized that there was a desperate need for the Warming Center's services immediately. Ex. 1 (Horn Aff.) ¶¶ 45–47.

71.   With temperatures well below freezing and significant numbers of homeless individuals sleeping outdoors, City officials agreed to allow the Warming Center to open in December 2020. Ex. 1 (Horn Aff.) ¶¶ 45–47; Ex. 2 (Heffernan Aff.) ¶ 16. Indeed, a city official even suggested that the Warming Center install port-a-potties inside the

building so it would have required number of bathrooms while renovations were ongoing. Ex. 1 (Horn Aff.) ¶ 47; Ex. 2 (Heffernan Aff.) ¶ 16.

72.     For the winter of 2020, the City's Building Department issued the Warming Center a temporary certificate of occupancy. Ex. 1 (Horn Aff.) ¶ 48; Ex. 2 (Heffernan Aff.) ¶ 17.

73.     During the winter of 2020–21, the Warming Center sheltered 207 unique individuals. Ex. 1 (Horn Aff.) ¶ 49.

74.     Over the next several months, the Warming Center worked diligently to secure all the required site plan approvals and renovate 889 North Meridian. Ex. 1 (Horn Aff.) ¶ 51; Ex. 2 (Heffernan Aff.) ¶ 19.

75.     In the year following the purchase of 889 North Meridian, all site plans required by both the CUP and City ordinances were submitted and approved. Ex. 1 (Horn Aff.) ¶52; Ex. 2 (Heffernan Aff.) ¶ 20.

76.     As the winter of 2021 was approaching, the Warming Center had completed many but not all planned renovations for 889 North Meridian. Ex. 1 (Horn Aff.) ¶ 52; Ex. 2 (Heffernan Aff.) ¶ 24–25. In recognition that the outstanding items, such as exterior landscaping, would not prevent the Warming Center from serving a critical need, the

City issued the Warming Center a second temporary certificate of occupancy. Ex. 1 (Horn Aff.) ¶ 53; Ex. 2 (Heffernan Aff.) ¶ 21.

77.   On October 16, 2021, the Warming Center hosted the grand opening of its mostly completed space at 889 North Meridian. Ex. 1 (Horn Aff.) ¶ 54; Ex. 2 (Heffernan Aff.) ¶ 22. Even though the Warming Center had been operating out of 889 North Meridian since December 2020, the Warming Center wanted to thank the community and showcase the facility now that most improvements had been completed. *Id.*

78.   The grand opening was well attended by the community and the Warming Center's supporters. Ex. 1 (Horn Aff.) ¶ 55; Ex. 2 (Heffernan Aff.) ¶ 23. Several members of City leadership attended, including City Council members Chad Graham, Ryan Hunter, and Sid Daoud as well as City Manager Doug Russell. *Id.*

79.   During the next few months, the winter of 2021–22, the Warming Center sheltered 349 unique individuals. Ex. 1 (Horn Aff.) ¶ 56.

80.   Even though the Warming Center spent considerable time and money converting the mechanic shop at 889 North Meridian into an emergency shelter, the resulting shelter is not luxurious. Ex. 1 (Horn Aff.) ¶ 57. It is a simple, clean facility that makes use of every square

inch of space to serve its guests. *Id.* The converted car bay of the mechanic shop is now the 50-bed bunk room (40 beds at opening). *Id.* Sturdy but basic bunk beds with plastic mattresses approximately three inches thick stand in a few rows in the large room. *Id.* The remainder of the Warming Center (what was likely the office area of the former mechanic shop) features showers, laundry machines, restrooms, small lockers, two computers, a fridge, and a microwave. *Id.*

81. The Warming Center only offers a place to sleep at night from October through April, but it offers showers and laundry year-round during limited hours a few days a week. *Id.* ¶ 58.

**In 2022, the Warming Center obtained the right to increase its capacity without any objection from the City or its neighbors.**

82. On August 2, 2022, the Warming Center applied for an administrative conditional use permit (ACUP) to increase the capacity of the shelter from 40 beds to 50 beds. Ex. 1 (Horn Aff.) ¶ 59; Ex. 20 (ACUP Application). Tonya completed the application on behalf of the Warming Center. *Id.*

83. Because the Warming Center sought a capacity expansion of its existing CUP, it was required to apply for an ACUP via an application to the Zoning Administrator. Kalispell, Mont., Code § 27.33.040(1)–(2).

84.    To account for the additional capacity sought, the Warming Center proposed converting several single beds to bunk beds and adding two parking spaces. Ex. 20 (ACUP Application).

85.    In the application, Tonya stated that "[w]e have provided communication to our neighbors regularly and have been responsive to their questions and concerns. We have explained our application to our immediate neighbors and are offering an Open House for our immediate neighbors on August 11, 2022 from 5pm - 7pm (come and go.)" *Id.* at 3.

86.    No one attended the open house to discuss updates about the Warming Center or learn about or comment on the ACUP application. Ex. 1 (Horn Aff.) ¶ 60.

87.    Kalispell, Mont., Code § 27.33.040 requires the Zoning Administrator to mail notice of an ACUP application to "all property owners within 150 feet of the subject property providing at least 15 days for formal comment."

88.    Planning Department staff notified all property owners within 150 feet, and that required waiting period for comments ended on August 31, 2022. *See* Ex. 21 (2022.09.02 Emails Horn-Barnhart) at 6.

Planning Department staff received no public comments on the Warming Center's ACUP application. *Id.* at 3.

89.    Because there were no public comments on the Warming Center's ACUP application, Planning Department staff, as the Zoning Administrator, had authority to make a decision on the ACUP application. Kalispell, Mont., Code § 27.33.040(4).

90.    If the Zoning Administrator had received a public comment and "the comment is of substance and cannot be mitigated," then the Zoning Administrator had to follow the procedures for an application for a full CUP, which would have required the City Council to decide whether to grant the ACUP. Kalispell, Mont., Code § 27.33.40(5).

91.    On September 1, 2022, the City granted the Warming Center the ACUP subject to three conditions:

(1)    The property shall be developed in accordance with the submitted plans.

(2)    Prior to the occupancy of the 10 additional beds, all conditions and site improvements must be completed as per the original Conditional Use Permit approved November 2, 2020, and original building permit approved in April of 2021.

(3)    This permit shall be valid for a period of eighteen (18) months after which time it shall terminate if commencement of the authorized activity has not begun.

Ex. 22 (ACUP) at 1.

92.    Planning Department staff explained that the Warming Center could not use the additional ten beds if it did not complete all the remaining work and obtain a certificate of occupancy. Ex. 1 (Horn Aff.) ¶ 63; Ex. 23 (2022.10.12 Emails Horn-Nygren).

93.    If the remaining work was not completed, then the Planning Department staff would issue another temporary certificate to allow the Warming Center to operate for the 2022–23 winter season—just without the additional ten beds. Ex. 1 (Horn Aff.) ¶ 63; Ex. 23 (2022.10.12 Emails Horn-Nygren) at 2–3.

**The Warming Center satisfied all conditions of both of its CUPs.**

94.    While providing shelter and other services, the Warming Center continued to make progress on the conditions of its CUP, ACUP, the Zoning Ordinance, and other City requirements. Ex. 1 (Horn Aff.) ¶ 64; Ex. 2 (Heffernan Aff.) ¶ 24.

95.    In the fall of 2022, there were only a few outstanding issues:

    a. A handicapped accessible ingress/egress;

    b. Sidewalk improvements;

    c. Parking lot and related site improvements;

    d. Fire damper installation; and

    e. Installation of courtyard fencing.

Ex. 23 (2022.10.12 Emails Horn-Nygren) at 5.

96.    Most of these items were outstanding simply because the Warming Center had been unable to secure contractors to do the sidewalk and parking lot improvements. Ex. 2 (Heffernan Aff.) ¶ 25; Ex. 24 (2022.10.11 Emails Heffernan-Nygren). Because the parking lot and sidewalk had not been completed, the Warming Center was unable to install a permanent handicapped accessible ingress/egress, complete the courtyard fencing (it had installed portions of that fencing that did not have asphalt), or complete the landscaping. *Id.*

97.    Additionally, the Warming Center had installed fire dampers, but the contractor installed the dampers incorrectly. The Warming Center had the fire dampers repaired at the first opportunity. Ex. 2 (Heffernan Aff.) ¶ 26; Ex. 23 (2022.10.12 Emails Horn-Nygren) at 2–3.

98.    It was all hands on deck during the fall of 2022 as the Warming Center sought to complete all the requirements to obtain both the ability to use the additional ten beds and a certificate of occupancy. For example, Luke, the Warming Center's Board Chairman, personally called and met with numerous contracting companies to get the work completed. Ex. 2 (Heffernan Aff.) ¶ 27; Ex. 24 (2020.10.11 Emails

Heffernan-Nygren). Warming Center guests also contributed, helping with some of the exterior work. Ex. 1 (Horn Aff.) ¶ 66.

99.   In November 2022, Planning Department staff determined that the Warming Center had complied with the conditions of the ACUP and therefore the CUP. Ex. 1 (Horn Aff.) ¶ 67; Ex. 25 (2022.11.03 Emails Horn-Nygren). The Planning Department staff therefore authorized the Warming Center to use the additional ten beds that were the subject of the ACUP. Ex. 1 (Horn Aff.) ¶ 67; Ex. 25 (2022.11.03 Emails Horn-Nygren).

100.   The Warming Center subsequently received a certificate of occupancy. Ex. 2 (Heffernan Aff.) ¶ 29; Ex. 26 (Occupancy Certificate).

101.   In 2023–24, the shelter was open for overnight shelter for 205 nights. Ex. 1 (Horn Aff.) ¶ 68. Its 50 beds sheltered 324 unique individuals, many suffering sudden economic emergencies. *Id.* It provided 3,000 showers, ran almost 1,000 loads of laundry, and offered hundreds of hours of access to social services. Its volunteers donated almost 3,000 hours. *Id.*

**The Warming Center took its commitment to be a good neighbor seriously and planted its roots at 889 North Meridian.**

102.  Even though the Warming Center is low barrier, it is not low standards. Ex. 1 (Horn Aff.) ¶ 69; Ex. 29 (Aemisegger Aff.) ¶ 6. It has strict rules. *Id.*

103.  Among those rules, once a guest checks in for the night, they will not be readmitted if they leave before morning. *Id.* Guests using the Warming Center with any regularity must meet with staff weekly to discuss a personalized roadmap to getting out of homelessness. *Id.* Alcohol, drugs, violence, and antisocial behavior are not tolerated on property. *Id.*

104. A guest must sign an occupancy agreement listing the Warming Center's rules each time they visit the shelter, no matter how many times they have visited before. Ex. 1 (Horn Aff.) ¶ 70*;* Ex. 27 (Occupancy Agreement). If a guest fails to follow the rules, then they will be asked to leave the shelter and will not be allowed to return for 7 nights, 30 nights, or the rest of the winter season depending on the severity of the violation. *Id.*

105.  If a guest is asked to leave, they are designated NRS—no return status. The Warming Shelter has applied NRS status to guests

many times and keeps records of this status to ensure that its rules are enforced. Ex. 1 (Horn Aff.) ¶ 71; Ex. 27 (Occupancy Agreement).

106.  Many of the Warming Center's rules are specifically focused on encouraging guests to be respectful to the neighborhood. Here are some examples:

      a. A guest may only be on the Warming Center's property when the center is open. No loitering is permitted.

      b. If a guest acts in either a poor or aggressive manner on neighboring properties, then that guest will lose their bed, potentially for the entire winter season.

      c. A guest must keep the neighborhood clean and not leave belongings or trash outside of the Warming Center or in the neighborhood more generally.

      d. If a guest is asked to leave and refuses, law enforcement will be called to ensure that the guest leaves the Warming Center and the surrounding neighborhood.

Ex. 1 (Horn Aff.) ¶ 72; Ex. 27 (Occupancy Agreement).

107. Even with these rules in place, the Warming Center recognized that there might still be issues that arose for neighbors concerning Warming Center guests. Ex. 1 (Horn Aff.) ¶ 73. To be responsive to these concerns, Tonya provided her personal cell phone number to the neighbors immediately surrounding the Warming Center's property. *Id.*

108.  Those property owners can and did call Tonya when issues occurred. Tonya always sought to listen and take action to address these concerns. *Id.* ¶ 74.

109.  Tonya, Warming Center staff, and the guests themselves ensured that the Warming Center's property remained trash free. *Id.* ¶ 75.

110.  During the winter of 2023, the Warming Center paid off the loan on 889 North Meridian. *Id.* ¶ 76. On February 3, 2023, the Warming Center received confirmation that its final payment had been processed. *Id.*; Ex. 28 (Final Payment Confirmation).

111.  The Warming Center paid off its loan for 889 Meridian because it believed that the property would be its permanent location to provide emergency shelter services. Ex. 1 (Horn Aff.) ¶ 77; Ex. 2 (Heffernan Aff.) ¶ 30.

**Montana experienced the nation's sharpest increase in homelessness and the Warming Center became a scapegoat for a complex problem.**

112.  Montana has reported the nation's sharpest increase in the rate of homelessness in recent years—a 551 percent increase between 2007 and 2023.[4]

113.  In recent years, Kalispell experienced significant changes that have exacerbated homelessness in the Flathead valley:

   a.  The U.S. Census Bureau registered a 26.54 percent growth in the Kalispell population between 2020 and 2024.[5]

   b.  From 2020 to 2023, Flathead County experienced the greatest population growth of any county in Montana.[6]

   c.  The non-seasonally adjusted unemployment rate for the Kalispell Micropolitan Statistical Area rose from 2.5 percent in September 2022 to 5 percent in January 2024.[7]

---

[4] Tanya de Sousa et al., The 2023 Annual Homelessness Assessment Report (AHAR) to Congress 82 (2023), https://www.huduser.gov/portal/sites/default/files/pdf/2023-AHAR-Part-1.pdf.

[5] *Kalispell, Montana Population*, World Population Review, https://worldpopulationreview.com/ us-cities/montana/kalispell (last visited Oct. 4, 2024).

[6] *Flathead's Brisk Growth Rate Shows Signs of Slowing*, Flathead Beacon (Mar. 26, 2024), https://flatheadbeacon.com/2024/03/26/flatheads-brisk-growth-rate-shows-signs-of-slowing/.

[7] *Unemployment Rate – Kalispell, MT Micropolitan Statistical Area*, USA Today, https://data.usatoday.com/unemployment/kalispell-mt-micropolitan-statistical-area/MC3028060000000/2022-september/ (last visited Oct. 4, 2024).

d.     The average rent in Kalispell rose from $883 in July 2022 to $1,455 in July 2024.[8]

114.   Much of the recent population growth is driven by an influx of telecommuting remote workers with white collar jobs.[9] The salaries these telecommuters bring with them explains the jump in rent.

115.   Recent years have also seen significant increases in mortgage rates,[10] making it harder to buy a home.

116.   The consumer inflation rate went from 1.2 percent in 2020 to 8 percent in 2022, making it harder to buy necessities like food.[11]

117.   Another likely factor that has increased homelessness in western Montana and the Kalispell area is a sharp reduction in resources for mental-health treatment. Ex. 29 (Aemisegger Aff.) ¶ 9. In March 2023, Sunburst Mental Health's Kalispell clinic closed abruptly. Ex. 29 (Aemisegger Aff.) ¶ 9; Ex. 1 (Horn Aff.) ¶ 79.

---

[8] *Kalispell, Montana Rental Market Trends*, Point2, https://www.point2homes.com/US/Average-Rent/MT/Kalispell.html (last visited Oct. 4, 2024).

[9] Arielle Rawlings, Mountain Town Migration 9 (2023), https://www.jchs.harvard.edu/sites/default/files/research/files/harvard_jchs_mountain_town_migration_rawlings_2023.pdf.

[10] Scott Horsley, *Mortgage rates just hit their highest since 2002*, Mont. Pub. Radio (Aug. 17, 2023), https://www.mtpr.org/2023-08-17/mortgage-rates-just-hit-their-highest-since-2002.

[11] *Consumer Price Index*, Federal Reserve Bank of Minneapolis, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913- (last visited Oct. 4, 2024).

118.  The year before, in 2022, the state's only psychiatric hospital, located in Warm Springs, lost its federal funding after failing to correct patient safety issues, which resulted in at least four preventable deaths.[12]

119.  Pre-pandemic, in 2017, the Montana legislature cut $200 million in state and matching federal dollars from the state public health budget. That all but eliminated community-based case management for people with severe, disabling mental illness and substance-use disorders.[13]

120.  For example, in 2021, Flathead County's five-bed in-patient crisis stabilization facility, the Glacier House, permanently closed due to funding and staffing shortages that developed in the wake of the public health budget cuts.[14]

121.  The deterioration in mental-health services has resulted in many profoundly mentally ill people living on the streets, people who lack

---

[12] Aaron Bolton, *The only psychiatric hospital in Montana is losing federal funding*, Nat'l Pub. Radio (Apr. 14, 2022), https://www.npr.org/2022/04/14/1092904504/the-only-psychiatric-hospital-in-montana-is-losing-federal-funding.

[13] Augusta McDonnell, *Montana lawmakers seek to fix damage to mental health care*, KTVQ (Apr. 20, 2023), https://www.ktvq.com/news/montana-news/montana-lawmakers-seek-to-fix-damage-to-mental-health-care-from-2017-budget-cuts#:~:text=In%202017%2C%20the%20Montana%20legislature,illness%20and%20substance%20use%20disorders.

[14] Maggie Dresser, *System in Neglect*, Flathead Beacon (Mar. 22, 2023), https://flatheadbeacon.com/2023/03/22/system-in-neglect/.

the ability to care for themselves and who might otherwise be involuntarily committed. Ex. 29 (Aemisegger Aff.) ¶ 10; Ex. 1 (Horn Aff.) ¶ 80.

122. Consistent with the trend that made Montana the national leader in increasing homelessness, Kalispell and the surrounding Flathead County have also seen a corresponding increase in the number of homeless people in recent years. Ex. 29 (Aemisegger Aff.) ¶ 11; Ex. 1 (Horn Aff.) ¶ 78.[15] The January 2022 point-in-time count recorded 319 homeless Kalispell residents, making Kalispell the city with the second largest homeless population in Montana. Ex. 1 (Horn Aff.) ¶ 81.

123. The increase in homelessness was a reason why the Warming Center was founded and a reality that City planning staff (and the City Council in adopting staff findings) acknowledged in recommending that the Warming Center's CUP be granted.

---

[15] *See also* Kate Heston, *Flathead Valley sees a lack of services for homeless individuals*, Daily Inter Lake (Nov. 5, 2023), https://dailyinterlake.com/news/2023/nov/05/flathead-valley-sees-a-lack-of-services-for-homeless-individuals-outside-of-kalispell/#:~:text=These%20results%20reveal%20a%20significant,largest%20concentration%20in%20the%20state (reporting a significant increase in homeless individuals in Kalispell between 2021 and 2022).

124. During the 2020 hearings on Ordinance 1851 and the Warming Center's CUP applications, it was well recognized that homeless individuals were already present in the area around 889 North Meridian. Even City Council members themselves recognized that reality in public comments on the Warming Center's CUP application—highlighting how homeless individuals sought shelter at the Flathead County Fairgrounds, the property next to the Warming Center's property.

125. The 2020 comments from the public and City Council members alike highlighted how the neighborhood surrounding the Warming Center's proposed location and the Kalispell community more generally struggled with issues associated with a homeless population: trash, loitering, and crime.

126. When the Warming Center operated temporarily in Christ Church Episcopal in the 2019–20 winter season, it was at capacity almost every night. Ex. 1 (Horn Aff.) ¶ 83.

127. When the Warming Center operated during its abbreviated 2020–21 season—offering shelter at Faith Lutheran Church for a month before opening its doors at 889 North Meridian in late December—it

served 207 unique individuals. *Id.* ¶ 84. When the Warming Center operated its first full season from October to April at 889 North Meridian during the 2021–22 winter, it served 349 unique individuals. *Id.*

128.  The sheer number of unique Kalispell residents that the Warming Center served in its first two years demonstrates that the Warming Center did not *create* homeless people in Kalispell. It served homeless people who were already there and whose numbers were growing as a result of socio-economic factors that were causing homelessness to increase throughout Montana at the highest rates in the nation.

129.  The City Council knew that homeless individuals would visit and travel to the Warming Center. Indeed, one of the reasons that the Planning Staff recommended that "homeless shelters" be added to the uses permitted in the B-1 zone was that the zone would offer streets, sidewalks, and proximity to public transportation. It was therefore expected that homeless people would be on the streets, sidewalks, and public transportation in the area.

130.  Instead of recognizing that the recent uptick in homelessness in Montana and the Flathead valley had complex causes rooted in real

demographic, economic, and mental-healthcare changes, local politicians opted for an explanation that was false, but which they hoped would be simple and politically popular: Blame the Warming Center.

131. Turning the Warming Center into a political football and vilifying the homeless as freeloading outsiders resulted in a wave of deadly violence against the homeless and the unjustified revocation of the Warming Center's CUP.

132. This vilification began when the Flathead County Commissioners published an open letter to Flathead County residents in January 2023. Ex. 30 (Commissioners' Letter); Ex. 1 (Horn Aff.) ¶ 85.

133. Highlighting a report that Kalispell had the second highest number of homeless in the state, the Commissioners' letter decried "a low barrier shelter [that] opened in our community," blaming the shelter for causing "a dramatic increase in homeless individuals." Ex. 30 (Commissioners' Letter). According to the letter, homelessness "is a lifestyle choice for some" and "these wanderers are well-networked and eager to share that Kalispell has 'services' to serve their lifestyle." *Id.*

134. The letter called on the community to "be unified in rejecting all things that empower the homeless lifestyle" and asked "our peers

serving on city councils not to permit or expand warming shelters that bring more of these homeless individuals to our community." *Id.*

135. The allegations of the Commissioners' letter are false. The Warming Center did not increase homelessness. Ex. 29 (Aemisegger Aff.) ¶ 5. Homelessness typically results from the compounding effect of things like mental health issues, illness, disability, and abuse—in addition to the lack of affordable housing and financial difficulties. Ex. 3 (Ball Aff.) ¶ 7; Ex. 29 (Aemisegger Aff.) ¶ 8.

136. It is false that the people using the Warming Center are "lifestyle" homeless who belong to a network of freeloading vagabonds who use cell phones to identify locations where they can get free services from locals. Ex. 1 (Horn Aff.) ¶ 87.

137. Most people facing homelessness in Kalispell are from the Kalispell area. Ex. 3 (Ball Aff.) ¶ 7; Ex. 1 (Horn Aff.) ¶ 88; Ex. 29 (Aemisegger Aff.) ¶ 4. The Warming Center is not aware of anyone who has come from outside the Flathead valley to the Warming Center for the specific purpose of wintering in Kalispell at the Warming Center. Ex. 1 (Horn Aff.) ¶ 88.

138.  The Commissioners' letter presented no evidence—and there is no evidence—that the Warming Center caused a "dramatic increase in homeless individuals" or any other attendant problems. *See* Ex. 30 (Commissioners' Letter).

139.  County residents understood the letter's comments about "a low barrier shelter [that] opened in our community" and "warming shelter[]" to be references to the Flathead Warming Center. Ex. 2 (Heffernan Aff.) ¶ 31; Ex. 29 (Aemisegger Aff.) ¶ 12; Ex. 1 (Horn Aff.) ¶ 86.

140.  Following the Commissioners' letter, violence against the homeless drastically grew in both frequency and severity. Ex. 1 (Horn Aff.) ¶ 89; Ex. 29 (Aemisegger Aff.) ¶ 13. And "homeless individuals in the vicinity of the Warming Center have been targeted for harassment and physical abuse." Ex. 31 (Johnson Aff.) ¶ 18.

141.  Several homeless individuals were beaten badly. Jennifer Ball, a social worker with the Kalispell office of the Montana State Public Defender, confirmed: In the summer of 2023 alone, "at least seven of the homeless individuals that I help were assaulted. Some had rocks thrown at them. Some were beaten with rocks and sticks." Ex. 3 (Ball Aff.) ¶ 34.

43

One of her clients was beaten so badly that "[h]is injuries were nearly fatal." *Id.* ¶ 35.

142.   Other homeless people report repeated harassment via things like being pelted with eggs, shot with paintball guns, threatened with hanging, and hurt by fireworks. Ex. 1 (Horn Aff.) ¶ 90; Ex. 29 (Aemisegger Aff.) ¶ 14.

143.   And then a member of the homeless community was killed. "In June 2023, Scott Bryan, a homeless individual in Kalispell, was beaten to death outside of a gas station." Ex. 3 (Ball Aff.) ¶ 36.[16] Several news outlets, including the New York Times,[17] covered the violence.

144.   That news coverage almost cost Jennifer Ball, the social worker with the Kalispell office of Montana State Public Defender, her life: "After Scott Bryan was killed, I spoke at his funeral. My speech was broadcast on local television. After the funeral, I began walking across the street in a crosswalk to attend a dinner at a nearby church. A truck

---

[16] Scott, a 60-year-old man battling cancer and a variety of other health conditions, had lived on and off the streets since 2021. *See* Ex. 1 (Horn Aff.) ¶ 91. Onlookers filmed his beating and circulated the video on social media before the cops even arrived. *Id.*; *see* Maggie Dresser, *In the Flathead Valley, the Homeless Crisis is at a Crossroads*, Flathead Beacon (Aug. 3, 2023), https://flatheadbeacon.com/2023/08/03/in-the-flathead-valley-the-homeless-crisis-is-at-a-crossroads/.
[17] Mike Baker, *A City's Campaign Against Homelessness Brings Stories of Violence*, N.Y. Times (Jan. 9, 2024), https://www.nytimes.com/2024/01/09/us/homelessness-violence-kalispell-montana.html.

drove at me, nearly striking me in front of several witnesses. It is my belief that the driver intended to injure or intimidate me because of my work with the homeless community." Ex. 3 (Ball Aff.) ¶ 37.

145.   Despite the unprecedented violence, the Commissioners never retreated their letter. Ex. 29 (Aemisegger Aff.) ¶ 15. Instead, they double down by driving the poor from public transportation. *Id.* After providing free transportation to homeless guests of the Warming Center for four years through the bus systems, the Commissioners changed the policy just before the Warming Center opened for the 2023–24 winter season: only individuals who had a smart phone with the required app that linked to a bank account or credit card could use the bus. *Id.* Since the vast majority of homeless individuals do not have either a bank account or credit card, they were excluded from public transportation. *Id.*

146.   But the Warming Center stood in the gap and paid for over 3,000 rides to and from the Warming Center for homeless individuals during the 2023–24 winter season. Ex. 29 (Aemisegger Aff.) ¶ 16.

147.   Inspired by the Commissioners' actions and their call to "reject[] all things that empower the homeless lifestyle[,]" the City

Council of Kalispell began its own efforts to drive the homeless out of town. Ex. 30 (Commissioners' Letter).[18]

148.   The City Council first passed three ordinances designed to limit the use of public parks by the homeless.[19] Then, the City made it a crime for motorists to give money or supplies to panhandlers.[20]

149.   A few months later, the City Manager announced that the City would install bars on benches to deter people from sleeping on them and cut off both electricity and water in a park where some homeless were seeking refuge.[21]

150.   The City also closed all the public restrooms in parks across the City. The only public restroom that remains open is in the Kalispell Library. Ex. 3 (Ball Aff.) ¶¶ 26–27.

---

[18] *See* Mike Kordenbrock, *Kalispell City Council Considers New Ordinances for Parks Amid Growing Homeless Presence*, Flathead Beacon (Jan. 25, 2023), https://flatheadbeacon.com/2023/01/25/kalispell-city-council-considers-new-ordinances-for-parks-amid-growing-homeless-presence/ (describing the City Council meeting to consider restrictions on homeless activity just a few days after the Commissioners' open letter).

[19] *See* Kalispell, Mont., Code § 19-37 (prohibiting any person from storing or maintaining "excessive personal property" on public property); *id.* § 19-38 (prohibiting any person from erecting tents or shelters in public parks); *id.* § 19-20(E) (prohibiting any person from using covered park structures for more than 150 minutes without a permit).

[20] *Id.* § 19-39(C)(3).

[21] *Kalispell city manager outlines plans to address homeless presence in parks*, Daily Inter Lake (June 7, 2023), https://dailyinterlake.com/news/2023/jun/07/kalispell-announce-plans-address-homeless-presence/.

### The City Council announced a "roadmap" to revoke the Warming Center's CUP.

151. The City did not stop at measures targeting activities associated with homelessness in public spaces.

152. Some City Council members agreed with the Flathead County Commissioners that public homelessness would disappear if they could destroy the Warming Center. On April 1, 2024, the City Council began efforts to revoke the Warming Center's CUP.

153. During that meeting, City Councilmember Chad Graham read prepared comments blaming the Warming Center for the "deterioration" of "the quality of life" and the "businesses in that area." Ex. 32 (4.1.24 Video) at 25:38–25:48.[22] Councilmember Graham's prepared comments quote parts of and repeatedly referenced the Warming Center's CUP application from nearly four years ago—claiming that "the information and application materials I used to inform my decision [to grant the CUP] are not currently reflecting the current condition of the neighborhood, the surrounding neighborhood." Ex. 32 (4.1.24 Video) at 26:05–26:16.

---

[22] For the Court's convenience, the 4.1.24 Video is available at https://tinyurl.com/4fs7pjfb.

154.  After summarizing complaints that he had allegedly received from the Kalispell community about issues stemming from an increased homeless population, Councilmember Graham outlined five areas where he believed the Warming Center was not honoring statements made in its CUP application: (1) increased homelessness in the area, (2) loitering on the Warming Center's property and in the area, (3) responsiveness and accountability to the neighborhood, (4) an increase in law enforcement, and (5) whether the shelter was serving the community of Kalispell or outsiders. *Id.* at 30:16–31:10. Councilmember Graham then called for a work session to hear public comments from the surrounding neighborhood. *Id.* at 31:18–32:26.

155.  Subsequent conversation between Councilmember Graham and the City Manager clarified that the City Council was proposing to review the Warming Center's CUP and application materials, which they alleged were "fair game because a permit is a matter of grace by the Council." *Id.* at 37:32–37:48.

156. The City Manager is incorrect. The Zoning Ordinance[23] states that *granting* a conditional use permit to an applicant in the first instance is a matter of grace. The provision entitled "Burden of Applicant" states that the "granting of the Conditional Use Permit is a matter of grace, resting in the discretion of the City Council and a refusal is not the denial of a right." Zoning Ord. § 27.33.090. Once granted, the CUP becomes a vested real-property interest that "run[s] with the lot, building, structure, or use." *Id.* § 27.33.060(1).

157. Neither the Warming Center's CUP nor the over 200 current CUPs in the City of Kalispell depend on the City Council's perpetual "grace"—a term associated with the unreviewable power of monarchs and popes, and originating in the Latin word "gratia," meaning "favor."

158. The City has a process for granting a CUP but no process for revoking one.

159. The City does have a process for addressing violations of CUPs. A CUP violation is treated as a violation of the Zoning Ordinance. Zoning Ord. § 27.33.050. The zoning administrator is authorized to issue

---

[23] Chapter 27 of the Kalispell's municipal ordinances is cited as "City of Kalispell Zoning Ordinance," hereinafter referred to as "Zoning Ordinance." Kalispell, Mont., Code § 27.01.010.

citations and the Board of Adjustment is authorized to hear appeals. *Id.* §§ 27.31.010–.020, 27.36.010. Decisions from the Board of Adjustment may be appealed per state statute. *Id.* § 27.21.030; Mont. Code Ann. § 76-2-327.

160.  If a property is a nuisance, the Zoning Ordinance authorizes the City to seek injunctive relief in court. Zoning Ord. § 27.36.20.

161.  Councilmember Graham and the City Manager could not take action against the Warming Center via allegations of code violations because the Warming Center had not violated any Kalispell law.

162.  Councilmember Graham and the City Manager could not take action against the Warming Center via allegations of violating the conditions in the CUP because there is no evidence the Warming Center violated the conditions of the CUP.

163.  Councilmember Graham and the City Manager could not take action against the Warming Center via a nuisance lawsuit because there is no evidence the Warming Center satisfies the elements of being a public nuisance.

164.  Councilmember Graham and the City Manager could not take action against the Warming Center via formal CUP revocation

procedures because no such procedures exist in the Kalispell ordinances or state statute. CUPs in Kalispell are not meant to be revocable.

165.  With absolutely no basis in fact or the law for taking action against the Warming Center via any procedures that actually exist, Councilmember Graham and the City Manager invented a "roadmap" for how the City Council could revoke the Warming Center's CUP involving "work sessions" and then council meetings.

166.  Because this process was *ad hoc* and designed to reach the predetermined outcome of revoking the CUP, it had none of the safeguards that ordinarily attend quasi-judicial proceedings with such high stakes.

167. At no point was the Warming Center given notice of the specific allegations of wrongdoing against it.

168.  No one who spoke during public comment periods was sworn in, and there was no opportunity for cross examination.

169.  The City Council was not a neutral decisionmaker because some of its members were not neutral decisionmakers. For example, Councilmember Kari Gabriel expressed that she was very conflicted over the choice whether to revoke the CUP, but that she "was elected by my

neighbors, and my neighbors have spoken." Ex. 33 (9.16.24 Video) at 1:52:32–1:53:00. She therefore voted to revoke. A neutral judge rules on the basis of the reliable evidence, not to appease voters to ensure reelection.

### The City Council's proceedings were a sham with a foregone conclusion—revoke the CUP.

170.  During May 2024, the City Council held two work sessions.

171.  During the first work session on May 13, 2024 (First Work Session), the City Council reviewed law enforcement call data, the Warming Center's 2020 application for a conditional use permit, sections of the municipal code, the Planning Department staff's report (KCU-20-05), and the CUP. Ex. 34 (2024.05.13 Agenda Packet).

172.  City council members and the City manager stated that the Warming Center brought problems associated with homelessness to the community. Ex. 35 (5.13.24 Video) at 7:25–14:30, 27:00–29:23, 58:20–59:30.[24]

173.  The Mayor opened the meeting for public comment. *Id.* at 1:28:40. The Warming Center, its staff, and supporters were treated as

---

[24]  For the Court's convenience, the 5.13.24 Video is available at https://tinyurl.com/24s3swk9.

members of the general public who could make comments on the work session topics. *See id.* at 1:45:56 (Warming Center director Tonya Horn participating in public comment); 2:04:08 (Warming Center volunteers doing the same).

174. However, after almost an hour of public comments where only two of the comments expressed complaints about the Warming Center, the Mayor announced that he wanted to prioritize the comments of neighbors with concerns rather than individuals from the Warming Center. *Id.* at 2:05:28–2:06:12.

175. Fewer than half of the public comments at the First Work Session expressed a negative opinion about the Warming Center. Ex. 36 (2024.5.13 Work Session Minutes) at 3–11.

176. The Council held a second work session on May 28, 2024 (Second Work Session) on the topic of the Warming Center and its CUP.

177. Much of the Second Work Session featured a debate among City Council members about the Warming Center and how the City Council should proceed. Ex. 37 (5.28.24 Video) at 50:40–2:02:00.[25]

---

[25] For the Court's convenience, the 5.28.24 Video is available at https://tinyurl.com/txrmzjkd.

178.  Several Council members stated their desire to move forward with revoking the Warming Center's CUP. *Id.* at 1:08:20, 1:21:18, 1:27:14, 1:29:53, 1:32:06.

179.  After the City Council's discussion, the Mayor opened the Second Work Session for public comment. *Id.* at 2:06:18.

180.  Of the thirteen public comments made at the Second Work Session, only three of them expressed concerns about the Warming Center. Ex. 38 (2024.5.28 Work Session Minutes) at 5–7.

181.  No person who gave a public comment at either the First or Second Work Session was put under oath. *See* Ex. 35 (5.13.24 Video); Ex. 38 (5.28.24 Video).

182.  None of the public comments at either work session identified a specific wrongdoing by the Warming Center, its staff, or a confirmed guest of the Warming Center. *See* Ex. 35 (5.13.24 Video); Ex. 38 (5.28.24 Video). Instead, public comments only discussed general community problems attributed to unspecified homeless people. *See* Ex. 35 (5.13.24 Video); Ex. 38 (5.28.24 Video).

183.  Following the work sessions, the City attorney sent Tonya and the Warming Center a letter accusing the Warming Center of making

misrepresentations in its documents and testimony during the application process for the CUP. Ex. 39 (2024.5.31 City Attorney Letter). Although the letter stated that its nine accusations about misrepresentations that the Warming Center had made were "supported by evidence and warrant a hearing[,]" the City Council provided the Warming Center with no such evidence. *Id.*; Ex. 1 (Horn Aff.) ¶ 96.

184.  The City Council then invited the Warming Center to respond to its nine vague accusations at a regularly scheduled City Council meeting. Ex. 39 (2024.5.31 City Attorney Letter).

185.  At the July 15, 2024 City Council meeting, the Warming Center made a detailed presentation on why the City Council's vague accusations were false. Ex. 40 (7.15.24 Video) at 1:28:17–2:33:17[26]; Ex. 41 (Warming Center Presentation). The Warming Center was not responding to the City's accusations, which were devoid of content. Ex. 1 (Horn Aff.) ¶ 98. The Warming Center simply sought to establish that it was addressing homelessness, not creating or attracting it. *Id.*

---

[26] For the Court's convenience, the 7.15.24 Video is available at https://tinyurl.com/ypm3jua4.

186.   Without access to the evidence supporting the City Council's accusations, the Warming Center could only respond generally to the accusations against it. *Id.*

187.   The following night, July 16, 2024, the City Council decided to postpone the decision to revoke the Warming Center's CUP for sixty days to give the Warming Center a chance to meet with community members under the supervision of Mayor-appointed mediators. Ex. 42 (7.16.24 Video) at 3:24:15.[27]

188.   The Warming Center participated in that mediation with the good-faith hope that greater communication between the Warming Center and community members would alleviate concerns. Ex. 1 (Horn Aff.) ¶ 100; Ex. 2 (Heffernan Aff.) ¶ 32.

189.   But mediation under the threat of CUP revocation was doomed to fail because, with the threat of revocation hanging over the Warming Center, the community members felt they could make impossible demands that the Warming Center could never agree to. *See* Ex. 29 (Aemisegger Aff.) ¶ 7. The community members only ever wanted the CUP revoked.

---

[27] For the Court's convenience, the 7.16.24 Video is available at https://tinyurl.com/2ud8wra4.

190. After a series of initial conversations, the community members produced a document stating the community members' position that "we want the permit to be rescinded" but "[i]f we are forced to move forward with negotiations, we expect the [Warming Center] to come up with agreeable solutions to remedy the failures which the community is being burdened by." Ex. 1 (Horn Aff.) ¶ 102; Ex. 43 (Community Member Demands). The community members then set out a list of demands all to be paid for "at the expense of the [Warming Center]:"

1. Low barrier to be changed to a higher status
2. ID required for entry into the [Warming Center]
3. Private Security – Patrolling the neighborhood (to be defined), with a response time of less than 15mins [sic].
4. [Warming Center] to negotiate with Post Office and County Fairgrounds to get back openness
5. Private Transportation [for guests]
6. Volunteer to help clean up and fix what has been destroyed (especially those who do not have jobs)
7. 60 Day random compliance checks & audits
8. Reports [on guests served]
9. Regulate Patrons [to screen who gets served]
10.  Agree not to expand.

Ex. 43 (Community Member Demands).

191.  Expressly stating that the Warming Center "remains open to conversation[,]" the Warming Center sent a letter to the mediators

asking the community members involved in the mediation to "manage expectations about what [the Warming Center] can do to address community issues." Ex. 44 (2024.8.22 Letter to Mediator). The Warming Center sought to clarify that it would "do our best" to address community members' concerns but it could not "agree to take on duties off [its] property, such as supervising people out in the community" that were outside of its "legal, moral, and practical control." *Id.*

192.  In response to the Warming Center's letter*,* the mediators canceled an upcoming meeting between community members and the Warming Center, announcing "we don't believe the meeting on August 26 would be productive[.]" Ex. 45 (2024.8.22 Mediator Email).

193. Community members immediately and wrongly began pointing the finger at the Warming Center for refusing to meet when the opposite was true: The Warming Center had tried to ensure that the previously scheduled meeting would be successful by encouraging realistic expectations and collaborative solutions to a city-wide problem that the Warming Center had not created or worsened. Ex. 1 (Horn Aff.) ¶¶ 103, 105.

194. As soon as the community members began accusing the Warming Center of canceling the second meeting, Tonya wrote Mayor Johnson and the City Council to state that this was false. Ex. 1 (Horn Aff.) ¶ 106; Ex. 46 (2024.8.29 Email Horn-City).

**The City Council revoked the Warming Center's CUP.**

195. On September 16, 2024, the City Council once again took up the topic of revoking the Warming Center's CUP.

196. The City Council passed Resolution 6227, which was titled "Potential Action on Conditional Use Permit of Flathead Warming Center" in the City's Agenda. Ex. 47 (2024.9.16 Agenda Packet) at 2. Six council members voted to pass the resolution, and three voted against. Ex. 33 (9.16.24 Video) at 1:55:54–1:56:21.[28]

197. A complete copy of Resolution 6227 was not part of the City Council's agenda or provided at any time during the September 16, 2024 meeting. Only a partial copy of Resolution 6227—with numerous blanks to be filled out, including the portion stating what the City Council was resolving—was provided and voted on. Ex. 47 (2024.9.16 Agenda Packet) at 337–38.

---

[28] For the Court's convenience, the 9.16.24 Video is available at https://tinyurl.com/4ejcsc5u.

198. City Council member comments before the vote reveal fundamental flaws with the City's sham process decision to revoke the Warming Center's CUP.

199. Via an oral statement, Councilmember Chad Graham moved that "Resolution number 6227, a resolution by the Kalispell City Council regarding the Flathead Warming Center to revoke the conditional use permit, determine findings of fact, and declare an effective date." Ex. 33 (9.16.24 Video) at 53:55–54:11.

200. By the terms of Councilmember Graham's motion, the City Council was voting to revoke the Warming Center's permit *and then* determine findings of fact and an effective date.

201. During the September 16th meeting, the City did not make findings of fact and decide what actions to take based on those findings. Rather, the City *first* decided to revoke and *then retroactively* made up findings of fact to support its decision *after the meeting*.

202. In advocating for revocation, Councilmember Graham stated the Warming Center should be held responsible for the behavior of individuals that the Warming Center attracted to the area. Ex. 33 (9.16.24 Video) at 59:39–1:00:05.

203.   Councilmember Graham expressly disclaimed any conclusion that the Warming Center violated the conditions of its CUP: "I've said this several times, forget the nine conditions" and "I have said they're compliant with the nine conditions that we as a council set." Ex. 33 (9.16.24 Video) at 1:01:30–1:01:40.

204.   Councilmember Graham then stated that "I've put together nine findings of fact." Ex. 33 (9.16.24 Video) at 1:03:48–1:03:51. He then read a lengthy statement summarizing his personal findings. The Warming Center's 2020 CUP application materials, unsworn public comments and complaints, problematic call data (see paragraphs 240–63 below), and a recommendation by a group of Kalispell citizens for increased police presence around the Warming Center were the only pieces of evidence Councilmember Graham cited to support his findings.

205.   Councilmember Ryan Hunter, who voted against revoking the CUP, repeatedly objected to the City Council's legal authority to revoke, saying that the City Council could not "punish" the Warming Center for "the behavior in the neighborhood of people who might be their clients" or "impose collective punishment by depriving unsheltered homeless of

the life-saving services of the Warming Center due to the actions of a few." Ex. 33 (9.16.24 Video) at 1:22:31–1:23:08, 1:29:26–1:29:41.

206.  Councilmember Kari Gabriel expressed that she was very conflicted over the choice whether to revoke the CUP, but that she "was elected by my neighbors, and my neighbors have spoken." Ex. 33 (9.16.24 Video) at 1:52:32–1:53:00. She therefore voted to revoke.

### The City Council's post hoc resolution rests on bogus, unspecified findings of false statements to retroactively justify revoking the CUP.

207.  After the City Council voted for Resolution 6227, Warming Center leadership immediately began requesting a copy of the resolution, which City staff ignored. Ex. 29 (Aemisegger Aff.) ¶ 17; Ex. 1 (Horn Aff.) ¶ 108.

208.  On information and belief, the City Council was not able to give the Warming Center a copy of Resolution 6227 immediately following the City Council's vote because it had not been fully written at that time.

209.  The Warming Center did not receive a copy of what the City claims is the enacted Resolution 6227 until one arrived in the mail on September 24, 2024. Ex. 29 (Aemisegger Aff.) ¶ 18; Ex. 1 (Horn Aff.) ¶ 109; Ex. 48 (6227 Resolution).

210. The copy of Resolution 6227 that the Warming Center received uses the phrase that Councilmember Graham read in introducing the motion to revoke (Ex. 33 (9.16.24 Video) at 53:55–54:11) and not the title listed in the City Council's September 16th agenda. Ex. 47 (2024.9.16 Agenda Packet) at 2.

211. The City Council never publicly voted to adopt any findings of fact. *See* Ex. 33 (9.16.24 Video) at 53:26–1:58:29.

212. The City Council never publicly voted to adopt Councilmember Graham's nine findings of fact. *Id.*

213. Nevertheless, in the copy of Resolution 6227 the Warming Center received in the mail contains sixteen "Whereas" clauses, the last eleven of which purport to contain the City Council's findings. Ex. 48 (Resolution 6227) at 2–3 (using the verb "finds" in the last 11 clauses).

214. Five of the "Whereas" clauses include purported findings that the Warming Center and its director Tonya Horn, made incorrect or untrue statements in applying for the CUP in September 2020:

  a.   "[D]uring the application process, the Warming Center submitted a letter to the Kalispell Planning Board that included incorrect or untrue statements upon which the Council relied in granting approval of a zoning text amendment and the Conditional Use Permit";

b.   "[D]uring the application process, the Warming Center submitted a letter to the Kalispell City Council that included incorrect or untrue statements upon which the Council relied in granting approval of a zoning text amendment and the Conditional Use Permit";

c.   "[S]tatements from the Warming Center that it will not take responsibility for things that occur off its property and beyond its control contradict information provided by the Warming Center in its application for the Conditional Use Permit";

d.   "[S]tatements by the Warming Center regarding its lack of responsibility for effects on areas beyond its property or within 150 feet of its property contradict statements in its application for the Conditional Use Permit and its letters to the Planning Board and the City Council all of which the City Council relied upon in granting the zoning text amendment and the Conditional Use Permit"; and

e.   [I]nformation and representations submitted in connection with the Warming Center's application for the Conditional Use Permit is incorrect or untrue."

*Id.*

215.   Despite these findings that "statements," "representations," and "information" were "incorrect or untrue," Resolution 6227 does not identify a single specific statement, representation, or piece of information submitted to any official in connection with the 2020 CUP application that was false then or false now. *See id.*

216. That is because the Warming Center has fulfilled each and every specific promise it made in the "Being a Good Neighbor" section of its 2020 CUP application:

a. "[W]e will not allow nor tolerate" "individuals to loiter, stand, or sit on the curb to smoke, or socialize";

b. "The Flathead Warming Center will never be a homeless hangout";

c. "It is our policy that if a customer 'burns their bridge with any neighbor,' that customer 'burns their bridge' with the Flathead Warming Center"—meaning that any homeless person whom a neighbor identifies as acting in an aggressive manner will be excluded from the Warming Center;

d. "The neighbors will be provided with the director's cell phone number"; and

e. "The full-time director will periodically check in with neighbors to maintain open communications[.]"

Ex. 7 (CUP Application) at 6–7.

217. In writing findings of fact after revoking the Warming Center's CUP, the City Council did not—because it could not—identify any specific statement, representation, or piece of information in the Warming Center's CUP application or associated statements as false or incorrect. *See* Ex. 48 (Resolution 6227) at 2–3.

**No evidence connected the Warming Center with anyone who may have engaged in antisocial behavior.**

218. Some public comments during the September 16, 2024 revocation hearing supported revocation. Ex. 33 (9.16.24 Video) at 7:35–53:26.

219. These unsworn negative comments focused on allegations about what unidentified people had done on public property or while trespassing on private property. *Id.*

220. These unsworn negative comments assumed without evidence that the unidentified people engaged in antisocial behavior were homeless. *Id.*

221. These unsworn negative comments assumed without evidence that the unidentified people engaged in antisocial behavior were associated with the Warming Center. *Id.*

222. These unsworn negative comments frequently discussed unidentified people relieving themselves in public rather than in appropriate restroom facilities. *Id.*

223. The Warming Center did not then and does not now know who the unidentified people engaged in antisocial behavior are, know if they are real, know if they are homeless, or know if they had any connection

to the Warming Center. Ex. 1 (Horn Aff.) ¶ 110; Ex. 2 (Heffernan Aff.) ¶ 33.

224.  In the one instance where a Warming Center guest was found to have acted in an aggressive manner (spitting) toward a community member, the Warming Center responded by excluding that guest from the Center's services. Ex. 1 (Horn Aff.) ¶ 111.

225.  No other community members have come to the Warming Center with a specific name or picture of someone engaged in antisocial behavior who uses the Warming Center. Ex. 1 (Horn Aff.) ¶ 112; Ex. 2 (Heffernan Aff.) ¶ 34. If that happened and the antisocial behavior occurred, that person would be excluded from the Warming Center. *Id.*

226.  The Warming Center has appropriate restroom facilities and will let anyone use them, homeless or otherwise, during its hours of operation. Ex. 1 (Horn Aff.) ¶ 113. The Warming Center offers its guests nine-minute showers. *Id.* The only other publicly accessible showers in Kalispell are at the Salvation Army, which requires identification to use the showers. Ex. 3 (Ball Aff.) ¶ 29. Many homeless individuals do not have or carry identification. Ex. 1 (Horn Aff.) ¶ 17.

227.   Because the people who use the Warming Center are from the Kalispell area, closing the Warming Center—a place where people can use the restroom on private property—will not reduce the incidence of people relieving themselves in public. Ex. 3 (Ball Aff.) ¶ 27; Ex. 1 (Horn Aff.). ¶ 114.

**The City Council draws unsupported inferences from police call data.**

228.   The City Council's main documentary evidence of the Warming Center's impact on the area around 889 North Meridian were so-called "heat maps" showing the incidence of four kinds of police calls within Kalispell. Ex. 47 (2024.9.16 Agenda Packet) at 354–80.

229.   The City's own police call data does not support the conclusion that the Warming Center caused increased police calls or that the issues experienced by the area surrounding the Warming Center are unique or worse than other areas of the City.

230.   The City identified four types of police calls that it associates with homeless individuals: trespass, disorderly conduct, welfare check, and criminal mischief. Ex. 47 (2024.9.16 Agenda Packet) at 353–54.

231. The City offered no analysis of why it chose those four particular call types as the indicators of issues caused by homelessness. *See id.*

232. The City collected the data for calls for its four call types for two three-year periods, 2018–20 and 2021–23. *Id.* The City looked at the call data by geographic region and by specific locations within a half-mile radius. *Id.*

233. The City did not identify the nature of the individual calls within a type category. *Id.* For example, a call for a welfare check could include a call to check on an elderly home resident. A call for disorderly conduct could include a call about the harassment of or aggression toward homeless people by others in the community.

234. On information and belief, the City had no data on which police calls for its four call types resulted from problems caused by homeless individuals versus problems caused other community members.

235. On information and belief, the City had no data on which police calls were duplicates or incorrect reports. For example, the City had no information on whether calls for trespassing were correctly

reporting trespassing rather than a mistaken belief that an authorized entry was trespassing (a homeowner climbing in a window after forgetting her key, for example).

236.   The City's police call data shows that the City has experienced a citywide growth in the number of police calls for the four call types, an increase from 6,476 calls in 2018–20 to 9,779 calls in 2021–23. *Id.* at 355.[29]

237. According to data from the U.S. Census Bureau, the population of Kalispell increased by 26.54 percent between 2020 and 2024.[30] Thus, that increase in calls may be explained in large part due to the increased population.

238.   The City's police call data shows that the area around the Warming Center experienced fewer calls and a lower increase than several other locations. Ex. 47 (2024.9.16 Agenda Packet) at 356.

239.   The Samaritan House—a nonprofit that offers nightly shelter for approximately forty-five people, longer-term transitional housing,

---

[29] Although the graphs on page 355 show the percent change, the numbers in parentheses provide the number of calls. Ex. 35 (5.13.24 Video) at 9:48.
[30] *Kalispell, Montana Population*, World Population Review, https://worldpopulationreview.com/ us-cities/montana/kalispell (last visited Oct. 4, 2024).

and thirty-two low-income permanent apartments—has a CUP to operate a homeless shelter in a residential zone. Ex. 49 (Samaritan House CUP).

240. From 2021 to 2023, the half-mile radius around the Samaritan House received 1,455 police calls for the four call types. Ex. 47 (2024.9.16 Agenda Packet) at 355.

241. From 2021 to 2023, the half-mile radius around Depot Park received 3,166 police calls for the four call types. *Id.*

242. From 2021 to 2023, the half-mile radius around the Kalispell Library received 2,812 police calls for the four call types. *Id.*

243. By contrast, 2021 to 2023, the half-mile radius around the Warming Center received 1,324 police calls for the four call types. *Id.*

244. Samaritan House and the Warming Center are almost exactly one mile apart so the half-mile radii surrounding the Samaritan House and the Warming Center do not overlap, which is to say that the 1,455 Samaritan House area calls don't overlap with the 1,324 Warming Center area calls. *Id.* at 377–80.

245. Also, the calls received for the half-mile radius around Depot Park and the half-mile radius around the Kalispell library account for a

greater share of the increase in citywide calls than the half mile surrounding the Warming Center. *See id.* at 355.

246.  The half mile around Depot Park accounts for 38.15 percent of the increase in calls citywide. *See id.* The half mile around the Kalispell Library accounts for 34.39 percent of the increase in calls citywide. *See id.* These areas do, however, overlap.

247.  The half-mile radius around the Warming Center, on the other hand, accounts for 19.4 percent of the increase in calls citywide. *See id.*

248.  That means the area around Depot Park and the Kalispell Library is responsible for more of the City's increase in police calls than the Warming Center is.

249.  The Warming Center is only open for overnight stays during the winter while the Samaritan House, Depot Park, and Kalispell Library are open year-round. Analyzing the call data on a monthly basis—which the City failed to do—reveals that call numbers for the half-mile radii surrounding the Warming Center (during the months when it is open for sleeping) and the Samaritan House are comparable while the

call numbers from the radii around Depot Park and the Library are much
higher:

**Calls per month during 2021–2023
in half-mile radius around specific locations**

| Call Types | Warming Center | Samaritan House | Depot Park | Kalispell Library |
|---|---|---|---|---|
| Trespass | 43 | 40 | 93 | 75 |
| Disorderly conduct | 28 | 25 | 57 | 52 |
| Welfare check | 46 | 76 | 94 | 81 |
| Mischief | 9 | 21 | 20 | 20 |

*See id.* at 355–64.

250.  The City's police call data for the area around the Warming
Center does not and cannot identify calls that stem from the behavior of
homeless individuals versus other community members. *Id.* at 353–80.

251.  The City's police call data for the area around the Warming
Center does not and cannot identify calls that stem from the behavior of
homeless individuals with a connection to the Warming Center. *Id.*

252.  The half-mile radius around the Warming Center includes the
Flathead County Fairgrounds and Kalispell's division of the United
States Post Office, both of which are locations that the general
community and homeless individuals visited before the Warming Center

existed and continue to visit independent of visits to the Warming Center. *Id.* at 379–80; Ex. 1 (Horn Aff.) ¶ 115.

253. The Flathead County Fairgrounds hold dozens of public events each year that include concerts, carnivals, livestock shows, gun shows, roller derby bouts, boxing matches, and even a cage fighting competition. Ex. 1 (Horn Aff.) ¶ 116; Ex. 50 (Fairgrounds 2024 Event Calendar). The City police call data includes no information on the police calls caused by individuals attending these events. Ex. 47 (2024.9.16 Agenda Packet) 353–80.

254. As was discussed during the public hearings in 2020, homeless individuals still seek shelter on the Flathead County Fairgrounds today. Ex. 1 (Horn Aff.) ¶ 117. Flathead County does not completely secure the fairgrounds. *Id.* Only a portion of the property is fenced, and homeless individuals and others enter the fenced area through gaps in the fence or by climbing over the fence. *Id.*

255. There are over 200 active CUPs in Kalispell. Ex. 29 (Aemisegger Aff.) ¶ 19; Ex. 52 (Full CUP Map).

256.  The City does not have a policy of attributing all police calls for trespass, disorderly conduct, welfare check, and criminal mischief within a half-mile radius to each of those individual CUP holders.

257.  There are approximately 17 CUPs within a half-mile radius of the Warming Center. Ex. 29 (Aemisegger Aff.) ¶ 20; Ex. 53 (Half-Mile CUP Map).

258.  The City does not have a policy of attributing all police calls for trespass, disorderly conduct, welfare check, and criminal mischief to the CUP holders within a half-mile of the Warming Center.

259.  There are two other homeless shelters in Kalispell—Samaritan House and Ray of Hope. Ex. 1 (Horn Aff.) ¶ 118. The Samaritan House is located slightly over a mile away from the Warming Center.

260.  The City does not have a policy of attributing all police calls for trespass, disorderly conduct, welfare check, and criminal mischief within a half-mile of those shelters to the shelters themselves.

261.  On information and belief, the City Council has not raised the topic of revoking the Samaritan House's CUP—or even investigated whether the Samarian House is contributing to the City's issues with

homelessness. That is particularly startling because the City's police call data shows that the half-mile radius around the Samaritan House has been the source of more calls for trespass, disorderly conduct, welfare check, and criminal mischief in the last three years than the area around the Warming Center.

262.  A Ray of Hope is also located slightly over a mile away from the Warming Center but is less than a half mile away from the Samaritan House. Ex. 1 (Horn Aff.) ¶ 119.

263.  On information and belief, the City Council has not raised the topic of revoking A Ray of Hope's CUP—or even investigated whether A Ray of Hope is contributing to the City's issues with homelessness.

264.  In February 2022, the City Council approved a CUP for Fortify Holdings, LLC to redevelop the former Outlaw Inn, located at 1701 U.S. 93 S, Kalispell, MT 59901, into 205 studio apartments. Ex. 53 (Fortify CUP).

265.   Shortly after Fortify Holdings received the CUP, it evicted 100 low-income residents who lived in the hotel's north wing in the middle of winter.[31]

266.   More than two years later, the former Outlaw Inn is vacant, unsecured, an eyesore, and the scene of trespassing and squatting. Ex. 1 (Horn Aff.) ¶ 121.

267.   As of early September 2024, the former Outlaw Inn was surrounded by a fence, but much of that fence lay on the ground, providing easy access to the building. Ex. 1 (Horn Aff.) ¶ 122. By the end of September 2024, the fence was completely removed, permitting easy access to the former Outlaw Inn via open doors and broken windows. *Id.* ¶ 123; Ex. 54 (Outlaw Inn Pictures).

268.   Trash and junk litter the property of the former Outlaw Inn. Ex. 1 (Horn Aff.) ¶ 123; Ex. 54 (Outlaw Inn Pictures).

269.   On information and belief, the City's data shows that the area around the former Outlaw Inn has experienced a substantial increase in calls to police for trespass, disorderly conduct, welfare check, and

---

[31] Adrian Knowler, *Evicted Outlaw Inn renters still seeking home*, Daily Inter Lake (Nov. 24, 2022), https://dailyinterlake.com/news/2022/nov/24/evicted-outlaw-inn-renters-still-seeking-home/.

criminal mischief. *See* Ex. 47 (2024.9.16 Agenda Packet) at 366–67; Ex. 1 (Horn Aff.) ¶ 124.

270.  In January 2024, a woman's body was found inside the former Outlaw Inn. Police have labeled the death "suspicious," and no other details on the investigation have been made public.[32]

271.  On information and belief, the City has made no move to revoke or investigate revoking the CUP of Fortify Holdings for the former Outlaw Inn.

272.  On information and belief, the City Council has not investigated or censured Fortify Holdings in any way for contributing to or exacerbating homelessness issues in Kalispell.

273.  During a work session on August 26, 2024, the City manager informed the City Council that the City had no mechanism for holding a property owner responsible for conditions on their property, such as issues related to "the security of the building, the opening of doors, and [broken] windows[.]" Ex. 55 (8.26.24 Video) at 1:44:43–1:48:35.[33]

---

[32] Derrick Perkins, *Authorities identify body discovered in Kalispell building*, Daily Inter Lake (Jan. 11, 2024), https://dailyinterlake.com/news/2024/jan/11/authorities-identify-body-discovered-in-kalispell-building/.
[33] For the Court's convenience, the 8.26.24 Video is available at https://tinyurl.com/bdhbsd38.

274. The City has not sought to revoke the CUP of any of the other hundreds of CUP holders in Kalispell. It has not done this even though crimes are committed within a half-mile radius of the CUP—and, indeed, sometimes crimes are committed within a CUP holder's own building. Still, the only CUP Kalispell has ever sought to revoke is the Warming Center's.

275. Rather than address community issues associated with population growth, an increase in unemployment, and an increase in housing costs, the City Council made the politically expedient decision to eliminate the Warming Center's right to operate by revoking its CUP.

**The City Council DID NOT find (and could not have found) that the Warming Center violated any condition of its CUP, broke any law, or failed to enforce its rules against anyone it knew to have broken them.**

276. The City Council DID NOT find that the Warming Center violated any condition of its CUP. *See* Ex. 48 (Resolution 6227) at 2–3.

277. The City Council DID NOT find that the Warming Center violated any condition of its ACUP. *See id.*

278. The City Council DID NOT find that the Warming Center violated any provision of the City of Kalispell Zoning Ordinance. *See id.*

279.  The City Council DID NOT find that the Warming Center violated any ordinance of the City of Kalispell. *See id.*

280.  The City Council DID NOT find that the Warming Center violated any ordinance of Flathead County. *See id.*

281.  The City Council DID NOT find that the Warming Center violated any provision of Montana state law. *See id.*

282.  The City Council DID NOT find that the Warming Center violated any provision of federal law. *See id.*

283.  The City Council DID NOT find that the Warming Center knew about the antisocial public behavior of any specific person and failed to enforce its own rules about excluding that person. *See id.*

284.  The City Council did not find any of these things because it could not have: None of them is even remotely true.

### The City Council DID NOT find (and could not have found) "negative impacts" under the "review criteria" of the CUP ordinance.

285.  In granting the CUP in 2020, the Planning Department Staff Report, Planning Department and Zoning Commission, and City Council made specific findings of fact related to the "review criteria" in the CUP ordinance. Ex. 8 (Staff Report # KZTA-20-01); Ex. 9 (Staff Report # KCU-20-05); Ex. 18 (Ordinance 1851); Ex. 14 (Warming Center CUP).

286.  One of the "review criteria" requires determining that "the proposed use will not be detrimental to abutting properties in particular and the neighborhood in general" based on "(1) excessive traffic generation; (2) noise or vibration; (3) dust, glare, heat; (4) smoke, fumes, gas, or odors; and (5) inappropriate hours of operation." Zoning Ordinance § 27.33.080(2)(d).

287.  In issuing the CUP in 2020, the Planning Department Staff Report, Planning Department and Zoning Commission, and City Council specifically found that the Warming Center satisfied all the "review criteria" under § 27.33.080, including the specific sub-criteria under subsection (2)(d) about neighborhood impacts. Ex. 9 (Staff Report # KCU-20-05) at 7.

288.  In revoking the CUP on September 16, 2024, the City Council DID NOT find that the Warming Center was failing to satisfy any of the sub-criteria in subsection (2)(d) about neighborhood impacts. *See* Ex. 48 (Resolution 6227) at 2–3.

289.  The City Council did not find any of these things because it could not have.

## The revocation of the Warming Center's CUP has devastating consequences.

290.  The shuttering of the Warming Center has already and will continue to dramatically affect the homeless population and the broader community.

291.  Day services such as laundry and showers ended on Monday, September 30, 2024. Ex. 1 (Horn Aff.) ¶ 125. The Warming Center expected to begin providing overnight shelter for the winter season October 10, 2024. *Id.* But without its CUP, the Warming Center cannot shelter the homeless at 889 North Meridian. *Id.*

292.  The loss of the Warming Center's fifty beds as a nightly option for the homeless in the Kalispell community during winter means that there will be more homeless individuals sleeping on the streets, in parks, and in public spaces overnight. Ex. 1 (Horn Aff.) ¶ 126; Ex. 3 (Ball Aff.) ¶¶ 16, 31; Ex. 58 (Nelson Aff.) ¶¶ 6, 10; Ex. 59 (Amundson Aff.) ¶¶ 10–11, 13.

293.  That reality means that homeless individuals in the Kalispell community face a greater risk of death, acute injury, and worsened chronic conditions. Ex. 31 (Johnson Aff.) ¶¶ 13–15, 20–21; Ex. 3 (Ball Aff.) ¶ 30; Ex. 59 (Amundson Aff.) ¶¶ 13–14.

294.  "Every year or so, a homeless person in Kalispell is found dead in a tent or some other shelter, presumably having died from hypothermia." Ex. 31 (Johnson Aff.) ¶ 14.

295.  Even with the Warming Center open just down the street, the local emergency room "regularly sees injuries and illnesses such as frostbite, frozen fingers and toes, and hypothermia from overnight exposure among the homeless population." *Id.* ¶¶ 4–5, 13. "[A] lack of shelter, especially overnight during winter, tends to exacerbate existing medical issues or conditions. Minor injuries and illnesses often develop into more severe medical problems. Chronic health conditions worsen. Mental health issues and substance abuse problems intensify." *Id.* ¶ 12.

296. Without the Warming Center, there will likely be "more homeless individuals seeking shelter and emergency treatment for frostbite, hypothermia, and avoidable complications from other medical conditions." *Id.* ¶ 21. Among the people who previously sheltered at the Warming Center, minor issues like trench foot, respiratory infections, and cuts will develop into more severe medical issues and infections. *Id.* ¶ 19. Homeless individuals with chronic diseases like diabetes, heart

disease, lung disease, and kidney disease will experience more severe complications from these diseases. *Id.* ¶ 20.

297.   Before the Warming Center opened, one homeless individual "lost part of his foot from hypothermia because he had no place to go and was forced to sleep outside in subfreezing temperatures." Ex. 3 (Ball Aff.) ¶ 19. In recent years, he "has regularly stayed at the Warming Center during the winter." *Id.* The Warming Center's closure means that "[he]— and more homeless individuals like him—will suffer injuries in the freezing cold." *Id.* ¶ 20.

298.   Social workers and community organizations relied on the Warming Center as a safe place to check on their clients and ensure their legal needs, medication needs, and other needs were being correctly handled. *Id.* ¶¶ 22–24. Stripping the Warming Center of its CUP means that safe place no longer exists.

299.   Without a safe place for community organizations and their staff to work with homeless individuals with mental illness, social worker Jennifer Ball "expect[s] that more individuals with mental health disorders will not receive their medication" and will therefore "suffer worse symptoms." *Id.* ¶¶ 25, 30.

300.  If more homeless individuals on the streets at night, social worker Jennifer Ball anticipates "that Kalispell will experience a sharp rise in criminal incidents and charges"—especially concerning homeless individuals suffering mental health disorders who are unable to get the care they need. *Id.* ¶¶ 30, 32.

301.  Forcing the Warming Center to close means that the homeless in Kalispell have lost one of their few options to access a bathroom in the City. *Id.* ¶¶ 26–27. If restroom options are not available or accessible, homeless individuals "have no option but to relieve themselves in public." *Id.* ¶ 27.

302.  But the homeless population and the broader community aren't the only ones harmed by the revocation. The Warming Center itself is facing dire consequences—the impact of which may never be able to be undone.

303.  The harm to the Warming Center began when the City threatened to revoke the Warming Center's CUP. The uncertainty about whether the Center would continue to operate caused donors to decrease giving to the Center—or stop giving altogether. Ex. 1 (Horn Aff.) ¶ 127. Immediately after the City Council indicated that the Warming Center

made untrue statements in its CUP application and scheduled a work session on the topic, the Warming Center experienced a sharp drop in donations, putting the Warming Center on a collision course with a budget shortfall. *Id.*

304. The Warming Center's financial picture is even worse now that the City followed through on its threats to revoke: Donations have dropped even more. *Id.* ¶ 128. Charitable grants that the Warming Center depends on are being withheld. *Id.* One foundation partner has expressed concern that it will have to return donations to the original donors if the Warming Center does not open as promised. *Id.*

305. If the revocation of the CUP is allowed to stand, the Warming Center will lose over $185,000 in pending grants and donations. *Id.* ¶ 129.

306. The Warming Center currently employs twelve staff members, four full-time and eight part-time. *Id.* ¶ 130. If the Center is unable to open within the month of October, it will lay off all eight part-time employees immediately and determine when it must do the same for its full-time employees. *Id.*

307.  If laid off from the Warming Center, staff may be forced to seek alternative employment. Ex. 1 (Horn Aff.) ¶ 131; Ex. 15 (Young Aff.) ¶ 4; Ex. 56 (Sago Aff.) ¶ 7; Ex. 59 (Amundson Aff.) ¶ 9.

308.  Should the Warming Center be able to reopen at some point in the future, there is no guarantee that staff will be able to return to their former positions if they have found another job. Ex. 1 (Horn Aff.) ¶ 132; Ex. 56 (Sago Aff.) ¶ 8; Ex. 59 (Amundson Aff.) ¶ 9.

309.  The Warming Center's director Tonya expects to fight for the Warming Center's survival as long as possible, but even she will have to walk away if the Warming Center cannot serve its mission and funding continues to dwindle. Ex. 1 (Horn Aff.) ¶ 133.

310.  If the Warming Center is unable to get a court order staying the revocation of its CUP pending a final ruling on the merits of the Warming Center's claims, it will be difficult for the Warming Center to reopen if it ultimately wins this lawsuit years later. Ex. 1 (Horn Aff.) ¶ 134; Ex. 2 (Heffernan Aff.) ¶ 35. Funding will have dried up. *Id*. The Center's resources will have been expended. *Id*. Staff will have sought new jobs. *Id*. All momentum the Warming Center has gained over the

last five years of serving homeless in the Kalispell community will be lost. *Id.*

311.  If the City's revocation of the Warming Center's CUP is allowed to stand, the City will have successfully evicted the Warming Center from its own property to score political points.

## INJURY TO PLAINTIFF

312.  The September 16, 2024 CUP revocation in Resolution 6227 deprives the Warming Center of a vested property right via legislative fiat.

313.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would open for its upcoming sleeping season on October 10, 2024. Ex. 1 (Horn Aff.) ¶ 135; Ex. 2 (Heffernan Aff.) ¶ 36.

314.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would be able to fulfill its primary objective as a nonprofit entity—provide emergency shelter for the homeless in Kalispell during winter. Ex. 1 (Horn Aff.) ¶ 136; Ex. 2 (Heffernan Aff.) ¶ 37.

315.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center and its board would not have to face the

prospect of selling the Warming Center's assets and terminating its existence as a legal entity because it cannot operate at 889 North Meridian and lacks any realistic option of obtaining a CUP to operate an emergency shelter elsewhere in Kalispell. Ex. 1 (Horn Aff.) ¶ 137; Ex. 2 (Heffernan Aff.) ¶ 38.

316.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would receive monetary donations from individuals and groups that support the Warming Center's mission. Ex. 1 (Horn Aff.) ¶ 138; Ex. 2 (Heffernan Aff.) ¶ 39.

317.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would offer volunteer opportunities to people in Kalispell who want to help operate the Warming Center by contributing labor. Ex. 1 (Horn Aff.) ¶ 139; Ex. 2 (Heffernan Aff.) ¶ 40.

318.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would not be uncertain about whether it can continue to offer its year-round services to the homeless during the daytime, such as showers and laundry. Ex. 1 (Horn Aff.) ¶ 140; Ex. 2 (Heffernan Aff.) ¶ 41.

319.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center board of directors would be able to engage in strategic planning for the Warming Center's future, a future that is now in severe doubt. Ex. 1 (Horn Aff.) ¶ 141; Ex. 2 (Heffernan Aff.) ¶ 42.

320.  But for the September 16, 2024 CUP revocation in Resolution 6227, the homeless residents of Kalispell would have a warm, safe place to sleep at night during the winter sleeping season. Ex. 1 (Horn Aff.) ¶ 142; Ex. 2 (Heffernan Aff.) ¶ 43; Ex. 58 (Nelson Aff.) ¶¶ 6, 10; Ex. 59 (Amundson Aff.) ¶¶ 13–14.

321.  But for the September 16, 2024 CUP revocation in Resolution 6227, the homeless who would otherwise sleep at the Warming Center face death and severe bodily injury, as well as psychological harm, from sleeping outside without proper shelter. Ex. 1 (Horn Aff.) ¶ 143; Ex. 2 (Heffernan Aff.) ¶44; Ex. 31 (Johnson Aff.) ¶¶ 19–21; Ex. 3 (Ball Aff.) ¶¶ 20, 25, 30.; Ex. 58 (Neslon Aff.) ¶ 7; Ex. 59 (Amundson Aff.) ¶¶ 10–14.

322.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center wouldn't have to face the prospect of deciding what to do with 889 North Meridian instead of using it as an emergency winter shelter. Ex. 1 (Horn Aff.) ¶ 144; Ex. 2 (Heffernan Aff.) ¶ 45.

323.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center wouldn't have to determine whether its year-round services can be shoehorned into a use permitted as a matter of right in the B-1 Neighborhood Business district. Ex. 1 (Horn Aff.) ¶ 145; Ex. 2 (Heffernan Aff.) ¶ 46.

324.  But for the September 16, 2024 CUP revocation in Resolution 6227, Tonya Horn, the Warming Center director and a full-time employee, would not face the loss of her livelihood. Ex. 1 (Horn Aff.) ¶ 146.

325.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center's other employees would not face the loss of their livelihoods. Ex. 1 (Horn Aff.) ¶ 147; Ex. 2 (Heffernan Aff.) ¶ 47; Ex. 15 (Young Aff.) ¶ 4; Ex. 56 (Sago Aff.) ¶¶ 7–8; Ex. 57 (Gambrel Aff.) ¶ 7; Ex. 59 (Amundson Aff.) ¶ 9.

326.  But for the September 16, 2024 CUP revocation in Resolution 6227, the Warming Center would not face the financial loss of the hundreds of thousands of dollars that it spent renovating 889 North Meridian into an emergency shelter because those renovations would likely be of little value to any future purchaser in the event the Warming

Center will have to sell. Ex. 1 (Horn Aff.) ¶ 148; Ex. 2 (Heffernan Aff.) ¶ 48.

## CLAIMS

### Claim I
### Fourteenth Amendment Procedural Due Process

327. The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

328. The Warming Center's 2020 CUP is a vested property right entitled to the procedural protections of the Fourteenth Amendment's Due Process Clause.

329. The City Council's revocation of the Warming Center's CUP deprived it of its vested property right.

330. Although the City Council provided process, it was not meaningful process under the three-part test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) nature of private interest; (2) risk of erroneous or unjustified deprivation; and (3) administrative cost of additional process.

331. The Warming Center's private interest is immense because it cannot legally operate its emergency shelter without a CUP, thus effectively destroying the organization. The Warming Center also has a

profound interest in the welfare of the homeless people who will have to risk death and severe physical and psychological injury from having to sleep outside in winter.

332. The risk of an erroneous or unjustified deprivation is immense—the City Council revoked the CUP in part on the basis of unsworn statements about the alleged antisocial behavior of unidentified people who may have no connection to the Warming Center and who engaged in such behavior off Warming Center property and beyond its control. The risk of an erroneous deprivation is evident in the City Council's "findings" that the 2020 CUP application had false or incorrect information, but those "findings" don't identify any specific factual statement in the 2020 CUP application that were factually false.

333. And it is evident in the express statement one of the City councilmembers that their vote was driven by the will of the voters rather than the facts of the case. A system in which the adjudicator decides whether to deprive a person of property on the basis of that person's popularity is definitionally prone to erroneous or unjustified deprivations.

334.  The cost of added administrative procedures is not excessive, as evidenced by the fact that the City already has them. The Kalispell Zoning Ordinance has quasi-judicial procedures for citing and punishing code violations, including CUP violations. Those procedures provide for review by a Board of Adjustment that is independent from the City Council and appeal from that Board to state trial courts authorized to hear administrative appeals of such decisions.

335. The City declined to invoke any of these procedures not because they were too expensive or burdensome but because the City would have lost—because the Warming Center has done nothing wrong.

336.  Because there are no formal procedures for CUP revocations in Kalispell ordinances or state statute, there is no path of appeal to an independent quasi-judicial body like the Board of Adjustment or a state trial court specifically authorized by statute to hear such administrative appeals. Thus, there is no adequate post-deprivation remedy.

337.  For the violation of its federal procedural due process rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

## Claim II
## Fourteenth Amendment Equal Protection

338.  The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

339.  The Equal Protection Clause requires the government to treat similarly situated people or entities alike.

340.  Here, the Warming Center is similarly situated to other social-service providers, including CUP holders that are homeless shelters. The Warming Center is also similarly situated to CUP holders in general.

341.  The City Council has singled out the Warming Center for differential treatment in several ways, including: (1) attributing all police calls for trespass, disorderly conduct, welfare check, and criminal mischief within one-half-mile of the Warming Center to the Warming Center and then revoking the CUP, but not doing so to any of the other 200-plus CUP holders in Kalispell; (2) revoking the Warming Center's CUP based on 1,324 police calls within a one-half-mile radius, but not revoking the Samaritan House's CUP, another homeless shelter, which had 1,455 police calls within a one-half-mile radius; (3) taking no action against the Outlaw Inn, which has had a CUP since February 2022,

despite its property being unfenced, unsecured, and a hotspot for crime and squatting; and (4) fabricating "findings" of false information in CUP applications to justify revoking a CUP.

342. There is no rational basis for the differential treatment to which the Warming Center has been subject. Instead, the only plausible explanation is that the Warming Center has been singled out politically as a scapegoat for social and economic conditions it did not cause and could not have prevented. The Supreme Court has rejected naked animus against a disfavored group as a basis for differential treatment.

343. For the violation of its federal equal protection rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

## Claim III
## Fourteenth Amendment Substantive Due Process

344. The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

345. The Warming Center has a vested property interest in its CUP. It also has a liberty interest in using its property for the

noncommercial, charitable purpose of sheltering the homeless from life-threatening peril.

346. The revocation of the CUP arbitrarily and irrationally deprived the Warming Center of its property interest in its CUP. The City cannot expropriate private property by legislative fiat simply by asserting that problems exist in other parts of the City.

347. To the extent the City wants to reduce the presence of the homeless on public property like parks and sidewalks, reduce the likelihood the homeless will sleep unlawfully on public property or on private property without permission, reduce the likelihood that the homeless will relieve themselves other than in a proper restroom, shutting down the Warming Center is irrational because it is where the homeless can be on private property with permission, sleep on private property with permission, and use appropriate restroom facilities on private property with permission.

348. To the extent the right to use property for the noncommercial, charitable purpose of sheltering the needy from life-threatening peril is fundamental, the City Council's CUP revocation fails strict scrutiny.

349.  For the violation of its federal substantive due process rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

**Claim IV**
**U.S. Constitution Article I, Section 10 Bills of Attainder**

350.  The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

351.  Article I, Section 10 of the United States Constitution forbids bills of attainder.

352.  A bill of attainder is a legislative act that applies either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial.

353.  Resolution 6227 is a legislative act of the Kalispell City Council.

354.  Resolution 6227 applies solely to the Warming Center.

355.  Resolution 6227 made repeated findings that the Warming Center's CUP was subject to revocation under the perjury clause of the 2020 CUP application because of false or incorrect information.

356. Resolution 6227 inflicts punishment on the Warming Center by depriving it of its vested property interest in its CUP.

357. During the September 16, 2024 hearing at which the City Council voted to revoke, City Councilmembers stated that they were voting to revoke the CUP to punish the Warming Center for violating the perjury clause of the 2020 CUP application.

358. The process for revoking the CUP was not a judicial process.

359. To the extent Resolution 6227 revoked the Warming Center's CUP to punish it for falsehoods in its 2020 CUP application, Resolution 6227 is a prohibited bill of attainder.

360. For the violation of its rights against bills of attainder, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

### Claim V
### Montana Constitution Individual Dignity Clause

361. The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

362. Article II, Section 4 of the Montana Constitution forbids discrimination "on account of . . . social origin or condition." The Montana

Supreme Court has stated that "social origin or condition" refers to economic status.

363.  The City Council singled out the Warming Center for differential treatment based not on any law it had broken or any wrong it had committed, but because a majority on the City Council wanted to vilify and punish the homeless.

364.  Vilifying and punishing the homeless by irrationally destroying the Warming Center, a refuge on private property where the homeless can safely exist without fear of violence or arrest, is a form of discrimination based on economic status and hence "on account of social origin or condition."

365.  For the violation of its state individual dignity rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

## Claim VI
## Montana Constitution Fundamental Inalienable Rights

366.  The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

367.  Article II, Section 3 of the Montana Constitution codifies "inalienable rights" that the Montana Supreme Court deems "fundamental."

368.  These inalienable fundamental rights include the "rights of pursuing life's basic necessities . . . acquiring, possessing, and defending property . . . and seeking their safety [and] health."

369.  The Warming Center has a fundamental right to possess and defend its vested property right in its CUP.

370.  Sleeping indoors during a Montana winter is a basic necessity of life.

371.  Coming to the Warming Center during a Montana winter is a way to seek safety and health.

372.  As a nonprofit whose specific purpose is to provide emergency winter shelter, the inalienable fundamental rights in Article II, Section 3 collectively confer a fundamental right on the Warming Center to use its property to provide basic necessities to the homeless who are seeking their own safety and health.

373.   Revocation of the Warming Center's CUP cannot be justified under the heightened scrutiny to which impairments of Montanans' fundamental rights are subject.

374.   For the violation of its state fundamental inalienable rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

## Claim VII
## Montana Constitution Substantive Due Process

375.   The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

376.   Article II, Section 17 of the Montana Constitution protects the right to due process of law.

377.   Montana's Due Process Clause provides greater protection than its Fourteenth Amendment counterpart.

378.   The Montana Supreme Court provides a standard of review more demanding than federal rational-basis review.

379.   To the extent the CUP revocation survives Fourteenth Amendment substantive due process, it still fails the independent and

stricter substantive due process requirement of the Montana Constitution.

380.  For the violation of its state substantive due process rights, the Warming Center is seeking compensatory and nominal damages, declaratory relief, a temporary restraining order, and preliminary and permanent injunctions.

## Claim VIII
## Fifth and Fourteenth Amendment Takings

381.  The Warming Center realleges and incorporates by reference the allegations in paragraphs 1 through 326.

382.  A CUP is a property interest protected under Montana law.

383.  If the City is successful in its efforts to revoke the Warming Center's CUP, the City will have deprived the Warming Center of its property.

384.  The City, acting under color of law, seeks to cause the Warming Center to be deprived of its property interest in its CUP without just compensation in violation of the Takings Clause of the Constitution.

385.  As applied to the Warming Center, the City's revocation of the Center's CUP is being deployed to deprive the Center of its reasonable

investment-backed expectations of how it would use 889 North Meridian to shelter the homeless in Kalispell.

386.  Unless the City is enjoined from enforcing the revocation of the Warming Center's CUP, the Warming Center will continue to suffer irreparable harm and the loss of its property interest.

387.  The Warming Center has no other remedy by which to prevent or minimize this continuing irreparable harm to its constitutional rights and its property interest.

388.  Absent declaratory and injunctive relief, the Warming Center will suffer irreparable harm caused by the deprivation of its constitutional rights and the deprivation of its property interest.

389.  For the violation of its rights under the Takings Clause, the Warming Center seeks declaratory relief, injunctive relief, and just compensation.

## REQUEST FOR RELIEF

A.     For an award of compensatory damages due to the violation of the Warming Center's constitutional rights;

B.     For an award of $1 in nominal damages for the violation of the Warming Center's constitutional rights;

C.     For a judgment declaring that the City violated the
       Warming Center's constitutional rights;

D.     For a temporary restraining order and preliminary
       injunction to protect the ability of the Warming Center to
       allow homeless Kalispell residents to sleep at the Warming
       Center during the winter for the pendency of this case;

E.     For a permanent injunction against application of Resolution
       6227 revoking the Warming Center's CUP;

F.     For an award of reasonable attorneys' fees and costs;

G.     For an award of just compensation, in the alternative; and

H.     Such other relief as this Court deems appropriate.

Dated: October 8, 2024                    Respectfully submitted,

                                          /s/ David F. Knobel
Jeff Rowes*                               David F. Knobel
Christen Hebert*                          CROWLEY FLECK PLLP
INSTITUTE FOR JUSTICE                     P.O. Box 2529
816 Congress Ave., Ste 970                Billings, MT 59103-2529
Austin, TX 78701                          Email: dknobel@crowleyfleck.com
                                          Tel: 406-252-3441

*pro hac vice forthcoming

## Verification

The statements verifying the allegations contained in this complaint can be found in paragraph 149 of Exhibit 1, Affidavit of Tonya Horn, and in paragraph 49 of Exhibit 2, Affidavit of Luke Heffernan.