David F. Knobel
CROWLEY FLECK PLLP
P.O. Box 2529
Billings, MT 59103-2529
Email: dknobel@crowleyfleck.com
Tel: 406-252-3441

Jeff Rowes*
Christen Hebert*
INSTITUTE FOR JUSTICE
816 Congress Ave., Ste 970
Austin, TX 78701
*pro hac vice forthcoming

Attorneys for Plaintiff Flathead Warming Center

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD WARMING CENTER,<br><br>      Plaintiff,<br><br>  vs.<br><br>CITY OF KALISPELL,<br><br>      Defendant. | Case No. 9:24-cv-00141-KLD<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPOR OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER** |

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iii

Introduction ........................................................................... 1

Background ............................................................................. 2

I.    The status quo before revocation: The Warming Center has a vested property right and shelters the homeless from death and serious injury ................................................................. 2

II.   The Warming Center opened in late 2020 with a CUP for 889 North Meridian ...................................................................... 4

III.  As homelessness worsens statewide, local politicians scapegoat the Warming Center ................................................................. 5

IV.   The City Council revokes the CUP even though CUPs are not revokable, and even though procedures exist for problem properties ............................................................................ 7

V.    Rather than use existing procedures with real protections, the City Council made up procedures with no protections ................ 8

Standard of Review ................................................................. 12

Argument ................................................................................ 13

I.    Profound irreparable harms: Death or severe injury for the homeless, destruction of the Warming Center, and violation of constitutional rights ......................................................... 14

II.   There are serious questions going to the merits ...................... 15

      A.    Procedural Due Process: A "fair chance" the *ad hoc* political process was unconstitutional ............................ 16

            1.    The Warming Center's CUP is a vested property right ..................................................................... 17

            2.    The "private interest" is enormous: The Warming Center cannot exist without its CUP and the homeless are at risk ............................................... 18

3.   The risk of "erroneous deprivation" is immense because the City Council used a rigged political process, not normal procedures ............................. 18

4.   *Mathew*'s "administrative burden" factor favors the Warming Center ................................. 22

B.   Equal Protection: A "fair chance" that singling out the Warming Center for CUP revocation is irrational ........... 23

1.   The Warming Center is similarly situated to other social-service providers and other CUP holders ..... 24

2.   There is a "fair chance" of showing no rational basis for intentionally singling out the Warming Center for CUP revocation .................................... 25

C.   Substantive Due Process: Arbitrary to destroy a vested property right that will objectively worsen Kalispell ....... 29

III.  Serious questions about the constitutional merits and profound irreparable harms mean that the Warming Center is entitled to a TRO ................................................................... 32

Conclusion ......................................................... 33

Certificate of Compliance ................................................ 35

Certificate of service ........................................................ 36

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ariz. Dream Act Coal. v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014)............................................................25

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) ...........................................................32

*Bateson v. Geisse,*
   857 F.2d 1300 (9th Cir. 1988)............................................................29

*Catherine H. Barber Mem. Shelter, Inc. v. Town of N. Wilkesboro*
   *Bd. of Adjustment,*
   576 F. Supp. 3d 318 (W.D.N.C. 2021).................................................29

*Ching v. Mayorkas,*
   725 F.3d 1149 (9th Cir. 2013).....................................................21, 22

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985)..........................................................24, 26, 29

*Clements v. Airport Auth.,*
   69 F.3d 321 (9th Cir. 1995)..............................................................20

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey,*
   920 F.2d 1496 (9th Cir. 1990)............................................................29

*Engquist v. Or. Dep't of Agric.,*
   553 U.S. 591 (2008)........................................................................24

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
   98 F. 4th 1180 (9th Cir. 2024) ............................................1, 2, 15, 16

*Ford v. Wainwright,*
   477 U.S. 399 (1986).........................................................................14

*Gallinger v. Becerra,*
   898 F.3d 1012 (9th Cir. 2018)............................................................25

*Garcia v. Google, Inc.,*
   743 F.3d 1258 (9th Cir. 2014)............................................................14

*Gerhart v. Lake County,*
   637 F.3d 1013 (9th Cir. 2010)..............................................................24

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000)..............................................................33

*Hamdi v. Rumsfeld,*
   542 U.S. 507 (2004)...................................................................... 19, 22

*Hernandez v. Sessions,*
   872 F.3d 976 (9th Cir. 2017)................................................................15

*hiQ Labs, Inc. v. LinkedIn Corp.,*
   31 F.4th 1180 (9th Cir. 2022) ........................................................ 13, 15

*Kerley Indus., Inc. v. Pima County,*
   785 F.2d 1444 (9th Cir. 1986)..............................................................18

*Kirk v. Comm'r of Soc. Sec. Admin.,*
   987 F.3d 314 (4th Cir. 2021)................................................................19

*Korean Am. Legal Advoc. Found. v. City of Los Angeles,*
   23 Cal. App. 4th 376 (1994) ................................................................17

*Mathews v. Eldridge,*
   424 U.S. 319 (1976)...................................................................... 16, 17

*Sadid v. Vailas,*
   936 F. Supp. 2d 1207 (D. Idaho 2013) ................................................19

*St. Joseph Abbey v. Castille,*
   712 F.3d 215 (5th Cir. 2013)................................................................30

*Stivers v. Pierce,*
   71 F.3d 732 (9th Cir. 1995)..................................................................18

*Tai Tam, LLC v. Missoula County,*
   2022 MT 229 (2022) ............................................................................18

*Bd. of Regents v. Roth,*
   408 U.S. 564 (1972)..............................................................................17

*Vasquez v. Rackauckas,*
   734 F.3d 1025 (9th Cir. 2013)..............................................20, 21, 23

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017)............................................................. 12

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................ 13

## Statutes

Cal. Gov. Code § 65905........................................................................ 23

Mont. Code Ann. §76-2-327................................................................... 8

Zoning Ord. § 27.12.020(12) ................................................................ 18

Zoning Ord. § 27.21.030 ........................................................................ 8

Zoning Ord. §§ 27.31.010–.020............................................................. 8

Zoning Ord. § 27.33.050 ........................................................................ 8

Zoning Ord. § 27.33.090 ........................................................................ 9

Zoning Ord. § 27.36.010 ........................................................................ 8

## Other Authorities

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and
  Procedure* § 2948.1 (3d ed. 1998)....................................................... 15

## INTRODUCTION

> "I was elected by my neighbors and my neighbors
> have spoken." – Kari Gabriel, Kalispell City
> Councilmember, on why she voted to destroy an
> emergency shelter.

Politics. That is why, in a 6-3 vote on September 16, 2024, the Kalispell City Council voted to revoke the conditional use permit ("CUP") of Plaintiff Flathead Warming Center, a nonprofit that provides a warm, safe place for the homeless to sleep during frigid winter nights. The Warming Center never broke any laws. It never violated any condition of its permit. But it became politically unpopular, and so six members of the City Council destroyed it.

A temporary restraining order is warranted under the Ninth Circuit's "sliding scale" on the Warming Center's procedural due-process, equal-protection, and substantive due-process claims. The irreparable harms are so severe that the Warming Center need only show a "fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F. 4th 1180, 1194 (9th Cir. 2024). Winter is coming and the Warming Center cannot provide emergency nighttime shelter. As Dr. Todd Johnson, a Kalispell emergency-room doctor, testified: "Logan Health's Emergency Department will see more

homeless individuals seeking shelter and emergency treatment for frostbite, hypothermia, and avoidable complications from other medical conditions." Verified Complaint ("V.Compl.") ¶ 296.

A few months ago, in *Flathead-Lolo*, the Ninth Circuit affirmed a preliminary injunction because of "imminent harm to grizzly bears should Montana's wolf trapping and snaring season proceed as planned." 98 F.4th at 1194. If the prospect of dead and injured Montana bears during hunting season is enough for preliminary relief, then the prospect of dead and injured Montanans during winter should suffice, too. **The Warming Center respectfully seeks a temporary restraining order to open for the winter sleeping season on October 10, 2024**, and then asks the Court to hear its forthcoming preliminary-injunction motion as soon as practicable.

## BACKGROUND[1]

### I.   The status quo before revocation: The Warming Center has a vested property right and shelters the homeless from death and severe injury.

The City upset the status quo with the September 16, 2024 CUP revocation. Before that, the Warming Center was open for four years

---

[1] For simplicity, the Warming Center refers to paragraphs of the Verified Complaint, which in turn has citations to the complaint exhibits, including notarized affidavits with testimony.

between October and April when the average low in Kalispell is below freezing. V.Compl. ¶¶ 10, 57–58, 70–72. Because its mission is saving lives, the Warming Center is low-barrier. V.Compl. ¶ 13. It accepts anyone seeking shelter from life-threatening cold. V.Compl. ¶¶ 13–14. No criminal background check, drug or alcohol test, mental-health screen, or worship requirement. V.Compl. ¶ 13.

Kalispell cold can be lethal. Dr. Johnson, who volunteers at the Warming Center, testified that his ER "regularly sees injuries and illnesses such as frostbite, frozen fingers and toes, and hypothermia from overnight exposure among the homeless population." V.Compl. ¶ 295. [[Aff. ¶ 13]]. "Every year or so, a homeless person in Kalispell is found dead in a tent or some other shelter, presumably having died from hypothermia." *Id.* ¶ 14.

This year, the Warming Center was scheduled to open on October 10th. V.Compl. ¶ 291. Now it can't. V.Compl. ¶ 291. That act will cause severe injury and suffering, maybe death. Dr. Johnson again: "[A] lack of shelter, especially overnight during winter, tends to exacerbate existing medical issues or conditions. Minor injuries and illnesses often develop into more severe medical problems. Chronic health conditions

3

worsen. Mental health issues and substance abuse problems intensify." V.Compl. ¶ 295. *Id.* ¶ 12. Jennifer Ball, a social worker for the Public Defender's Office, works with the Kalispell homeless. V.Compl. ¶ 141. She testified that a client "lost part of his foot from hypothermia because he had no place to go and was forced to sleep outside in subfreezing temperatures." V.Compl. ¶ 297. In recent years, he "has regularly stayed at the Warming Center during the winter." V.Compl. ¶ 297. Now, if the Warming Center is closed, "[he]—and more homeless individuals like him—will suffer injuries in the freezing cold." V.Compl. ¶ 297. Those are the stakes.

## II. The Warming Center opened in late 2020 with a CUP for 889 North Meridian.

Tonya Horn and Luke Heffernan founded the Warming Center in 2019 with 20 beds in Christ Church Episcopal. V.Compl. ¶¶ 12, 16. But they had to turn people away nightly. V.Compl. ¶ 17. In summer 2020, the Warming Center found 889 North Meridian, a vacant mechanic shop. V.Compl. ¶¶ 30–32. The property was perfect: a central location in a business district near the hospital, food bank, post office, and addiction-recovery center. V.Compl. ¶ 31. In August 2020, the Warming Center contracted to buy 889 North Meridian, contingent on (1) a

zoning amendment to add "homeless shelter" as a use, and (2) obtaining a CUP. V.Compl. ¶¶ 33–34.

The City Council enacted the zoning amendment and granted the CUP by December 2020. V.Compl. ¶¶ 52, 57–58, 66–67. The Kalispell Planning Department report on the CUP assessed each "review criteria" in the zoning code, finding that each favored the CUP. V.Compl. ¶¶ 45–46. The City Council adopted that report. V.Compl. ¶ 59. The CUP had nine conditions. Only one pertained to ongoing operations—a 40-bed limit. V.Compl. ¶ 60.

## III.   As homelessness worsens statewide, local politicians scapegoat the Warming Center.

In late 2020, the City didn't dispute that Kalispell needed the Warming Center. In approving the zoning amendment, the Planning Department stated that "[h]omelessness is an issue that exists in the city with or without this text amendment," and that shelters "reduce the community costs of unsheltered homelessness." V.Compl. ¶ 42. The City Council adopted those findings. V.Compl. ¶ 59.

That reflected reality. Montana experienced the nation's steepest rise in homelessness between 2007 and 2023—a 551 percent increase. V.Compl. ¶ 112. The January 2022 point-in-time count recorded 319

homeless Kalispell residents. V.Compl. ¶ 122. The causes are complex and uncertain, but there are clues. Per the Census Bureau, Kalispell became the nation's fastest growing "micropolitan" area, seeing a 26 percent increase in population from 2020–2024. V.Compl. ¶ 113. The average rent in Kalispell rose from $883 in July 2022 to $1,455 in July 2024. V.Compl. ¶ 113. Per the Bureau of Labor Statistics, unemployment for Kalispell rose from 2.5 percent in September 2022 to 5 percent in January 2024. V.Compl. ¶ 113. This happened during a collapse in mental-health care. V.Compl. ¶¶ 117–21. In 2022, Montana's only psychiatric hospital, a state facility in Warm Springs, lost its federal funding. V.Compl. ¶ 118. In 2023, Sunburst mental-health clinic in Kalispell closed. Many with mental illness are now on the street. V.Compl. ¶¶ 117, 121.

Homelessness is complicated. But local politicians decided they could score political points with a simple explanation: Blame the Warming Center. In January 2023, the Flathead County Commissioners issued an open letter decrying "a low barrier shelter [that] opened in our community" that supposedly caused "a dramatic increase in homeless individuals." V.Compl. ¶¶ 132–33. The community

6

knew the Commissioners meant the Warming Center. V.Compl. ¶ 139.

"[H]omelessness is a lifestyle choice for some," they declared, asserting

that "these wanderers are well networked and eager to share that

Kalispell has 'services' to serve their lifestyle." V.Compl. ¶ 133. The

Commissioners called for unity "in rejecting all things that empower the

homeless lifestyle" and implored "city councils not to permit or expand

warming shelters." V.Compl. ¶ 134.

The letter contains no evidence to support its assertions. The

Warming Center and Ms. Ball, the social worker, testified that the

homeless they serve are Kalispell locals. V.Compl. ¶ 137.

## IV. The City Council revokes the CUP even though CUPs are not revokable, and even though procedures exist for problem properties.

A CUP cannot be revoked under Kalispell law. Once granted, a

CUP becomes a vested real-property interest that "runs with the land."

Zoning Ord. § 27.33.060(1). There is no procedure in the Kalispell

zoning code for revoking CUPs because they are not revokable. They are

intentionally not revokable because they typically involve significant

investment-backed expectations, such as apartment buildings.

There are procedures in Kalispell and state law for addressing problem properties. A CUP violation is treated as a violation of the zoning code. *Id*. § 27.33.050. The zoning administrator is authorized to issue citations, and the Board of Adjustment is authorized to hear appeals. *Id*. §§ 27.31.010–.020, 27.36.010. Decisions from the Board of Adjustment may be appealed per state statute. *Id*. § 27.21.030; Mont. Code Ann. §76-2-327. If a property is a nuisance, the Zoning Ordinance authorizes the City to seek injunctive relief in court. Zoning Ord. § 27.36.20.

## V. Rather than use existing procedures with real protections, the City Council made up procedures with no protections.

The City didn't use proper, existing procedures. Instead, the City created an *ad hoc* procedure for the Warming Center alone. The City Council itself initiated the revocation process at an April 1, 2024 meeting. V.Compl. ¶ 152. Councilmember Chad Graham read a prepared statement blaming the Warming Center for the "deterioration" of "the quality of life" and "the businesses in that area." V.Compl. ¶ 153. Discussion between Graham and the City Manager stated that revoking the CUP was "fair game because a permit is a matter of grace by the Council." V.Compl. ¶ 155.

8

This was a legal error. The word "grace" likely refers to the fact that, under the zoning code, the "**granting** of a Conditional Use Permit is a matter of **grace**, resting in the discretion of the City Council and the refusal is not the denial of a right." Zoning Ord. § 27.33.090 (emphasis added). But, as noted, once granted, the CUP becomes a vested real-property interest that "runs with the land." *Id.* § 27.33.060(1).

The process used to revoke the CUP lacked basic protections for a step as drastic as destroying a nonprofit. For example:

- No one disputed that the Warming Center complied with its CUP, but the City revoked it anyway. *E.g.* Councilmember Graham: "I have said that they're compliant with the nine conditions that we as a council set." V.Compl. ¶ 203.

- The May 31, 2024 letter to the Warming Center notifying it of a hearing on its CUP stated that public comment at the May City Council "working sessions" supported a revocation hearing, V.Compl. ¶ 183, but:

  o A majority of public comments at the May 13, 2024 meeting favored the Warming Center, V.Compl. ¶ 175;

  o The Mayor cut off speakers in support to elicit negative comments, V.Compl. ¶ 174;

  o Public comments at the May 28, 2024 meeting favored the Warming Center 10-3, V.Compl. ¶ 180; and

  o No public comment at either meeting identified a specific thing the Warming Center had done wrong, V.Compl. ¶ 182.

- No witnesses were sworn and there was no opportunity for cross examination at any point in the revocation process, V.Compl. ¶¶ 168, 181; *see* V.Compl. ¶¶ 173, 179 (explaining that both work sessions featured only public comment, with Warming Center staff participating the same as any other member of the public);

- City councilmembers, in addition to initiating the revocation process they were themselves judging, also served as their own unsworn witnesses, V.Compl. ¶¶ 153–54, 177;

- The May 31, 2024 letter from the City Attorney to the Warming Center notifying it of a hearing on its CUP repeatedly referenced discrepancies between what the Warming Center promised in its 2020 CUP application and the situation in Kalispell in 2024, but did not identify or provide specific evidence proving these discrepancies, V.Compl. ¶ 183;

- Resolution 6227 made repeated findings of discrepancies between the Warming Center's 2020 CUP application and the situation in Kalispell in 2024, but did not identify any specific discrepancy, V.Compl. ¶¶ 214–15; and

- Councilmembers admitted that they revoked the CUP for political reasons, V.Compl. ¶ 169.

The only thing *resembling* real evidence during this process were charts about police calls. V.Compl. ¶ 228. But even that was misleadingly presented (and the underlying data never shared). The Warming Center was vulnerable to the misuse of statistics because it was (1) new and (2) seasonal. This meant that the City could compare the 2018–2020 period before the Warming Center existed to 2021–2023 when it did. The City could also compare the winter season when the

10

Warming Center was open overnight to the five months when it isn't. The City used these charts to declare the Warming Center to be the cause of increased police calls.

Let's set aside obvious objections to this conclusion. Ignore, for example, that the population was increasing, that homelessness was increasing, and that we don't know whether the police calls involved the homeless (or, if they did, whether they concerned the abuse of homeless people). There is other statistical noise, too, like the fact that the County Fairgrounds are next to the Warming Center, holding concerts and rodeos. V.Compl. ¶ 253. But let's take the data at face value.

If we make a direct apples-to-apples comparison, there is nothing remarkable about the Warming Center. The direct comparison is with Samaritan House, a homeless shelter with a similar capacity where people sleep year-round. V.Compl. ¶¶ 239, 249. Here are the average monthly police calls within a half-mile of Samaritan House versus within a half-mile of the Warming Center during the months it is open for sleeping (the respective half-mile areas don't overlap):

| Police calls 2021–2023 (half-mile radius) | Warming Center | Samaritan House |
|---|---|---|
| Trespass | 43 | 40 |
| Disorderly conduct | 28 | 25 |
| Welfare check | 46 | 76 |
| Mischief | 9 | 21 |

V.Compl. ¶ 249.

Samaritan House existed in 2018–2020 and is open year-round. Therefore, the City can't make charts showing the theoretical gains in reduced police calls from revoking its CUP. But, if the City's theory about the Warming Center is correct and police calls go down when social service providers are destroyed, then that must be true of Samaritan House. And the Ray of Hope shelter. And the Flathead Food Bank. And the addiction-recovery center. But the City Council took drastic action only against the Warming Center.

## STANDARD OF REVIEW

The "legal standards applicable to TROs and preliminary injunctions are substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (cleaned up). "A plaintiff seeking a

12

preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit "use[s] a 'sliding scale' approach . . . [s]o when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (cleaned up).

## ARGUMENT

A temporary restraining order is warranted under the Ninth Circuit's "sliding scale" because the irreparable harms are profound and the merits questions serious. As mentioned earlier, the Ninth Circuit just upheld a preliminary injunction in Montana to protect the lives of bears. If protecting Montana bears justifies preliminary relief, then so does protecting Montanans. In Part I, the Warming Center explains those profound irreparable harms. In Part II, it demonstrates serious questions going to the merits of its procedural due-process, equal-

protection, and substantive due-process claims. Part III explains that preliminary relief is warranted because the remaining factors always favor the plaintiff in a constitutional case. Finally, Part IV explains the simple injunction—enjoining revocation of the CUP—that will preserve the status quo until further proceedings.

## I. Profound irreparable harms: Death or severe injury for the homeless, destruction of the Warming Center, and violation of constitutional rights.

The Warming Center faces three profound irreparable harms. First, the homeless face death and suffering. "Death is an 'irremediable and unfathomable' harm." *Garcia v. Google, Inc.*, 743 F.3d 1258, 1268 (9th Cir. 2014) (quoting *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)). "[A]nd bodily injury is not far behind." *Id.* And Dr. Johnson's ER, "Logan Health's Emergency Department[,] will see more homeless individuals seeking shelter and emergency treatment for frostbite, hypothermia, and avoidable complications from other medical conditions." V.Compl. ¶ 296. And even worse: "a homeless person in Kalispell" may be "found dead in a tent or some other shelter" from hypothermia. V.Compl. ¶ 294.

14

Second, the CUP revocation destroyed the Warming Center. It cannot lawfully open at its only place of business to perform its sole mission. V.Compl. ¶ 13. "The loss of an . . . ongoing business representing many years of effort and the livelihood" of its founder, board member, and director Tonya Horn "constitutes irreparable harm." *hiQ Labs*, 31 F.4th at 1188 (cleaned up). Its employees will be forced to leave, and donations will dry up. V.Compl. ¶¶ 304–6.

Last, irreparable harm "follows inexorably from [a] conclusion that the government's policies are likely unconstitutional." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017). Thus, with "an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).

## II.   There are serious questions going to the merits.

With those irreparable harms, the Warming Center need show only serious questions going to the merits. "Serious questions are ones that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Flathead-Lolo*, 98 F.4th at 1192 (cleaned up). "They need not promise a

15

certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* As the following demonstrates, the Warming Center has more than "a fair chance of success" on its procedural due-process (Section A), equal-protection (Section B), and substantive due-process (Section C) claims.

## A. Procedural Due Process: A "fair chance" the *ad hoc* political process was unconstitutional.

Even *if*—and that's a big *if*—a CUP is revocable, then the question is whether the City's procedures "assure[d] fairness." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Even a casual survey of the facts raises "serious questions" about whether the City "assure[d] fair consideration." *Id.* at 349. The Warming Center broke no laws, nor violated its CUP. The City could have used established procedures for addressing a problem property, such as citations or nuisance law. Instead, the City used a political process in which the City Council was prosecutor, witness (and other witnesses were unsworn), judge, jury, and executioner. The fairness problem is obvious.

The three-factor test from *Mathews* applies: (1) the magnitude of "the private interest"; (2) "the risk of erroneous deprivation"; and (3) the nature of "the Government's interest, including the function involved

16

and the fiscal and administrative burdens" of additional process. *Id.* at 335. This inquiry is flexible and fact-specific: "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334.

### 1. The Warming Center's CUP is a vested property right.

The first step is identifying a protected property interest, which "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Warming Center has a vested right in its CUP. "Once a licensee has acquired a conditional use permit . . . [and] has incurred substantial expense and acted in reliance on the permit, the permittee has acquired a vested property right." *Korean Am. Legal Advoc. Found. v. City of Los Angeles*, 23 Cal. App. 4th 376, 379 (1994). The Warming Center spent $750,000 on 889 North Meridian and used it for four years. V.Compl. ¶¶ 68–81. That creates "a sufficient claim of entitlement to its conditional use

17

permit . . . [to] trigger the constitutional requirement of due process."

*Kerley Indus., Inc. v. Pima County*, 785 F.2d 1444, 1446 (9th Cir. 1986).[2]

## 2. The "private interest" is enormous: The Warming Center cannot exist without its CUP and the homeless are at risk.

The private interest is existential. The Warming Center cannot

lawfully operate without its CUP. And, as a nonprofit with a specific

mission, the Warming Center cannot convert 889 North Meridian into

another permissible use such as a "funeral home" or "laundromat."

Zoning Ord. § 27.12.020(9), (12). The Warming Center also has a

profound interest in the welfare of the homeless.

## 3. The risk of "erroneous deprivation" is immense because the City Council used a rigged political process, not normal procedures.

"It is well-settled that the Due Process Clause prevents the state

from depriving a plaintiff of a protected property interest without a fair

trial in a fair tribunal." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir.

1995) (cleaned up). "[T]he Supreme Court has indicated that the risk of

an erroneous deprivation [of property] is too high where an individual is

not provided 'notice of the factual basis' for a material government

---

[2] Additionally, the "ownership of real property constitutes a protected property interest" for the purposes of federal procedural due process. *Tai Tam, LLC v. Missoula County*, 2022 MT 229, ¶ 23.

finding and 'a fair opportunity to rebut the Government's . . . assertions before a neutral decisionmaker.'" *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 325 (4th Cir. 2021) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004)).

The City Council needed to provide full procedural protections. "[W]here a meaningful review before an impartial decisionmaker is not necessarily afforded at the post-termination stage, the burden is on the government to conduct the pretermination hearing in a manner that affords the grievant all the process that he is due." *Sadid v. Vailas*, 936 F. Supp. 2d 1207, 1229 (D. Idaho 2013). There is no post-deprivation stage here. The City Council was the beginning and end of the line. There is no procedure for revoking CUPs, so there is no appeal procedure. The City *could have* issued citations to the Warming Center, which could have been appealed to the Board of Adjustment and then on to a state trial court. Or the City *could have* brought a nuisance action before a state trial court. But it didn't do either of those things.

There is a dearth of CUP-revocation precedent, much less apposite precedent, so we must examine analogous authority. *Clements v. Airport Authority*, 69 F.3d 321 (9th Cir. 1995), is on point. There, a

19

whistleblowing couple engaged in "efforts to expose fraud within the Airport Authority" were terminated in a "reorganization." *Id.* at 325. Like the Warming Center, the couple hadn't broken any rules but had run afoul of the powers that be. The Ninth Circuit held that the couple was entitled to an "impartial tribunal" that did not consist of the very decisionmakers who wanted the couple gone. *Id.* at 333. Here, the Warming Center is entitled to a tribunal that doesn't consist of the City Councilmembers who are acting simultaneously as accuser, prosecutor, judge, and jury—all the while inventing procedures on the fly that don't exist in the law. No surer proof of bias exists than Councilmember Gabriel's admission that she was just doing what she thought voters wanted her to do. That is not how neutral adjudicators make decisions. "[A]n adjudication . . . tainted by bias cannot be constitutionally redeemed[.]" *Id.*

The risk of erroneous deprivation is also acute when the proceeding is a form of collective punishment. In *Vasquez v. Rackauckas*, the Ninth Circuit considered injunctions secured against street gangs for being a public nuisance. 734 F.3d 1025 (9th Cir. 2013). The question was whether "due process requires that [individuals] be

afforded an adequate opportunity to contest whether they are active gang members before they are subjected to the injunction." *Id.* at 1029. There is a strong overtone of collective punishment, here: destroying the Warming Center, and excluding its guests, based on unsworn testimony that *some* homeless people might engage in nuisance behavior in public. But "the risk of error is considerable when" "a factual issue depends on the credibility of witnesses and assessment of conditions not subject to . . . reasonably precise measurement by external standards." *Id.* at 1045 (cleaned up).

This is why the lack of sworn testimony and cross-examination is also fatal. "[I]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Ching v. Mayorkas*, 725 F.3d 1149, 1158 (9th Cir. 2013) (quotation omitted). This is particularly true when "the evidence consists of . . . individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* In *Ching*, the Ninth Circuit held that due process required an adversarial hearing with sworn testimony when the stakes were high (the validity of a

marriage for immigration) and the adverse witness hostile (an ex-spouse). *Id.* at 1159. So too here. The stakes are immense: the Warming Center's existence and welfare of the homeless. The unsworn comments by members of the public peddled lurid tales of unidentified people doing antisocial things in public. That unsworn, freewheeling "testimony" had none of the safeguards likely to ensure truth.

The probative value of additional safeguards is self-evident. A quasi-judicial proceeding before a neutral adjudicator, like the Board of Adjustment, under procedures that are enacted into law (rather than never-before-seen and invented-on-the-fly), would provide a reliable method for evaluating wrongdoing and the appropriateness of a step as drastic as CUP revocation. Or the City could bring a nuisance lawsuit before a neutral state-court judge with those attendant protections.

### 4. *Mathews*'s "administrative burden" factor favors the Warming Center.

When plaintiffs show, as the Warming Center has, that there is an unacceptable risk of erroneous deprivation, courts rarely rule that adequate process is too burdensome even when the government interest is substantial. *See Hamdi*, 542 U.S. at 533–35 (no excessive burden in basic due process for U.S. citizen detained on battlefield fighting for

enemy); *Vasquez*, 734 F.3d at 1052–53 (no excessive burden in basic due process for gang members).

The existence of adequate process in other jurisdictions is usually dispositive proof that adequate process isn't too burdensome. For example, in *Vasquez*, the Ninth Circuit pointed out that "at least two jurisdictions in California . . . regularly provide . . . pre-deprivation process for individuals in anti-gang injunction proceedings[.]" 734 F.3d at 1053. Even if a CUP created under Kalispell law were revocable, it is possible to use an independent, quasi-judicial entity like Kalispell's Board of Adjustment. California statutes, for example, require CUP revocations to be adjudicated by the board of zoning adjustment. Cal. Gov. Code §§ 65901, 65905. And Montana law has nuisance actions. The cost of basic due process is plainly manageable.

## B. Equal Protection: A "fair chance" that singling out the Warming Center for CUP revocation is irrational.

The Warming Center also has a "fair chance of success" on the merits of its equal-protection claim. The City Council likely violated equal-protection by singling out and destroying the Warming Center via a political process it has never and will never use against other social-

service providers (including two other homeless shelters) or any of the over 200 CUP holders in Kalispell.

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "The Supreme Court has recognized that 'an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called class of one.'" *Gerhart v. Lake County*, 637 F.3d 1013, 1021 (9th Cir. 2010) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation marks omitted)). To succeed on a class-of-one theory, the Warming Center "must demonstrate that [the City Council]: (1) intentionally (2) treated [the Warming Center] differently than other similarly situated property owners, (3) without a rational basis." *Id.* at 1022.

## 1. The Warming Center is similarly situated to other social-service providers and other CUP holders.

We begin by "looking for a control group . . . composed of individuals who are similarly situated to [the Warming Center] in respects that are relevant to the" CUP revocation. *Gallinger v. Becerra*,

898 F.3d 1012, 1016 (9th Cir. 2018). "The groups need not be similar in all respects, but they must be similar in those respects relevant to [Kalispell's] policy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014).

Here, there are two ways to view "similarly situated" comparators. Most narrowly, the Warming Center is similarly situated to other social-service providers that might "attract" the homeless. These would include CUP holders like the Samaritan House and Ray of Hope homeless shelters, the Flathead Food Bank, and an addiction-recovery center.

Most broadly, if the relevant criterion is "CUP holders who have not violated any ordinances or conditions of their CUP," then the Warming Center is similarly situated to essentially every CUP holder in the City.

### 2. There is a "fair chance" of showing no rational basis for intentionally singling out the Warming Center for CUP revocation.

The Supreme Court explained how the equal-protection analysis should proceed in *Cleburne*, a case with considerable factual similarity. *Cleburne* was about the politically motivated denial of a CUP to an

outsider group (the mentally handicapped), just as the Warming Center faces the politically motivated revocation of its CUP. "After holding a public hearing . . . the City Council voted 3 to 1 to deny" the permit for reasons such as the site being "located on 'a five hundred year flood plain.'" *Cleburne*, 473 U.S. at 437, 449.

But, the Supreme Court held, the question wasn't whether an asserted justification—"flood plains" or "the size of the home and number of people"—was arguably rational in the abstract. *Id.* at 449. The question was whether Cleburne applied the same standard to similarly situated property owners. The evidence proved that Cleburne did not. "This concern with the possibility of a flood . . . can hardly be based on a distinction between the Featherston home and, for example, nursing homes . . . which could be located on the Featherston site[.]" *Id.*

The question here, then, is whether the City is applying a standard to the Warming Center that it doesn't apply to other similarly situated property owners. It is. As to social-service organizations, the City's CUP-revocation theory is: "We will have fewer police calls within a half-mile radius if we destroy this nonprofit that attracts needy people." But that theory applies with equal force to the two other

homeless shelters in town, Samaritan House and Ray of Hope, to the Food Bank, and to the addiction-recovery center. The City's own police-call data indicate that the Warming Center and Samaritan House generate similar area calls when the Warming Center has people sleeping there. And Samaritan House is in a residential area. V.Compl. ¶ 239. Police calls would surely decrease there if the Samaritan House were destroyed. Yet the City isn't destroying Samaritan House or any other social-service organization.[3]

And what about every other CUP holder in town? There are over 200 besides the Warming Center. Most of them, presumably, are like the Warming Center in never having violated any ordinances or CUP conditions. It isn't remotely plausible that the City would ever revoke their CUPs in a political process based on unsworn testimony about grievances against unidentified people off the CUP holder's property. The Warming Center could not find any evidence of a prior CUP revocation or even evidence that such a step was ever before

---

[3] The Warming Center, of course, isn't suggesting the City *should* destroy its other social-service providers. The Warming Center is only pointing out the unconstitutional double-standard.

contemplated. The explanation for that, of course, is that CUPs are not revocable.

There is at least a "fair chance" of showing no rational basis for singling out the Warming Center for this differential treatment. To the contrary, it is almost certainly just the irrational scapegoating of an emergency shelter for a complex homelessness problem with many causes. This irrational scapegoating is premised on invidious stereotypes about the homeless, either as merry "wanderers" fleecing naïve locals or feral animals who relieve themselves on sidewalks. As the new kid on the block, unlike the Samaritan House or Ray of Hope shelters, the Warming Center was a vulnerable political target. As Councilmember Gabriel admitted, her vote to revoke was a political act, driven by her constituents' anger about the homeless. V.Compl. ¶ 169.

"But mere negative attitudes, or fear . . . are not permissible bases for treating [an emergency shelter] differently from" other social-service providers and from every other CUP holder in Kalispell. *Cleburne*, 473 U.S. at 448. "[T]he [C]ity may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic." *Id*. "The short of it is that [revoking] the

permit in this case . . . rest[s] on an irrational prejudice against the [homeless], including those who would occupy the [Warming Center.]" *Id.* at 450.

Just before Christmas 2021, a federal judge in North Carolina relied on *Cleburne* to invalidate a politically motivated CUP denial for a homeless shelter there. *Catherine H. Barber Mem. Shelter, Inc. v. Town of N. Wilkesboro Bd. of Adjustment*, 576 F. Supp. 3d 318, 343 (W.D.N.C. 2021). What he concluded applies here: "While homeless individuals face many challenges, attaining equal protection of the law under the Constitution ought not be one of them." *Id.*

## C. Substantive Due Process: Arbitrary to destroy a vested property right that will objectively worsen Kalispell.

There is also a fair chance of success on the substantive due process claim because "the interference with property rights was irrational or arbitrary." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988). The Ninth Circuit is especially sensitive when that "irrational action [is] motivated, not by legitimate regulatory concerns, but by political pressure from neighbors and other residents[.]" *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).

The City's theory seems to be: (1) some homeless people cause problems in public; (2) the homeless sleep at the Warming Center between October and April; (3) if the Warming Center goes away, then; (4) homeless people will go away. That is an obvious *non sequitur*. The Warming Center exists because the homeless exist. Not the other way around. Rational-basis review may be deferential, but the government cannot act in ways that are objectively irrational or based on "fantasy." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

The Warming Center is a refuge for the Kalispell homeless on *private* property. It is irrational to believe that destroying a refuge on *private* property—for homeless people who, by definition, do not have private property—will reduce the presence of the homeless in *public* and reduce the problems some homeless people cause in *public*.

The evidence demonstrates that homelessness is a complex, statewide problem. In Kalispell, there is a thorny combination of population growth, rent and mortgage increases, inflation, collapse of mental-health care, and substance abuse. V.Compl. ¶¶ 112–21. As the Planning Department acknowledged in recommending the zoning amendment in 2020 to allow the Warming Center: "Homelessness is an

issue that exists in the city with or without this text amendment."
V.Compl. ¶ 42.

The evidence establishes that all of the public problems associated with homelessness will get worse if the Warming Center closes:

- More ER visits, more acute cold-related injuries, worsening of chronic health problems, even death, V.Compl. ¶¶ 293, 295–96;

- More sleeping in public spaces, such as parks and the County fairgrounds, V.Compl. ¶¶ 252, 292;

- More crime as desperate people are unsheltered in public spaces around the clock, V.Compl. ¶ 300;

- More people failing to take required psychiatric medications, V.Compl. ¶ 299;

- More substance abuse, V.Compl. ¶¶ 295, 298–99;

- More people losing touch with social workers and healthcare providers, V.Compl. ¶ 298;

- More incidents of people with no access to restrooms—especially after the City closed the public ones—relieving themselves in public, V.Compl. ¶ 301;

- Loss of the only place in Kalispell to shower for free without identification, V.Compl. ¶ 226; and

- Loss of access to free washing machines, V.Compl. ¶ 291.

There is at least a "fair chance" that destroying an emergency shelter by destroying its vested *private* property rights is irrational

when doing so will necessarily worsen the *public* problems this drastic action was meant to reduce.

## III. Serious questions about the constitutional merits and profound irreparable harms mean that the Warming Center is entitled to a TRO.

The temporary restraining order should be granted. The Warming Center has raised serious questions going to the merits and shown profound irreparable harms. On the Ninth Circuit's "sliding scale," preliminary relief is warranted. No separate analysis is required for the public interest and balance of equities. "Plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up).

The only remaining question asks what relief should look like. "The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008 (D. Or. 2019) (quotation omitted).

The status quo here is the Warming Center in possession of its CUP and lawfully able to operate. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (cleaned up). The trigger for this lawsuit was the CUP revocation on September 16, 2024, which caused and will continue to cause irreparable harms.

Preservation of the status quo thus requires a simple order enjoining enforcement of the CUP revocation so that the Warming Center may open for its winter sleeping season and operate as it has since its inception. The Warming Center asks for a restraining order to that effect until the Court can rule on a forthcoming preliminary-injunction motion in which the Warming Center will ask that the revocation be enjoined until a final decision on the merits.

## CONCLUSION

The Warming Center respectfully asks the Court to enjoin revocation of its CUP until the Court can rule on a forthcoming preliminary-injunction motion.

RESPECTFULLY SUBMITTED this 9th day of October, 2024.


Jeff Rowes*
Christen Hebert*
INSTITUTE FOR JUSTICE
816 Congress Ave., Ste 970
Austin, TX 78701

/s/ David F. Knobel
David F. Knobel
CROWLEY FLECK PLLP
P.O. Box 2529
Billings, MT 59103-2529
Email: dknobel@crowleyfleck.com
Tel: 406-252-3441


*Pro hac vice motions forthcoming

                    Counsel for Plaintiff

34

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to L.R. 7.1(d)(2)(E), this brief contains 6520 words, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service.

<u>s/David F. Knobel</u>
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I served true and accurate copies of the foregoing Plaintiff's Memorandum in Support of Its Motion for a Temporary Restraining Order by having a process server deliver to the following:

City of Kalispell
201 1st Ave. E.
Kalispell, MT 59901

DATED: October 9, 2024                    /s/ David F. Knobel
                                          *Counsel for Plaintiff*

36