David F. Knobel
Taylor M. Thompson
CROWLEY FLECK PLLP
P.O. Box 2529
Billings, MT 59103-2529
406-252-3441
dknobel@crowleyfleck.com
tthompson@crowleyfleck.com

Jeff Rowes*
Christen Hebert*
INSTITUTE FOR JUSTICE
816 Congress Ave., Ste 970
Austin, TX 78701
(512) 480-5936
jrowes@ij.org, chebert@ij.org
*admitted pro hac vice

*Attorneys for Plaintiff Flathead Warming Center*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD WARMING CENTER, | Case No. 24-cv-141-DLC |
| Plaintiff, | Judge: Dana L. Christensen |
| vs. | |
| CITY OF KALISPELL, | **PLAINTIFF'S REPLY IN SUPPORT OF TEMPORARY RESTRAINING ORDER** |
| Defendant. | |

1

## FACTUAL CORRECTION

The Warming Center must correct a mischaracterization in the City's brief: "WC circulated an August 22, 2024 letter disclaiming its role or ability to take action outside of its property to mitigate the public's concerns, notwithstanding prior representations about being a 'good neighbor.'" Resp. 3. That is false, as the Court can see by reading the letter. V.Compl. ¶¶191–94. The Center's letter confirmed its willingness to meet and be a good neighbor, but responded to unreasonable demands, such as providing paid security around town. The Center never disclaimed responding to concerns but called attention to limits on its ability to address community problems.

## ARGUMENT IN REPLY

The TRO should be granted. The Warming Center has established irreparable harms and a "fair chance of success on the merits." *Flathead-Lolo v. Montana*, 98 F. 4th 1180, 1192 (9th Cir. 2024) (cleaned up).

## I.   The Court need only preserve the last uncontested status, not order affirmative action.

The Warming Center asked the Court to "enjoin[] enforcement of the CUP revocation so that the Center may open for its winter sleeping

season and operate as it has since its inception." TRO Br. 33; V.Compl. p. 105, ¶D (same). That would preserve "the status quo ante litem"— meaning "the last, uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quotation omitted). The last uncontested status was before Resolution 6227. *See id.* (status quo is right before alleged trademark infringement).

The City argues that the Center wants a "mandatory" injunction, which requires a higher showing. Resp. 6–7. A mandatory injunction "orders a responsible party to take action." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (cleaned up). In *Garcia*, an actor sought a TRO that "required Google to take affirmative action—to remove (and to keep removing) [the video] . . . whenever and by whomever [it] was uploaded." *Id.* Here, the City claims the requested TRO is "mandatory" because enjoining Resolution 6227 "necessarily" requires ordering the City to reinstate the CUP. Resp. 7.

But that's incorrect. A TRO won't require any affirmative act, but instead will prohibit the City from stopping the Center's operations. That's a classic *prohibitory* injunction.

3

The City's other case, *Saeed v. City of Fairfield*, isn't helpful. Resp. 6–7 (citing No. 2:23-CV-00087-MCE-DB, 2023 WL 270153 (E.D. Cal. Jan. 18, 2023)). The plaintiff sought a TRO "to reinstate [his] business license," a request he made only after he failed to timely appeal and while the city was still considering his late appeal. *Id.* at *1–2 & n.2. While Saeed was dilatory, the Center wasn't. It worked around the clock after Resolution 6227 to file a 106-page verified complaint and 1,000-plus pages of evidence *before* the scheduled opening.

## II.   It is undisputed that the Warming Center faces irreparable harm.

The City doesn't dispute that the Center and the homeless will suffer irreparable injuries. The City just argues that the Court can't consider them. That is wrong. *East Bay Sanctuary Covenant v. Garland* controls, holding that "[o]rganizations may establish irreparable harm by showing ongoing harms to their organizational missions." 994 F.3d 962, 984 (9th Cir. 2021) (quotation omitted). In *East Bay*, the DOJ and DHS promulgated an immigration rule that "categorically denie[d] asylum to aliens arriving at our border with Mexico" absent certain conditions. *Id.* at 968. "[N]onprofit organizations that represent asylum seekers," the Ninth Circuit held, suffered irreparable harm to "their

mission of representing and assisting asylum seekers" and "through diversion of resources and the nonspeculative loss of funding from other sources." *Id.* at 968, 984 (cleaned up).

That applies here. The Center's mission is overnight winter shelter. V.Compl. ¶¶9–13. The City doesn't dispute that the Center can't do that now. Resp. 8–9; *see also* Ex. 1 (Horn Reply Decl.) ¶¶6–10. Instead, the City argues that the Center makes "a dramatic overstatement" in claiming that Resolution 6227 destroyed it because, according to the City (in a representation made for the first time in its brief), the Center can still provide daytime services. *Id.*

But that concession doesn't make the irreparable harm go away. Resolution 6227 "forces" the Center "to overhaul [its] programs and pursue more complex and time-and-resource intensive relief, resulting in [the Warming Center] providing fewer services to fewer people." *East Bay*, 994 F.3d at 984; *see also* Ex. 1 (Horn Reply Decl.) ¶¶6–10. The Center must "fundamentally change the nature of its business, not simply the manner in which it conducts its business, [because] [the Center's] current business could not survive" Resolution 6227. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1189 (9th Cir. 2022); *see*

*also* V.Compl. ¶¶290–326. That change to the mission is an irreparable harm.

The Center also faces financial loss. It is "on a collision course with a budget shortfall[:]" Donations have dropped sharply and over $185,000 in pending grants and donations are being withheld. V.Compl. ¶¶303–305. The Center's "non-speculative loss of substantial funding" that could lead to closure is irreparable harm. *East Bay*, 994 F.3d at 984; V.Compl. ¶¶302–11, 315–16.

The City also doesn't dispute that "the homeless face death and suffering." TRO Br. 14. The City's position is that the Court isn't allowed to care because death, amputations, injury, and worsening physical and mental health will happen to the homeless, not the Center. Resp. 8.

But the threat of death and injury to the homeless impedes the Center's mission. The new immigration rule in *East Bay* frustrated the nonprofits' mission because asylum applicants were discouraged from applying. 994 F.3d at 974. Resolution 6227 is worse. It exposes the people that the Center serves to vastly greater risks of death, injury,

illness, and mental breakdown due to nighttime cold, which frustrates the Center's mission of protecting the homeless from those things.[1]

The City relies on *Nutrition Distribution, LLC v. Enhanced Athlete, Inc.*, a case about a private dispute that provides no guidance here. Resp. 8 (quoting No. 2:17-CV-2069-JAM-CKD, 2017 WL 5467252 (E.D. Cal. Nov. 14, 2017)). In *Nutrition Distribution*, a bodybuilding-supplement maker sued a competitor for advertising products with a possibly dangerous chemical, and sought a TRO to prevent "false advertising" that might induce consumers to ingest the competitors' products. 2017 WL 5467252, at *1–2. But the fact that a for-profit business can't assert speculative harms to a competitor's customers has no bearing on this case.

Finally, the City argues that "WC posits a circular argument, claiming that since irreparable harm follows inexorably from deprivation of a constitutional right, no proof of irreparable harm is necessary." Resp. 9. To call this "circular" is doubly strange. First, the Center didn't say that proof of irreparable harm isn't necessary, just

---

[1] Although the Court need not consider the public interest and balance of equities because this is a constitutional case, the Court can certainly recognize that suffering and death among the most vulnerable are contrary to the public interest and further tip the balance of equities in favor of a TRO.

that unconstitutional action *is* an irreparable harm. TRO Br. 15 (citing Wright & Miller). Second, the "follows inexorably" is a quote from *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Far from being "circular," it is an established legal proposition.

### III. If the Warming Center can serve the homeless during the day but not at night, the equal-protection problem is much worse.

#### A. The City's concession that the homeless can be at the Center all day makes the revocation totally irrational.

The City tries to minimize the Center's irreparable harms by asserting that the Center can still provide daytime services. Resp. 8–9. "Plaintiff simply cannot offer overnight lodging." *Id.* at 8. Resolution 6227 doesn't say that. It revokes the CUP without qualification. But the Center and the Court can take the City's representation at face value.

That representation has sweeping consequences that make it far more likely the Center will prevail on its equal-protection and substantive due-process claims, and underscores how haphazard the process was. According to the City, the problem **is not**: (1) homeless people coming and going from 889 North Meridian in winter; nor (2) homeless people being at 889 North Meridian during the day in winter; nor (3) homeless people sleeping at 889 North Meridian during

8

the day in winter. Apparently, the **only** problem is "overnight lodging." Accordingly, if Resolution 6227 prohibits only "overnight lodging," then 50 homeless people can lawfully show up at 7:00 a.m. and go to sleep in the 50 beds as long as the Center kicks them out into the cold at night.

But what rational interest does the City have in forcing homeless people to sleep indoors at 889 North Meridian only during the day, not at night when normal people sleep? And what rational interest does the City have in forcing homeless people to be outside on public streets at night when it is dark and coldest?

### B. The City ignores *Cleburne* and the Center's actual equal-protection argument.

To pick up that thread, the Center has more than a "fair chance" of prevailing on its equal-protection claim. It seems patently irrational for the City to allow the Center to let the homeless sleep there during the day in winter, but not at night, while allowing shelters like Samaritan House to let the homeless sleep there at night. That is just bizarre.

But the Center has a "fair chance" for other reasons. The Center's equal-protection argument is based on the Supreme Court's decision in *City of Cleburne v. Cleburne Living Ctr.*, a case about a CUP denial for a

9

home for the mentally handicapped. 473 U.S. 432 (1985); *see also* TRO Br. 25–29. The City doesn't mention *Cleburne*, much less distinguish it (because it cannot). A federal judge just relied on *Cleburne* in ruling for a North Carolina homeless shelter. *Catherine H. Barber Mem. Shelter, Inc. v. Town of N. Wilkesboro*, 576 F. Supp. 3d 318, 336–37 (W.D.N.C. 2021).

Ignoring the precedent the Center cites, the City also ignores the argument the Center made. The City claims it is irrelevant that Samaritan House and the Center have similar police calls because the City revoked the Center's CUP due to the difference between police calls when it is open for winter shelter versus the months when it isn't. Resp. 20 ("The data was not considered for the <u>total</u> amount of activity in the vicinity of homeless shelters, but rather to assess whether there was an <u>increase</u> in criminal activity during the period in which the WC offered overnight boarding.") (emphasis in original).

But that is the *exact* problem the Center identified: "As to social-service organizations, the City's CUP-revocation theory is: 'We will have fewer police calls within a half-mile radius if we destroy this nonprofit that attracts needy people.'" TRO Br. 26. "Yet the City isn't destroying

Samaritan House or any other social-service organization." *Id.* at 27. The whole point is that the City *isn't* applying the same standard to other social-service providers—also destroying *them* to reap the benefit of fewer police calls in their areas.

The City suggests that singling out the Center was rational because "Council heard substantial public concern regarding adverse effects the WC had on the surrounding neighborhood[.]" Resp. 21. But, as the Center explained in quoting *Cleburne*, "'the [C]ity may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic.'" TRO Br. 28 (quoting 473 U.S. at 448). The question isn't *did people complain*. It's whether revoking the CUP *based on those complaints* violated equal protection. At this preliminary stage, there is more than a "fair chance" it did.

## IV.   There is more than a fair chance that the City violated the Warming Center's procedural due-process right.

### A. The City stripped the Center of a vested property interest.

The Center has a vested property interest in its CUP, which "runs with the lot." Zoning Ord. § 27.33.060(1). The City ignores that the

plain language of its own law treats a CUP as a real property interest. *See* Resp. 11–14 (omitting any mention of § 27.33.060(1)).

Instead, the City argues that "private property owners have no vested property interest in *being granted* a CUP." Resp. 11 (emphasis added). True, but irrelevant. The Center isn't challenging the denial of a CUP application. It's challenging the unconstitutional revocation of a vested property right that runs with the land, one relied on for years with investment-backed expectations over $750,000.

The City's citations to Montana cases about *granting* a CUP do not apply. Resp. 11. Neither Montana law nor Kalispell law include any procedures for revoking a CUP. That is because, once granted, CUPs in Kalispell are not meant to be revocable. Instead, like an easement or deed restriction, the Center's CUP is a real property interest that, as the plain language says, "runs with the lot."

**B. The City's contract/fraud theory underscores why the process was inadequate.**

The City doesn't dispute: (1) it never issued the Center a citation for violating any law or CUP condition; (2) Kalispell law lacks procedures for revoking a CUP; and (3) the City just made up the procedures it used to revoke the CUP. This should be a big red flag.

12

Desperate for a legal hook that can justify harming a property owner that hasn't broken any laws, the City invokes the perjury clause of the Center's 2020 CUP application, asserting that information in the application was inaccurate. Resp. 12–13. This follows the strategy the City employed in Resolution 6227, though, as the Court can read, the Resolution never identifies a factual statement that was false (nor does the City's brief). This tactic is especially petty and dishonorable considering the application was signed "to the best of my knowledge" by Tonya Horn, a social worker who got help with the application at every step from the City's planning department, and who didn't lie. V.Compl. ¶¶20–29, 40. This, too, should be a big red flag.

But the biggest red flag is the due-process implication of the perjury-clause theory. The City is saying that the Center either procured the CUP by fraud or that the CUP application is a contract that the Center breached. But fraud and breach of contract are civil claims with specific elements that judges hear in court in an adversarial process with real evidence. The City can hardly solve its due-process problem by claiming that it was merely acting as plaintiff and judge in its own fraud and contract case.

13

## C. The City's "persuasive authority" isn't persuasive.

The City has no case law in Montana or elsewhere with facts and law remotely resembling those here. The City willfully ignores that Kalispell CUPs are irrevocable, that the Center broke no laws, and that the City used a political, legislative process, not a quasi-judicial process. Because the City ignores how *abnormal* the situation is here, the cases it relies on are inapplicable. They involve normal procedures and create a stark contrast with what Kalispell did to the Warming Center.

Take, for example, *IRWS, LLC v. Elmore County*, 709 F. Supp. 3d 1158 (D. Idaho 2023). Set aside that Montana and Kalispell law matter here, not Idaho law.[2] *IRWS* is just different—a case about a landfill that illegally buried 300,000 tires. Just look at how far *IRWS* is from this case:

---

[2] *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (confirming that property rights are created and defined by "an independent source such as state law").

14

|  | *IRWS* | Here |
|---|---|---|
| Local ordinance that CUP "runs with lot" | No | Yes |
| Local ordinance allows for CUP revocation | Yes | No |
| CUP holder violated state law and administrative rules | Yes (illegally buried 300,000 tires) | No |
| CUP holder violated consent orders | Yes | No |
| Terms of the CUP itself provide for revocation | Yes | No |

*See id.* at 1160–63.

Or consider *Oneida Seven Generations Corporation v. City of Green Bay*, No. 16-CV-1700, 2017 WL 2455091 (E.D. Wis. June 6, 2017). Yes, Green Bay revoked a CUP. But there was no procedural due-process problem <u>because the plaintiff had previously appealed all the way to the Wisconsin Supreme Court under existing procedures and won</u>! *Id.* at *4 ("Whatever procedural protection [plaintiff] believes it was denied by the City was supplied by the availability of judicial review in the state courts, which ultimately reversed the City's decision to rescind the previously issued CUP."). There, the due-process claim wasn't even real. It was a Hail Mary to recover damages unavailable under state law. Here, unlike *Oneida*, there is no state-law process for

15

revoking a CUP or appealing the revocation under Kalispell or state law
(something the City doesn't dispute).

## V.   The City ignores the Warming Center's substantive due-process argument.

The City doesn't mention the Center's actual argument: that it is
irrational to address concerns about homeless people on *public* property
by shutting down a refuge for the homeless on *private* property. And the
City's position is now more incoherent because it boils down to letting
the homeless sleep at the Center during the day but not at night. Surely
there is a "fair chance" that the City lacks a rational basis for making
the homeless live like vampires.

The City relies on *Peak Oil Holdings LLC v. County of Ventura*,
No. 2:21-CV-00734-DSF-AFMX, 2023 WL 9226929 (C.D. Cal. Dec 13,
2023), to illustrate the supposed deference to which governments are
entitled in revoking zoning permits. But that case was decided at
summary judgment after three layers of administrative hearings, which
specifically found that Peak Oil had violated its "2012 Zoning
Clearance, applicable provisions of the Non-Coastal Zoning Ordinances,
the County Building Code, and other regulations." *Id.* at *1. And there
was reliable evidence that Peak Oil caused "the contamination of the

potable water aquifers." *Id.* at *2. Revoking Peak Oil's permit might have been rational, but it says nothing about the rationality of revoking the Center's CUP when it never broke the law and when doing so will make everything worse. There is, at least at this preliminary stage, a "fair chance" of success on the merits.

## VI.   No public-interest or balance-of-equities analysis is required in constitutional cases.

The City faults the Warming Center for stating that "[n]o separate analysis is required for the public interest and balance of equities." Resp. 24 (quoting TRO Br. 32). But this is the Ninth Circuit rule in constitutional cases. *See* TRO Br. 32. Nevertheless, according to the City, "[t]his Court . . . has made clear in other decisions 'Plaintiff must establish . . . the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" Resp. 24 (quoting *Native Ecosystems Council v. Marten*, No. CV 18-87-M-DLC, 2018 WL 3178145, at *1 (D. Mont. June 27, 2018)). The City appears to mean that this specific Court (Judge Christensen) has *his own rule* that differs from controlling Ninth Circuit precedent. That, of course, is incorrect. *Native Ecosystems* wasn't a constitutional case (it was about the Endangered

17

Species Act) and hence the public interest and balance of equities had to be shown.

The Center urges the Court to read its decision in *Native Ecosystems* because it granted the TRO with less evidence and a less compelling argument than the Warming Center has here.

## CONCLUSION

For the foregoing reasons and those stated in the Warming Center's opening brief, the TRO should be granted.

RESPECTFULLY SUBMITTED this 14th day of October, 2024.

/s/ Jeff Rowes
Jeff Rowes*
Christen Hebert*
INSTITUTE FOR JUSTICE
816 Congress Ave., Ste 970
Austin, TX 78701
(512) 480-5936
jrowes@ij.org, chebert@ij.org

/s/ David F. Knobel
David F. Knobel
Taylor M. Thompson
CROWLEY FLECK PLLP
P.O. Box 2529
Billings, MT 59103-2529
(406) 252-3441
dknobel@crowleyfleck.com
tthompson@crowleyfleck.com

*admitted pro hac vice

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to L.R. 7.1(d)(2)(E), this brief contains 3,242 words, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service.

/s/Jeff Rowes
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which provided electronic service upon all attorneys of record.

/s/ Jeff Rowes
*Counsel for Plaintiff*