IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD WARMING CENTER, | CV 24–141–M–DLC |
| Plaintiff, | |
| v. | ORDER |
| CITY OF KALISPELL, | |
| Defendant. | |

Before the Court is Plaintiff's Motion for Temporary Restraining Order and Expedited Hearing (Doc. 4), which the Court has construed as a Motion for Preliminary Injunction (*see* Doc. 23). On October 25, 2024, the Court held a hearing on the Motion. (Doc. 29.) For the reasons stated herein, the Motion is GRANTED.

## BACKGROUND

### I.    Flathead Warming Center

The Flathead Warming Center ("the Warming Center" or "FWC") is a 501(c)(3) organization located in Kalispell, Montana. (Docs. 1-2 ¶ 5; 1-8 at 4.) The Warming Center's mission is to "save lives and encourage dignity through low barrier access to a warm safe place to sleep for anyone in need throughout the coldest months of the year." (Doc. 1-8 at 4.) The Warming Center is low-barrier,

which means it is accessible regardless of an individual's personal barriers—such as disability, addiction, and mental illness—to obtaining shelter. (Doc. 1-2 ¶ 15.)

The Warming Center only offers a place to sleep at night from October through April. (*Id.* ¶ 58.) During this period, monthly average low temperatures are between 16 and 31 degrees Fahrenheit. Climate Kalispell – Montana, U.S. Climate Data, https://perma.cc/39H5-4GB5 (last visited Nov. 5, 2024). However, temperatures can and do drop below average; the coldest temperature so far recorded in 2024 was negative 33. AccuWeather, Kalispell, MT, https://perma.cc/WNU3-QRGW (last visited Nov. 5, 2024). Before the Warming Center opened, homeless individuals spent winter nights in vehicles, under bridges, in parks, behind businesses, and in makeshift shelters.[1] (Doc. 1-2 ¶ 8.)

The Warming Center first opened in the winter of 2019. (*Id.* ¶ 12.) At that time, the Warming Center operated out of the basement of Christ Church Episcopal and offered 20 beds and restroom facilities, but no showers or laundry. (*Id.* ¶ 14.) Almost nightly the Warming Center had to turn people away because of its limited capacity. (*Id.* ¶ 22.)

For almost two years, Warming Center leadership searched for a property that would allow the Warming Center to expand their capacity and services. (*Id.* ¶

---

[1] As of October 7, 2019, it is illegal to sleep in a vehicle parked on a public road in Kalispell city limits. *See* City of Kalispell Code of Ordinance No. 1830.

23.) During this time, Tonya Horn, Executive Director of the Warming Center, worked with the City of Kalispell's ("the City") Planning Department to learn what the Warming Center would need to do to obtain the necessary zoning approvals and right to operate. (*Id.* ¶ 24.) The City's Planning Department informed Ms. Horn that, for several of the properties the Warming Center was considering, two additional steps would be required: (1) the City's zoning ordinance would need to be amended to include "homeless shelter" as a permitted use in the zoning district where the property is located; and (2) a conditional use permit ("CUP") would be required for the specific property. (*Id.* ¶ 26.) As the Warming Center continued searching for property, Ms. Horn worked with the Planning Department to draft the documents needed to obtain a CUP. (*Id.* ¶ 29.)

In the summer of 2020, the Warming Center put in an offer for a property. (*Id.* ¶ 30.) While the offer was pending, Ms. Horn submitted a draft petition for a zoning code amendment and a CUP application. (*Id.* ¶ 31.) When the offer was rejected, the Warming Center withdrew the petition and the CUP application. (*Id.* ¶ 31.) Ms. Horn sought feedback from the Planning Department on her zoning code amendment petition and CUP application so that she could improve the Warming Center's submission when it applied again. (*Id.* ¶ 32.) Planning Department staff advised Ms. Horn to include "additional information" such as "[m]ore detail on day-to-day operations, rules, etc[.]" (Docs. 1-2 ¶ 34; 1-6 at 3.)

3

In August 2020, the Warming Center found a vacant property ("the Property") that it believed would be an ideal space for the Warming Center. (Doc. 1-2 ¶ 35.) The Property, located at 889 North Meridian in Zoning District B-1, had previously been a mechanic shop. (*Id.* ¶ 37.) Homeless individuals already frequented the surrounding area, often using the Flathead Fairgrounds for shelter. (*Id.*) Warming Center leadership believed the Property would be a good location for the Warming Center for many reasons, including the fact that the Property was located in a business district and surrounded by non-residential property on all sides. (*Id.* ¶ 36.)

## II.    The CUP Application and the Zoning Amendment

On August 19, 2020, the Warming Center entered into a contract to purchase the Property. (Doc. 1-7.) The sale was contingent on the Warming Center obtaining a CUP in order to use the Property to operate a homeless shelter. (*Id.* at 5.) Ms. Horn submitted a CUP application to operate a homeless shelter at the Property to the City of Kalispell Planning Department. (Doc. 1-8.) Part of that application included the following statement:

> It is a priority of the Flathead Warming Center to always be a good neighbor. Allowing individuals to loiter, stand, or sit on the curb to smoke, or socialize is not being [] a good neighbor and we will not allow nor tolerate that. Our policies and procedures also support the same for the neighborhood. It is our policy that if a customer "burns their bridge" with any neighbor, that customer "burns their bridge" with the Flathead Warming Center. We communicate this policy to both [] our customers and

> to our neighbors. . . . As we teach how to be a good neighbor, our customers become protective of the neighborhood and the neighborhood maintains it[s] standing as a great place to live and work. The neighbors will be provided with the director's cell number and while no one can control all behaviors in any neighborhood, the Flathead Warming Center ensures that we are prompt and responsive to neighbor concerns, if they so arise.

(*Id.* at 7–8.) Above the signature line where Ms. Horn signed her name was the following language:

> I hereby certify under penalty of perjury and the laws of the state of Montana that any information submitted herein, on all other submitted forms, documents, plans or any other information submitted as part of this application to be true, complete, and accurate to the best of my knowledge. Should any information or representation submitted in connection with this application be incorrect or untrue, I understand that any approval based thereon may be rescinded, and other appropriate action taken.

(*Id.* at 3.)

On November 2, 2020, the Kalispell City Council voted to grant the Warming Center a CUP for operation of a homeless shelter at the Property. (Docs. 1-2 ¶ 42; 1-15.) The CUP approval was subject to the following conditions:

1. That commencement of the approved activity begin within 18 months from the date of authorization or that a continuous good faith effort is made to bring the project to completion.

2. The conditional use permit is not valid until the B-1 zoning text amendment allowing homeless shelters as a conditionally permitted use becomes effective under statutory timelines 30 days from approval of the zoning amendment on second reading.

5

3. That the development of the site shall be in substantial conformance with the submitted application and architectural/site plan drawings.

4. Prior to occupancy, the applicant shall apply for a building permit through the City of Kalispell Building Department to review the proposed improvements and changes of use.

5. Architectural renderings are required to be submitted to the Kalispell Architectural Review Committee for review and approval prior to issuance of a building permit for any work which significantly changes the exterior appearance of the buildings.

6. To ensure the traffic flow and access comply with Kalispell Design and Construction Standards, as well as compliance with other site development standards, the development shall receive Site Review Committee approval prior to issuance of the building permit.

7. A minimum of one paved parking space per five occupants shall be provided. The specific design shall be submitted for review and approval in conjunction with building permit and site review prior to the occupancy of the building.

8. The existing sidewalk along North Meridian Road shall be extended to define the parking lot access and reduce the driveway to 24 feet, along with a five-foot landscape buffer adjacent to the sidewalk. The sidewalk should be continued through the approach in a manner designed to meet City of Kalispell Standards for Design and Construction.

9. The number of occupants shall be limited to no more than 40 people. Increases in occupancy may be applied for and would go through either the conditional use permit or administrative conditional use permit process. The review would be based on an analysis of the increase impacts.

(Doc. 1-15 at 2–3.)

On December 16, 2020, Ordinance 1851 took effect, amending the zoning code to allow homeless shelters in Zoning District B-1 with a CUP. (Doc. 1-2 ¶ 43.) The Warming Center closed on its purchase of the Property the following day. (Doc. 1-20 at 6–7.)

### III.  Flathead Warming Center Operations Between 2020 and 2024

To cover the cost of purchasing and renovating the Property, the Warming Center raised over $750,000 in donations from the community. (Doc. 1-2 ¶ 44.) After closing, there was still a considerable amount of work to do to make the Property suitable for an emergency shelter. (*Id.* ¶ 45.) However, the City agreed to allow the Warming Center to open in December 2020 and issued a temporary certificate of occupancy for the winter of 2020. (*Id.* ¶¶ 47–48.)

During the first winter at the new location, the Warming Center sheltered 207 individuals. (*Id.* ¶ 49.) In 2020, the Warming Center submitted all site plans required by both the CUP and City ordinances. (*Id.* ¶ 51.) The City approved all of the Warming Center's plans. (*Id.*) As the winter of 2021 was approaching, the Warming Center had outstanding planned renovations for the Property. (*Id.* ¶ 52.) The City issued the Warming Center a second

temporary certificate of occupancy. (*Id.* ¶ 53.) During the winter of 2021–2022, the Warming Center sheltered 349 individuals. (*Id.* ¶ 56.)

In August 2022, the Warming Center applied for an administrative conditional use permit ("ACUP") to increase its shelter capacity from 40 occupants to 50 occupants. (Docs. 1-2 ¶ 59; 1-21.) The same month, the Warming Center held an open house to welcome community input on the proposal to expand the Warming Center's capacity. (Doc. 1-2 ¶ 60.) No one attended. (*Id.*)

As part of its consideration of the ACUP, the City notified surrounding property owners of the Warming Center's desire to expand its capacity. (Doc. 31 at 39.) When Ms. Horn asked Planning Department staff if they had received any comments on the Warming Center's ACUP application, staff indicated that they had not received any comments. (Docs. 1-2 ¶ 61; 31 at 39.)

In September 2022, the City approved the Warming Center's application, allowing the Warming Center to increase its capacity. (Doc. 1-23.) The ACUP was subject to the following conditions:

1. The property shall be developed in accordance with the submitted plans.

2. Prior to occupancy of the 10 additional beds, all conditions and site improvements must be completed as per the original Conditional Use Permit, approved November 2, 2020, and original building permit approved in April of 2021.

3. This permit shall be valid for a period of eighteen (18) months after which time it shall terminate if commencement of the authorized activity has not begun.

(*Id.* at 2.) At the time the ACUP was approved, the City did not make any statement that the Warming Center was not being a good neighbor. (Doc. 31 at 39–40.) Nor did the City claim that the Warming Center had made a misrepresentation in its initial CUP application materials. (*Id.* at 40.)

In November 2022, Planning Department staff determined that the Warming Center had complied with the conditions of the ACUP and the CUP. (Docs. 1-2 ¶ 67; 1-26 at 3.) Accordingly, the Planning Department authorized the Warming Center's use of ten additional beds, bringing the Warming Center's maximum capacity to 50. (*Id.*) In the winter of 2023–2024, the Warming Center sheltered 324 individuals, provided 3,000 showers, ran almost 1,000 loads of laundry, and offered hundreds of hours of access to social services. (Doc. 1-2 ¶ 68.) Volunteers donated nearly 3,000 hours of time to the Warming Center. (*Id.*) That same winter, the Warming Center paid off the loan on the Property. (Docs. 1-2 ¶ 76; 1-60.)

## IV.   Letter from the Board of Commissioners to the Flathead Community

On January 21, 2023, four months after the City granted the Warming Center its ACUP, the Board of Commissioners of Flathead County sent a letter to

Flathead County Residents.[2] (Doc. 1-30.) The letter read as follows:

Dear Flathead County Residents,

We, as the Flathead County Board of Commissioners, are addressing the community after receiving numerous complaints of an increasing and distressing problem in our valley. The Flathead Beacon recently reported that Kalispell has the second highest number of homeless in the state. If we continue to enable the homeless population, then those numbers will increase.

The simple truth is that providing homeless infrastructure has the predictable consequence of attracting more homeless individuals to our community. When a low barrier shelter opened in our community, we saw a dramatic increase in homeless individuals. Using social media and smartphones, these wanderers are well-networked and eager to share that Kalispell has "services" to serve their lifestyle. Make no mistake, it is a lifestyle for some. In fact, many of the homeless encountered in our parks, streets, and alleys consist of a progressive networked community who have made the decision to reject help and live unmoored. Although well intended, facilities that offer only shelter, and no accountability, exacerbate the problem.

Therefore, it is our hope that our community will be unified in rejecting all things that empower the homeless lifestyle. Many times, that spare change that you give to the homeless individual standing at the intersection is used for drugs and alcohol. We are asking our peers serving on city councils to not permit or expand warming shelters that bring more of these homeless individuals to our community.

We believe that hard conversations solve hard problems. We ask members of our community to speak out about their experiences with the homeless. Only together can we make it clear to this networked homeless community that "enough is enough".

Sincerely,

---

[2] The letter filed at (Doc. 1-30) is dated January 19, 2022; however, it appears as though the letter was actually published January 21, 2023. *See* Kalispell County Commissioners, *Stop Enabling the Homeless* (Jan. 21, 2023), https://perma.cc/9RGM-ZEZL.

BOARD OF COMMISSIONERS
FLATHEAD COUNTY, MONTANA

(*Id.* at 2.) The letter was signed by the Chairman and two Members of the Board of Commissioners. (*Id.*)

Two days later, the Kalispell City Council met with members of the public to consider several ordinances related to public parks. *Kalispell City Council Work Session* (Jan. 23, 2023), https://perma.cc/8LCX-BK94. As a result, City Council passed two ordinances. The first ordinance prohibits individuals from storing or maintaining "excessive personal property"—defined as "[m]ore than what a reasonable person would carry with them as the most rudimentary precaution"—on public property. [3] City of Kalispell Code of Ordinances § 19-37. The second prohibits the erection of tents or shelters in public parks. § 19-38. The third prohibits the use of a covered park structure for more than 150 minutes without a permit. § 19-20(E).

Following the Commissioners' letter, violence against the homeless drastically grew in both frequency and severity. (Docs. 1-2 ¶ 89; 1-29 ¶ 13.) Warming Center guests reported being physically assaulted; pelted with rocks, sticks, and eggs; shot with paintball guns; hurt by fireworks; and being run down by automobiles. (Docs. 1-2 ¶ 90; 1-29 ¶ 14.) In June of 2023, Scott Bryan, a

---

[3] At the preliminary injunction hearing, Mayor of Kalispell Mark Johnson testified that an individual can easily carry two suitcases, but carrying three or more suitcases while on public property may cross the threshold into illegality under the ordinance. (Doc. 31 at 106.)

homeless individual in Kalispell, was beaten to death outside of a gas station. (Doc. 1-2 ¶ 91.)

Professionals that work with the homeless population have also been targeted with threats of violence. (*See* Doc. 1-4 ¶ 37.) After Scott Bryan was murdered, Ms. Ball, a Kalispell Social Worker, delivered a speech at his funeral, which was broadcasted on local television. (*Id.*) After the funeral, as Ms. Ball utilized a crosswalk to walk across the street, a truck nearly struck her in front of several witnesses. (*Id.*)

Ms. Ball testified that the violence was related to the Commissioners' letter, stating that "it would seem that certain things happened after the County Commissioners wrote a letter to the Daily Inter Lake basically saying don't help the homeless and don't help the people helping the homeless." (Doc. 31 at 94.)

**V. Communications and Processes Leading up to the Recission of the CUP**

On April 1, 2024, the City Council held a public meeting. (Doc. 32.) At that meeting, Councilmember Chad Graham read prepared comments blaming the Warming Center for the "deterioration" of "the quality of life" and the "business in that area." (*Id.* at 25:38–25:48.) Referring to the Warming Center's CUP application, Councilmember Graham stated that "the information in the application materials I used to inform my decision are not currently reflecting the current condition of the neighborhood, the surrounding neighborhood." (*Id.* at 26:08–

26:17.) Councilmember Graham outlined five areas in which he believed the Warming Center was not honoring statements made in its CUP application: (1) an increase in homelessness in the area; (2) loitering on the Warming Center's Property and in the surrounding area; (3) responsiveness and accountability to the neighborhood; (4) an increase in law enforcement calls; and (5) whether the Warming Center was serving the community of Kalispell. (*Id.* at 3 :16–31:10.) He then called for a work session to hear public comments from the surrounding neighborhood. (*Id.* at 31:18–32:26.) After further conversation, City Manager Doug Russell stated that the CUP was "fair game because a permit is a matter of grace by the Council." (*Id.* at 37:32–37:48.)

In May of 2024, the City Council held two work sessions. In the first work session, City Council reviewed law enforcement data, the 2020 CUP application, sections of the municipal code, the Planning Department staff's report, and the CUP. (Doc. 1-34.) When Mayor Johnson opened the meeting for public comment, the Warming Center, its volunteers, its staff, and supporters, were treated as members of the public who could make comments on the work session topics. (Doc. 1-35 at 1:28:40.) Nine individuals spoke, two of whom provided complaints regarding the Warming Center. (*Id.* at 1:29:29–2:04:08.) After forty minutes of public comment, Mayor Johnson stated that he wanted to prioritize the comments

of neighbors with concerns rather than individuals form the Warming Center. (*Id.*
at 2:05:28–2:06:12.)

During the second working session, several Councilmembers indicated that
they would like to move forward with revoking the Warming Center's CUP. (Doc.
1-36 at 1:08:20, 1:21:18, 1:27:14, 1:29:53, 1:32:06.) Mayor Johnson then opened
the work session for public comment and heard public comment from thirteen
individuals—three of whom expressed concerns about the Warming Center. (*Id* .at
2:06:18–3:05:22; 1-37 at 6–8.)

On May 31, 2024, the City Attorney for the City of Kalispell sent Ms. Horn
a letter outlining "perceived differences between the representations FWC
presented to Council, through documents and testimony, during the application
process for" the CUP. (Doc. 1-38.) The concerns were as follows:

- Contrary to initial representations by FWC, FWC has increased
  the number of homeless individuals in the area. This assertion is
  supported by public comments to Council.

- Contrary to initial representations by FWC, the surrounding
  neighborhood has seen an increase in loitering in the area. This
  assertion is supported by public comments to Council.

- Contrary to initial representations by FWC, FWC has failed to be
  responsive or accountable to neighbors' concerns. This assertion
  is supported by public comments to Council.

- Contrary to initial representations by FWC, the presence of FWC
  has increased law enforcement calls in the area. This assertion is
  supported by the difference in the number of calls to law

enforcement when FWC was open compared to when it was closed.

- Contrary to initial representations by FWC, FWC services communities beyond the Kalispell community. This assertion is supported by public comments to Council and public records including statements from City of Whitefish.

- Contrary to initial representations by FWC, FWC has not been a good neighbor as its patrons have left garbage and needles, defecated[,] and loitered on the property and in the neighborhood and have failed to be "protective of . . . the neighborhood." Additionally, FWC has not been responsive and has been dismissive of neighborhood complaints. Some of those in the neighborhood stated they did not know Ms. Horn or have her contact information. This assertion is supported by public comments to Council and law enforcement call data.

- Contrary to initial representations by FWC, transportation of its patrons into and out of the neighborhood has not been provided. This assertion is supported by public comments to the Council.

- FWC initially represented that loitering was a serious issue that would be addressed accordingly. Recently, however, FWC has minimized the seriousness of the loitering issues in the neighborhood. This assertion is supported by public comments to the Council.

- FWC initially represented that it would be a good neighbor and not cause issues within the neighborhood. FWC also represented that Ms. Horn would give her telephone number to members of the neighborhood. No where [sic] in the initial representations did FWC limit the area which it considered the neighborhood. Recently, however, FWC has indicated it only perceived the neighborhood to encompass an area within 150 feet of FWC. This assertion is supported by public comments to the Council.

(*Id.* at 2–3.) The letter went on to state that the above assertions had "not been accepted or adopted by Council" but that the assertions were "supported by evidence

and warrant a hearing." (*Id.* at 3.) The City then invited the Warming Center to attend the regularly scheduled meeting on July 1 to respond to the City's concerns. (*Id.*) In addition, the City stated that "[o]n July 15, 2024, . . . Council may consider whether it will 'rescind [] and [take] other appropriate action regarding FWC's Conditional Use Permit." (*Id.*)

## V.    July 15 City Council Meeting

At the July 15 meeting, City Council again took public comment regarding the Warming Center. (Doc. 13 at 27:57–28:15) City Council also allowed the Warming Center to respond to the concerns delineated in the May 31 letter. Ms. Horn explained that she was there to defend the Warming Center's existence but that the Warming Center "was unsure how to proceed." (*Id.* at 1:29:54–1:29:58.) She expanded by stating the following concerns:

> A review of the Kalispell city code shows that there is not an established process for the city to follow. The city code makes no provision for the revocation of a CUP after the permit has been granted. The code makes no mention for a CUP revocation hearing, and it certainly does not specify what format this hearing should adhere to. We are not told the evidentiary standards, what the burden of proof is, if witnesses may be called, or even if they may be cross examined. We don't understand how this is a quasi-judicial process. We are truly in unchartered waters so please bear with us as we proceed.

(*Id.* at 1:29:45–1:30:37.) Ms. Horn went on to state that City Council had acknowledged that the Warming Center has met each condition of its CUP. (*Id.* at 1:30:40–1:30:45.) Ms. Horn then addressed the May 31 letter as follows:

There are members of this City Council that believe that I, Tonya Horn, was not truthful in the application to the City of Kalispell for a conditional use permit. In a letter from the Kalispell city attorney dated May 31, 2024, the Flathead Warming Center was advised of nine assertions against the veracity of my application.

The City Council found enough merit in these assertions to gather us here tonight. The only basis for revocation the city has provided to us is my signature clause in the application.

I am here to tell you tonight that everything in the Flathead Warming Center CUP application was absolutely true to the best of my knowledge at the time that I signed it. I read and understood the under-penalty-of perjury clause, and I signed the document.

To the best of my knowledge, I am the only person in these proceedings being held to the standard of perjury.

(*Id.* at 1:30:50–1:31:56.) Ms. Horn stated that the Warming Center did not know how to defend the unknown and unquoted initial representations referred to in the May 31 letter. (*Id.* at 1:32:50–1:32:56.)

She went on to express her concerns relating to the language from the May 31 letter stating that each "assertion [was] supported by public comments to the council." (*Id.* at 1:33:25) Specifically, Ms. Horn questioned who made the comments, when, and what standard City Council used in its decision to accept and act on the comments. (*Id.* at 1:33:25—1:33-35) Ms. Horn stated that on May 28, 2024, the Flathead Warming Center Board of Directors wrote a letter to Mayor Johnson, the City Council, and the City Manager requesting that each alleged falsehood in the CUP application be identified explicitly, but the City never responded. (*Id.* at 1:32:58–1:33:21.) In the same letter, the

Board of Directors requested that each complaint relied on by the Council be identified and detailed. (*Id.* at 1:33:37–1:34:00.) The City did not respond to this request. Ms. Horn concluded that the Warming Center did "not know what evidence we are to defend against" or "how to defend against unknown comments made by unknown persons with unknown veracity." (*Id.* at 1:34:00–1:34:14.)

## VI.    Mediation

The day after the July 15 hearing, City Council decided to postpone the decision to revoke the Warming Center's CUP for sixty days to allow the Warming Center a chance to meet with community members and Mayor-appointed mediators. (Doc. 1-40 at 3:24:15.) After a series of conversations, the community members produced a document setting forth the following demands to be paid for at the expense of the FWC:

1.  Low barrier to be changed to a higher status

2.  ID required for entry into the FWC
    a.  [Government] issued, even if expired, some way to identify for the safety of the volunteers and community
    b.  A system within the shelter with an up-to-date Photo ID. If Big Mountain[4] can issue, follow, and scan, knowing identifies, so should the shelter. Creating a registry with each patron[']s 'account information'

3.  Private Security – Patrolling the neighborhood (to be defined), with a response time of less than 15 minutes.

---

[4] Big Mountain refers to Whitefish Mountain Resort, a ski resort located 20 miles North of Kalispell.

    a. When calling the local police per a homeless loitering/trespassing report, arrival time is not always prompt.

    b. When trespassing if asked to leave private property homeless seem to be trained to respond consistently with 'call the cops' or even will 'flip off' and keep doing whatever they are doing. They know there are no repercussions, the [Kalispell Police Department's] hands are tied, just ask to move along. Many times they return later. Nothing happens for them to change. There is no regard for the neighbor's homes and businesses

4. FWC to negotiate with Post Office and County Fairgrounds to get back openness

    a. Post office to return to hours past 6 [p.m.]

    b. Private Security to make hourly pass throughs

5. Private transportation

    a. FWC full expense

    b. All patrons to be bussed away from FWC, no 'path/parade' down Meridian or cutting through West Wyoming/5th/7th/West California to get to Downtown

    c. Manage a log of all patrons leaving/coming on the private bus system

6. Volunteer to clean up and fix what has been destroyed (especially those who do not have jobs)

    a. Whether their fault or not, take time to pick up/clean/improve community

    b. Keep log of who and how long, where and what

    c. Should not be giving for free with nothing in exchange, creates entitlement and disrespect of things which are not earned

7. 60[-]day random compliance checks & audits

    a. If Health Dept can randomly check on private businesses to be sure they are held to a standard, then the same should happen with the FWC

    b. Neighborhood audits, check-ins with the neighbors to be sure all conditions are being met and no incidents have happened

8. Reports [on guests served]

a. Age groups being serviced
b. Repeat occupants
c. Data to show they are giving a hand up, not hand out – accounts of those down on their luck who are now in a better positions in their lives

9. Regulate Patrons
    a. Give first right of refusal to families, veterans, those with employment, locals
    b. Those who have not lived in the Flathead Valley for more than two consecutive years do not receive any other services other than an emergency bed for the night. Cannot stay more than two consecutive nights, even if there is room.

10. Agree to not expand.
    a. Adding in a more in-depth appendix, with legal representation, to the permit, so as to not be able to default on or find 'loopholes' on current application/permit to be able to expand.
    b. Agreeing that if the permit is not rescinded, they will function within the current walls with a max of 50 beds.
    c. If our community has a greater need, they agree to find a separate location.

(Doc. 1-41 at 2–3.)

In response, the Warming Center sent a letter to mediators, providing the following:

Over the last few weeks, FWC has listened to concerns from community members. We did so to be a good neighbor and to confirm our commitment to serving the community, especially the most vulnerable among us. We are and intend to continue to be part of the solution to homelessness in the Flathead Valley. And we will continue to manage FWC in a way that is respectful to our neighbors and the broader community while reminding our guests to be similarly respectful. But we also must acknowledge that the recent mediated conversations are taking place under a threat to revoke our conditional use permit—a threat whose premises we strongly disagree with.

20

The FWC remains open to conversation. Other community members are always welcome to raise issues with the FWC, and we will do our best to address them. But to be clear, FWC cannot agree to take on duties off of FWC's property, such as supervising people out in the community. Any duties of that nature are outside of FWC's legal, moral, and practical control.

Based on the conversation so far, there appears to be a strong expectation that the FWC will take responsibility for things that occur off our property and beyond our control: transportation, cleaning up garbage, policing bad behavior, patrolling public parks, etc. We agree that there can be problems associated with these issues. And we want to work with the appropriate authorities to address them as best we can within our role as private citizens. To the extent the next round of discussion seeks our input on how the proper authorities and our neighbors can address problems that belong to the whole community, we are eager to do that. But, to the extent discussion will focus on what the FWC needs to do off its property to control the behavior of other private citizens, we can't agree to take on that kind of responsibility.

Again, our goal is to keep lines of communication open, but we must manage expectations about what FWC can do to address community issues. Sincerely, The Warming Center Board of Directors

(Doc. 1-42 at 2.) In response to the Warming Center's letter, the mediators canceled an upcoming meeting between community members and the Warming Center, explaining that they didn't "believe the meeting on August 26 would be productive." (Doc. 1-43 at 4.)

## VII.   Resolution 6227 and Rescission of the Warming Center's CUP

On September 16, 2024, City Council met and considered Resolution 6227, which was titled "Potential Action on Conditional Use Permit of Flathead Warming Center." (Doc. 1-33.) A partial copy of Resolution 6227—which

included several blank and incomplete sections—was provided and voted on. (Doc. 1-45 at 337–38.) During the meeting, Councilmember Graham stated that the Warming Center was "compliant with the nine conditions that we as a council set." (Doc. 33 at 1:01:30–1:01:40.) Nevertheless, he moved that "Resolution number 6227, a resolution by the Kalispell City Council regarding the Flathead Warming Center to revoke the conditional use permit, determine findings of fact, and declare an effective date." (*Id.* at 53:55–54:11.) However, during the meeting, the City did not make findings of fact to form the basis for its decision to revoke the CUP. While Councilmember Graham did read his personal findings of fact, (*id.* at 1:03:48–1:13:24), the City Council did not discuss the Councilmember's findings nor adopt them. Nevertheless, the City Council adopted Resolution 6227. (*Id.* at 1:56:25.)

Immediately after the City Council voted in favor of Resolution 6227, Warming Center leadership requested a copy of Resolution 6227. (Docs. 1-2 ¶ 108; 1-29 ¶ 17.) The Warming Center did not receive a copy of Resolution 6227 until September 24, 2024. (Docs. 1-2 ¶ 109; 1-29 ¶ 18; 1-46.) The Resolution read as follows:

> A RESOLUTION BY THE KALISPELL CITY COUNCIL REGARDING THE FLATHEAD WARMING CENTER TO RESCIND THE CONDITIONAL USE PERMIT, DETERMINE FINDINGS OF FACT, AND DECLARE AN EFFECTIVE DATE.

Whereas, the Flathead Warming Center was granted a Conditional Use Permit on November 2, 2020; and

Whereas, on May 13, 2024, the City Council held a meeting where it discussed concerns related to the Warming Center and its Conditional Use Permit, including hearing public comments on the same; and

Whereas, on May 28, 2024, the City Council held a meeting where it reviewed and discussed the concerns and testimony provided from the May 13 meeting, outlined concerns and provided direction to move forward with a hearing to allow the Warming Center an opportunity to respond to these concerns; and

Whereas, on July 15, 2024, the City Council held a meeting that included a hearing to allow the Warming Center the opportunity to respond the concerns; and

Whereas, on July 16, 2024, at a Special City Council Meeting, the City Council postponed action for 60 days to allow the Warming Center time to collaborate with the surrounding neighborhood to address the concerns; and

Whereas, the Kalispell City Council finds that during the application process, the Warming Center submitted a letter to the Kalispell Planning Board that included incorrect or untrue statements upon which Council relied in granting approval of a zoning text amendment and the Conditional Use Permit; and

Whereas, the Kalispell City Council finds that during the application process, the Warming Center submitted a letter to the Kalispell City Council that included incorrect or untrue statements upon which Council relied in granting approval of a zoning text amendment and the Conditional Use Permit; and

Whereas, the Kalispell City Council finds that the application for the Conditional Use Permit signed by Tonya Horn, the Executive Director of the Warming Center, on September 4, 2020 stated, "I hereby certify under penalty of perjury and the laws of the State of Montana that the information submitted herein, on all other submitted forms, documents, plans or any other information submitted as part of this application, to

be true, complete, and accurate to the best of my knowledge. Should any information or representation submitted in connection with this application be incorrect or untrue, I understand that any approval based thereon may be rescinded, and other appropriate action taken[];" and

Whereas, the Kalispell City Council finds that Kalispell Police Department call data establishes that the Warming Center's homeless shelter use has created a negative adverse effect on the surrounding neighborhood that exists during the homeless shelter's operating months of October through April and that the adverse effect decreases during the months of May through September when the homeless shelter is not operating; and

Whereas, the Kalispell City Council finds that statements from the Warming Center that it will not take responsibility for things that occur off of the property and beyond its control contradict information provided by the Warming Center in its application for the Conditional Use Permit and its letters to the City Council and the Planning Board; and

Whereas, the Kalispell City Council finds that public comments from all meetings held by the City Council on the Warming Center's Conditional Use Permit establish that the Warming Center's homeless shelter use has created a negative adverse effect on the surrounding neighborhood; and

Whereas, the City Council finds that statements by the Warming Center regarding its lack of responsibility for effects on areas beyond its property or within 150 feet of its property contradict statements in its application for the Conditional Use Permit and its letters to the Planning Board and the City Council all of which City Council relied upon in granting approval of a zoning text amendment and the Conditional Use Permit; and

Whereas, the Kalispell City Council finds that the Kalispell Chamber of Commerce, the Kalispell Downtown Association, and the Kalispell Business Improvement District recommended that the City Council "[i]ncrease police presence in the service triangle around the Warming Center, Fairgrounds, and Gateway Mall during the busy seasons. In particular, at 6pm and 8am when people are preparing to enter and exit

the Warming Center (Winter/Spring)." This recommendation demonstrates that the Warming Center's homeless shelter use has created a negative adverse effect on the surrounding neighborhood; and

Whereas, the Kalispell City Council finds that information and representations submitted in connection with the Warming Center's application for Conditional Use Permit is incorrect or untrue; and

Whereas, the Kalispell City Council finds that the Warming Center's homeless shelter use has created a negative adverse effect on the surrounding neighborhood; and

Whereas, the Kalispell City Council therefore finds that rescinding the Warming Center's Conditional Use Permit is in the best interests of the City and deems the passage of this resolution as necessary to protect the public health, safety, and welfare.

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF KALISPELL AS FOLLOWS:

Section 1. The Conditional Use Permit granted to the Flathead Warming Center by the Kalispell City Council on November 2, 2020, is hereby rescinded.

Section 2. This Resolution shall be effective on September 16, 2024.

(Doc. 1-46 at 3–4.) Resolution 6227 was signed by the Mayor Johnson on

September 19, 2024. (*Id.* at 4.)

**PROCEDURAL BACKGROUND**

The Warming Center filed this action on October 8, 2024, alleging that the

City of Kalispell violated the Warming Center's federal and state rights to

procedural due process, equal protection, substantive due process, and protection

from bills of attainder. (Doc. 1 at 2.) The Warming Center also alleges, in the

alternative, that the recission of the CUP was a taking under the Fifth Amendment, and that the Warming Center is entitled to just compensation. (*Id.*) Shortly after filing suit, the Warming Center filed a Motion for Temporary Restraining Order. (Doc. 4.) The Court set a hearing on the Motion and asked the Parties to provide notice of expected testimony. (Doc. 16.) After reviewing the pleadings and the expected witness testimony, the Court determined that the status of the case was more consistent with a motion for preliminary injunction. (Doc. 23 at 1.) Accordingly, the Court notified the Parties that absent objection, the previously scheduled hearing would proceed as a preliminary injunction hearing, rather than a temporary restraining order hearing. (*Id.*) The Parties did not object. (Docs. 24, 25.)

At the hearing, the Court heard testimony from the following witnesses: Ms. Horn; Dr. Todd Johnson, Emergency Room Physician at Logan Health; Ms. Ball; Mayor Johnson; and Kalispell Chief of Police Jordan Venezio. (Doc. 29.)

## LEGAL STANDARD

In order to obtain a preliminary injunction, a Plaintiff must establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def Council, Inc.,* 555 U.S. 7, 20 (2008). The Ninth Circuit "has adopted the 'serious questions'

26

test—a 'sliding scale' variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates (1) 'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction is in the public interest.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). "As to the first factor, the serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Id.* (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). Serious questions are questions "that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Id.* at 1192 (internal quotations and citations omitted). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (internal quotations and citations omitted).

**DISCUSSION**

## I.    Serious Questions Going to the Merits

The Warming Center argues that there are serious questions going to the merits of its procedural due process, equal protection, and substantive due process claims. (Doc. 5 at 19–20.) For the reasons below, the Court finds that the Warming

27

Center has established serious questions as to its procedural due process claim such that the Warming Center has a fair chance of success on the merits.

To succeed on procedural and substantive due process claims, a plaintiff "must first demonstrate that he was deprived of a constitutionally protected property interest." *Gerhart v. Lake Cnty. Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2010). Under some circumstances, an individual may "have a constitutionally protected interest in a government benefit, such as a license or permit." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).) Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. 577.

The Warming Center first argues that it has a vested property right in its CUP because under Kalispell Zoning Code, once a CUP is granted, it becomes a real-property interest that "runs with the land." (Doc. 5 at 13.) As evidence of this contention, the Warming Center points to the fact that the Kalispell Zoning Code is void of any procedures for revoking CUPs. (*Id.*)

In response, the City relies on the language of the Kalispell Code which provides that "[t]he granting of the Conditional Use Permit is a matter of grace, resting in the discretion of the City Council and a refusal is not the denial of a right, conditional or otherwise." (Doc. 14 at 17 (citing § 27.33.090).) The City further highlights the language on the CUP application, which provides that

"[s]hould any information or representation submitted in connection with this application be incorrect or untrue, I understand that any approval based thereon may be rescinded, and other appropriate actions taken." (*Id.* at 18.)

The Warming Center has the better argument. The language the City relies on applies specifically to the issuance of a CUP. The City argues that under Montana law, private property owners have no vested property interest in being granted a CUP. (Doc. 14 at 16.) But the issue before the Court is not whether the Warming Center had a vested property interest in being *granted* the CUP. The issue is whether the Warming Center had a vested property interest in the CUP it acquired in 2020 and has relied on since. The City has not pointed to any section of Kalispell Code that provides that the *recission of a CUP* is a "matter of grace."

Neither party cites to, and the Court is unaware of, any case in which a Montana court reviewed the recission or revocation of an already granted CUP. To his credit, at the September 16 City Council hearing, Councilmember Hunter expressed his concerns that City Council did not have the legal authority to revoke a CUP after all the conditions of approval had been met. (Doc. 1-33 at 1:13:37–1:20:04.) The City Manager stated that concerns with the legality of the revocation should be taken up at an executive hearing, not a public meeting. (*Id.* at 1:20:07–1:20:21.) At the preliminary injunction hearing, Mayor Johnson testified that prior to Resolution 6227, the City of Kalispell had never revoked a CUP. (Doc. 31 at

105.) While the lack of legal authority and historical records relating to CUP revocations is not dispositive, it supports the Warming Center's argument that in Montana, CUPs are not meant to be revoked.

Meanwhile, Kalispell Zoning Code provides that "[t]he Conditional Use Permit shall run with the lot, building, structure, or use and shall not be affected by changes in ownership." § 27.33.060(1). This language indicates the existence of a vested property right.

The Court finds that the Warming Center has—at the very least—a fair chance of establishing a vested property interest in the CUP. As such, the Court must now determine whether the City provided sufficient notice and process to the Warming Center prior to rescinding the CUP. A review of the evidence raises serious questions going to the merits of the Warming Center's procedural due process claim.

The Due Process Clause of the Fourteenth Amendment prohibits the government "from depriving a plaintiff of a protected property interest without 'a fair trial in a fair tribunal.'" *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "Precisely what procedures the Due Process Clause requires in any given case is a function of context." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998). Due process "is not a technical conception with a fixed content

unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). To overcome a presumption of honesty and integrity on the part of decision-makers, "a plaintiff must show that an adjudicator has prejudged, or reasonably appears to have prejudged an issue." *Ahir v. City of Anaheim*, 2024 WL 3503063, at *31 (C.D. Cal. June 11, 2024) (quoting *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992)). Important to this case, "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Ching v. Mayorkas*, 725 F.3d 1149, 1156 (9th Cir. 2013).

In assessing an alleged violation of procedural due process, courts look to the nature of the private interest at stake, the risk of erroneous or unjustified deprivation of that entitlement, and the administrative cost of additional process. *Eldridge*, 424 U.S. at 335.

To begin, the Court finds that the nature of the private interest at issue is significant. The Warming Center's purchase of the Property was contingent on the Warming Center securing the CUP. (Docs. 1-2 ¶ 38; 1-7 at 5.) The Warming Center would not have purchased the Property if it did not obtain the CUP. (Doc. 1-2 ¶ 39.) The Warming Center purchased the Property for one reason: to provide

emergency shelter for the homeless during the winter. (*Id.*) At the preliminary

injunction hearing, Ms. Horn testified that the Warming Center has spent close to

$1,000,000 on the purchase of the Property and the renovations required to operate

the shelter. (Doc. 31 at 33–34.) In order to continue the legal operation of the

Warming Center in furtherance of the Warming Center's mission, the Warming

Center needs its CUP.

The Court further finds that the risk of erroneous deprivation of the

Warming Center's CUP is also significant. "[W]here a meaningful review before

an impartial decisionmaker is not necessarily afforded at the post-termination

stage, the burden is on the government to conduct the pretermination hearing in a

manner that affords the grievant all the process that he is due." *Sadid v. Vailas*, 936

F. Supp. 2d 1207, 1229 (D. Idaho 2013). Neither Montana law nor Kalispell Code

provide a procedure for appealing the revocation of a CUP. For that reason, the

burden was on the City to afford the Warming Center sufficient process before

rescinding its CUP.

On numerous occasions, the Warming Center requested information

regarding the City's concerns as well as the recission process. On May 28, 2024,

Flathead Warming Center Board of Directors wrote a letter to Mayor Johnson, the

City Council, and the City Manager requesting that each alleged falsehood in the

CUP application be identified explicitly, but the City never responded. (Doc. 13 at

1:32:58–1:33:21.) The Board of Directors also requested that each complaint relied on by the Council be identified and detailed. (*Id.* at 1:33:37–1:34:00.) The City did not respond to this request, leaving the Warming Center unable to defend itself. Nor did the City inform the Warming Center of the evidentiary standards that would govern the process.

More concerning to this Court is the appearance that the City had prejudged the issue it was supposed to adjudicate—perhaps from the very beginning. The CUP recission arose from allegations that Ms. Horn submitted inaccurate or untrue information about "being a good neighbor" in the Warming Center's CUP application. "Being a good neighbor" strikes the Court as subjective, nebulous, and thus a meaningless basis for rescinding the CUP—and that is assuming, *arguendo*, that a CUP is revokable after all conditions have ben met in the first place. The Court has thoroughly reviewed the CUP application and cannot construe any statement made in the application to indicate that the Warming Center promised to, for example: provide and require scannable identification for patrons similar to identification that is used at ski resorts; provide private security for the City; negotiate with government entities regarding those entities' operating hours; provide private transportation allowing "[a]ll patrons to be bussed away from FWC" and "manage a log of all patrons leaving/coming on the private bus system"; institute 60-day random compliance checks and audits similar to those

used by the Health Department; or provide reports and data on patrons including data that shows the Warming Center is "giving a hand up, not [a] hand out." (*Compare* Doc. 1-8 *with* Doc. 1-41 at 2–3.)

The Warming Center—justifiably—did not agree to these demands, which culminated in the September 16 City Council Meeting where the City Council approved Resolution 6227. Curiously, prior to voting on Resolution 6227, a Councilmember stated that the Warming Center was compliant with the CUP conditions. (Doc. 1-33 at 1:01:30–1:01:40.) Another Councilmember expressed concerns with the legality of rescinding a CUP after all conditions had been met. (*Id.* at 1:13:37– 1:20:04.) Nevertheless, the City Council adopted Resolution 6227.

Finally, the Court finds that the administrative cost of additional procedure is minimal. The City could have explicitly identified the alleged falsehoods in the Warming Center's CUP application. The City could have identified and detailed the complaints they received that supported the alleged falsehoods. The City could have informed the Warming Center of the evidentiary standards of the hearing and whether the Warming Center could cross-examine witnesses. The administrative burden of these additional procedures is outweighed by the risk of erroneous deprivation of what the Court believes to be a significant property interest.

Based on the evidence provided at the preliminary injunction hearing, the Court finds that the Warming Center has a fair chance of establishing that the City

"prejudged, or reasonably appears to have prejudged" the issue before it, thereby precluding the Warming Center from a "fair trial in a fair tribunal."

## II.    Likelihood of Irreparable Harm

The Warming Center argues that absent an injunction, it faces three profound irreparable harms: death or severe injury of the homeless individuals that it serves, destruction of the Warming Center, and violation of its constitutional rights. (Doc. 5 at 20.) In response, the City does not dispute that the homeless will face the risk of death and injuries but argues that harm to third parties is inapplicable to the analysis, and that the Warming Center's argument is circular. (Doc. 14 at 13.)

The Court begins with the destruction of the Warming Center. The Warming Center argues that the recission of the CUP destroyed the Warming Center because it cannot lawfully perform its sole mission. (Doc. 5 at 21.) Interestingly, in its oppositional brief, the City of Kalispell argues that "CUP rescission does not prevent Plaintiff from operating the [Warming Center]. The rescission effectively means Plaintiff simply cannot offer overnight lodging. In fact, the [Warming Center] remained open before and after the rescission offering daytime use such as showers, laundry, light food, and other community resources. . . . Elimination of

overnight lodging does not 'destroy' the [Warming Center]."[5] (Doc. 14 at 13–14.) The Court agrees with the Warming Center.

"Organizations may establish irreparable harm by showing 'ongoing harms to their organizational missions.'" *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). In *East Bay*, nonprofit organizations that assist asylum seekers sought a preliminary injunction of a Department of Justice and Department of Homeland Security Rule which "categorically denie[d] asylum to aliens arriving at our border with Mexico" with limited exceptions. *Id.* at 968. The government challenged the organizations' standing. *Id.* at 974. The Ninth Circuit rejected the government's argument and found that the organizations "established that the Rule harms their mission of representing and assisting asylum seekers and results in a substantial loss of organizational funding." *Id.* at 984. The Court noted that "[t]he Rule force[d] plaintiffs to overhaul their programs . . . , resulting in plaintiffs providing fewer services to fewer individuals." *Id.*

Similarly here, the City of Kalispell's recission of the Warming Center's CUP harms the Warming Center's mission "to save lives and encourage dignity through low barrier access *to a warm safe place to sleep for anyone in need*

---

[5] This statement contradicts the plain language of Resolution 6227 which rescinded the Warming Center's CUP to operate a homeless shelter.

*throughout the coldest months of the year*." (Doc. 1-8 at 4.) (emphasis added). The Warming Center is not able to fulfill its mission if individuals are not legally permitted to sleep at the Warming Center. (Doc. 1-2 at 36.) The City's action has resulted in the Warming Center providing fewer services to fewer individuals. (*Id.*)

In addition, the Warming Center has experienced a drop in donations, further frustrating its ability to carry out its mission. (Docs. 1-2 ¶ 127; 31 at 31.) Absent an injunction, the Warming Center will lose over $185,000 in pending grants and donations. (Doc. 1-2 ¶ 129.) The Warming Center currently employs twelve staff members. (*Id.* ¶ 130.) Absent an injunction, the Warming Center will be forced to lay off some or all of its staff. (Doc. 1-2 ¶ 130.) If the Warming Center eventually wins this lawsuit on the merits, there is no guarantee that the laid off staff members would be available to return to their former positions. (*Id.* ¶ 132.)

Finally, "it is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Having found that the Warming Center has a fair chance of success on the merits as to its procedural due process claim, the Court is satisfied that the Warming Center has also established a likelihood of irreparable harm.

### III.   Balance of Hardships and Public Interest

The City contends that the equities set forth in Resolution 6227 weigh against the issuance of a preliminary injunction. (Doc. 14 at 29–30.) The equities fall into two buckets: (1) Ms. Horn's alleged false representations during the application process about "being a good neighbor" and (2) the Warming Center's alleged negative impacts on the surrounding area. The Court considers these equities in turn.

At the preliminary injunction hearing, Mayor Johnson testified that Ms. Horn did not lie nor mislead the City through the Warming Center's CUP application. (Doc. 31 at 127.) Similarly, Ms. Horn testified that she was truthful in the Warming Center's CUP application. (*Id.* at 57.) Based on this testimony— which the Court finds credible—it would be inconceivable for the Court to find that the City faces a hardship due to alleged false representations made in the Warming Center's CUP application process. Based on the testimony, there were no false representations.

Further, the City seems to have taken the position that by not taking on the role of law enforcement, the Warming Center is "not being a good neighbor." During the course of mediation, community members demanded that the Warming Center hire private security to patrol the neighborhood—which was notably undefined—that would respond to calls in fifteen minutes or less. (Doc. 41 at 2.)

At the hearing, Mayor Johnson was not able to delineate the geographical boundaries of where the City believed the Warming Center's policing responsibilities begin and end. (Doc. 31 at 190–94.) Yet, the City believes that if the Warming Center does not take on the responsibility at its own cost, the Warming Center is "not being a good neighbor," resulting in a hardship to the City. The Court finds this position unreasonable at best.

The Court is likewise unpersuaded that allowing the Warming Center to operate will have adverse effects on the surrounding neighborhood constituting a significant hardship to the City. While the Court is sympathetic to the experiences of community members, it is illogical to assume that decreasing services to the homeless will alleviate the adverse effects the City is experiencing. For example, at the hearing, the City argued that there had been issues in the neighborhood with individuals urinating and defecating in public. (*Id.* at 22–23.) But the Warming Center offers the only public restrooms in Kalispell that are accessible at night. (*Id.* at 30.) Taking away public restrooms will not diminish the homeless community's biological needs. However, removing access to proper restrooms and facilities will force individuals to address their biological needs in public spaces. To put it another way, granting the injunction is more likely to alleviate any hardship to the City than exasperate it.

Meanwhile, as discussed above, the Warming Center faces significant hardship including loss of funding, inability to pursue its mission, and ultimately, the possible destruction of the Warming Center. The Court finds the balance of hardships tips sharply in the Warming Center's favor.

Finally, "[b]ecause public interest concerns are implicated when a constitutional right has been violated, all citizens have a stake in upholding the constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up). In addition, the public has an interest in the prevention of injuries and death of community members. At the hearing, Dr. Johnson testified that—should the Warming Center be unable to open this winter—Logan Health Center will see an increase in volume due to the injuries suffered as a result of exposure to the elements. (Doc. 31 at 82–83.) Potential injuries include frostbite, hypothermia, trench foot, infection, and in the worst-case scenario, death. (*Id.* at 82.) In consideration of the above, the Court has little trouble concluding that a preliminary injunction is in the public interest.

## IV.    The Status Quo

The City argues that the Warming Center seeks a mandatory injunction, which is improper and requires application of a heightened standard of proof. (Doc. 14 at 2.) The City compares the present controversy to *Saeed v. City of*

*Fairfield*, 2023 WL 270153, (E.D. Cal. Jan. 18, 2023), where a business owner

sought to enjoin a local government from enforcing the revocation of a business

license. (Doc. 14 at 11.) There, the court held that the alleged irreparable injury

was not sufficiently imminent to warrant a TRO, because the plaintiff had waited

over three months to appeal the revocation of his business license. *Id.* at *3–4.

*Saeed* is inapposite to the present matter. In contrast with *Saeed*, here, Plaintiffs

filed a complaint less than two weeks after receiving a copy of Resolution 6227.

"The status quo ante litem refers not simply to any situation before the filing

of a lawsuit, but instead to the last uncontested status which preceded the pending

controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir.

2000). This controversy began with Resolution 6227. The last uncontested status is

pre-Resolution 6227.

## CONCLUSION

The Warming Center has established serious questions going to the merits of

its procedural due process claim, thus demonstrating a fair chance of success on

the merits. The Warming Center has also established that it will suffer irreparable

harm absent an injunction. The balance of hardships tips sharply in favor of the

Warming Center, and a preliminary injunction is in the public interest.

Accordingly, IT IS ORDERED that the Motion (Doc. 4) is GRANTED.

Defendant City of Kalispell is preliminarily enjoined from enforcing Resolution

6227 until this case has reached a decision on the merits. The Warming Center's

Conditional Use Permit is reinstated.

DATED this 7th day of November, 2024.

_____

Dana L. Christensen, District Judge
United States District Court